## ORAL ARGUMENT NOT YET SCHEDULED

### Case No. 21-1146

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

### MIDWEST OZONE GROUP,

**Petitioner,**

**v.**

### UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
**Respondents.**

On Petition for Judicial Review of Final Agency Action of
the United States Environmental Protection Agency
**86 Fed. Reg. 23,054 (Apr. 30, 2021)**

### OPENING BRIEF OF PETITIONER

David M. Flannery
Kathy G. Beckett
Edward L. Kropp
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, WV 25326
Tel. (304) 353-8000
Dave.flannery@steptoe-johnson.com
Kathy.beckett@steptoe-johnson.com
Skipp.kropp@steptoe-johnson.com

Counsel for Petitioner
Midwest Ozone Group

Dated: November 3, 2021
[Page-Proof Brief]

i

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The Petitioner submits this Certificate pursuant to Circuit Rule 28(a)(1).

**A.    Parties, Intervenors, and *Amici Curiae*.**

This case involves the following parties:

**Petitioner**:

The Petitioner is the Midwest Ozone Group ("MOG").

**Respondents:**

The Respondents are the United States Environmental Protection Agency ("EPA") and Michael S. Regan, Administrator, United States Environmental Protection Agency.

**Intervenors:**

Intervenors in support of Respondents are Downwinders at Risk, Texas Environmental Justice Advocacy Services, Appalachian Mountain Club, Sierra Club, Environmental Defense Fund, and Clean Wisconsin.

***Amici Curiae*:**

State of New York

**B.        Ruling Under Review**

This case involves a petition to review the final EPA action entitled Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS [National

Ambient Air Quality Standard] published at 86 Fed. Reg. 23,054 (Apr. 30, 2021),

("Rule") Joint Appendix ("JA")___.

**C.**         **Related Cases**

The Petitioner is aware of the remand ordered by the case of *Wisconsin v. EPA,*
938 F.3d 303 (D.C. Cir. 2019) ("*Wisconsin*"), which gave rise to the Rule under review.
Undersigned counsel is not aware of any other related cases presently pending in this
Court or any other court.

## **RULE 26.1 DISCLOSURE STATEMENT**

The Petitioner makes the following statement pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26:

***The Midwest Ozone Group*** ("MOG") is a 'trade association,' within the meaning of Circuit Rule 26.1(b), as it is a continuing association of organizations and individual entities operated to promote the general interests of its membership on matters related to air emissions and air quality. MOG has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public, although specific individuals in the membership of MOG have done so. MOG has no outstanding shares or debt securities in the hands of the public and has no parent company. No publicly held company has a 10% or greater ownership interest in MOG.

iv

## TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.........ii, iii

    A. Parties, Intervenors, and *Amici Curiae*.....................................................ii

    B. Ruling Under Review.........................................................................................ii

    C. Related Cases……………………………………………………………...iii

RULE 26.1 DISCLOSURE STATEMENT ...................................................iv

TABLE OF AUTHORITIES ...................................................viii, ix

GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS..................x, xi

JURISDICTION...................................................................................1

ISSUES .............................................................................................1

STATUTES AND REGULATIONS.......................................................2

STATEMENT OF THE CASE .............................................................2

STANDARD OF REVIEW ................................................................10

SUMMARY OF ARGUMENT...........................................................10

STANDING.......................................................................................16

ARGUMENT

    I.     EPA Acted Unlawfully and Arbitrarily Following this Court's Remand of the Cross-State Air Pollution Rule Update by Taking a Series of Shortcuts to Meet a Deadline of March 15, 2021, Imposed by a New York District Court……………………………16

        A. EPA Failed to Conduct Appropriate Photochemical Computer-

based Modeling……..………....……………………………..…17

B. EPA Failed to Address the "Interfere with Maintenance" Clause
of the CAA. ……………………………………………..........26

C. EPA Failed to Properly Consider the Air-quality Contribution
"Threshold" for Identifying States Subject to the Rule……..….…...27

D. EPA Denied Stakeholders a Meaningful Comment Period
on the Proposed Rule………………………………………...…......28

II.    EPA's Approach to Identifying Downwind Receptors (Step 1)
Was Arbitrary and Inconsistent with the *Wisconsin* Remand………..…...30

A. EPA Failed to Harmonize Good Neighbor Requirements
with Nonattainment and Maintenance Requirements………..….…31

B. EPA Disregarded Existing Emission Reduction Requirements……39

C. EPA Failed to Recognize the Impact of Exceptional Events
on the Regulatory Status of Downwind Nonattainment and
Maintenance Monitors……………………………...…………..…….42

III.    EPA Arbitrarily Relied on Inappropriate Air Quality Monitoring
Data In Making its Determination of Upwind State Significant
Contribution to Downwind State Nonattainment or Maintenance
Monitors (Step 2) …………………………………………….…..45

IV.    EPA Action Imposing Additional Control Requirements on EGUs
(Step 3) was Inconsistent with the *Wisconsin* Remand and Was
Based on Erroneous Data……………………………………………..47

A.    EPA's Action was Inconsistent with the *Wisconsin* Remand
Which Determined that the CSAPR Update Rule had Already
Properly Addressed Controls on EGU Sources………………......…47

B.    EPA Arbitrarily Determined NOx Reductions Purportedly
Available in the Twelve Upwind States Based on Data Related to
Twenty-two States with Very Different Characteristics………..……50

vi

CONCLUSION ................................................................................................ 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>                                                                                          <u>**Page(s)**</u>

*Appalachian Power Co. v. EPA*, 249 F.3d 1032 (D.C. Cir. 2001)........................................ 20

*Chevron USA, Inc. v. NRDC*, 104 S. Ct. 2778 (1984).......................................................... 27

*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012) .......................... 4

*EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015)...................... 4

*EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) .......................... 4,21,36

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................... 16

*National Resources Defense Council v. EPA*, 966 F.2d 1292 (9th Cir. 1992) ..................... 27

*New Jersey v. Wheeler*, 475 F.Supp.3d 308 (S.D.N.Y. 2020) ........................................... 5,23

*New York v. EPA*, 781 Fed. App'x 4 (D.C. Cir. 2019)........................................................ 5,17

*New York v. EPA*, 964 F.3d 1214 (D.C. Cir. 2020) .......................................................... 31

*North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir.), *on reh'g*, 550 F.3d 1176
(D.C. Cir. 2008)............................................................................................................25,36

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002)......................................................... 16

*Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) ............5,17,19,20,28,36,37,47,48,49,50

## <u>Federal Statutes</u>

CAA §107(d)(1)(A), 42 U.S.C. §7407(d)(1)(A)................................................................. 30

CAA §107(d)(1)(A)(i), 42 U.S.C. §7407(d)(1)(A)(i)  ................................................. 12,30

CAA §110(a)(1), 42 U.S.C. §7410(a)(1).......................................................................... 2,3

CAA §110(a)(2), 42 U.S.C. §7410(a)(2).......................................................................... 2,3

CAA §110(a)(2)(D)(i), 42 U.S.C. §7410(a)(2)(D)(i) .....................................12,30,37,38,39

CAA §110(a)(2)(D)(i)(I), 42 U.S.C. §7410(a)(2)(D)(i)(I) ......................................1,3,4,6,26

CAA §110(c)(1), 42 U.S.C. §7410(c)(1)....................................................................1,3,10

CAA §110(a)(2)(D), 42 U.S.C. §7410(a)(2)(D)...........................................................27,28

CAA §172(c)(1), 42 U.S.C. §7502(c)(1) ............................................................................3

CAA §181, 42 U.S.C. §7511 ................................................................................... 37,39

CAA §307(b)(1), 42 U.S.C. §7607(b)(1) ............................................................................1

CAA §307(d)(1)(B), 42 U.S.C. §7607(d)(1)(B) ................................................................ 10

CAA §307(d)(9), 42 U.S.C. §7607(d)(9) ........................................................................ 10

CAA §319, 42 U.S.C. §7619 ....................................................................................42,43

## Federal Register Notices

76 Fed. Reg. 48,208 (Aug. 8, 2011) ................................................................................ 4

81 Fed. Reg. 74,504 (Oct. 26, 2016) .................................5,18,21,22,31,40,48,49,50

84 Fed. Reg. 44,238 (Aug. 23, 2019) ............................................................................ 32

85 Fed. Reg. 68,964 (Oct. 30, 2020)..........................................................................22,40

86 Fed. Reg. 23,054 (Apr. 30, 2021) ................. 1,4,5,6,7,8,9,10,17,18,23,26,27,28,30,31,32

..................................................................................37,41,42,45,46,50,53

86 Fed. Reg. 43,956 (Aug. 11, 2021) ............................................................................ 38

86 Fed. Reg. 60602 (Nov. 3, 2021)................................................................................ 38

## GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

| | |
|---|---|
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CSAPR | Cross-State Air Pollution Rule |
| CSAPR Update | Cross-State Air Pollution Rule Update |
| CSAPR Close-Out | Cross-State Air Pollution Rule Close-Out |
| DV | design value |
| EGUs | electricity-generating units, or electric generating units |
| EPA | United States Environmental Protection Agency |
| FIP | Federal Implementation Plan |
| IPM | Integrated Planning Model |
| JA | Joint Appendix |
| MOG | Midwest Ozone Group |
| NAAQS | national ambient air quality standard(s) |
| NOx (or $NO_x$) | nitrogen oxide |
| ppb | part(s) per billion |
| ppm | part(s) per million |
| SCCT | simple cycle combustion turbines |
| SCR | selective catalytic reduction |
| SIP | state implementation plan |

SNCR                    selective non-catalytic reduction

TSD                     Technical Support Document

## JURISDICTION

This Petition challenges the Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS ("Revised Cross-State Air Pollution Update Rule" or "Rule"), a United States Environmental Protection Agency ("EPA") regulation under the Clean Air Act ("CAA"). Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23,054 (Apr. 30, 2021) (citing CAA §§110(a)(2)(D)(i)(I), 110(c)(1) and 42 U.S.C. §§7410(a)(2)(D)(i)(I), (c)(1)); JA_. The Petition was timely filed under CAA §307(b)(1), 42 U.S.C. §7607(b)(1).

## ISSUES

1.      Whether the EPA acted arbitrarily and/or capriciously, abused its discretion, or otherwise acted contrary to law by failing to conduct a legally and technically appropriate assessment of the Court-ordered remand of the Cross-State Air Pollution Rule Update ("CSAPR Update") to accommodate a deadline of March 15, 2021, imposed by a New York District Court.

2.      Whether the EPA acted arbitrarily and/or capriciously, abused its discretion, or otherwise acted contrary to law in its selection of downwind nonattainment and maintenance monitors upon which the challenged Rule is based, including failure to align downwind regulatory requirements applicable to the nonattainment area related to the subject Connecticut monitors with Good Neighbor deadline of 2021.

1

3.     Whether the EPA acted arbitrarily and/or capriciously, abused its discretion, or otherwise acted contrary to law by failing to base its determination of upwind state linkage to downwind nonattainment and maintenance monitors on inappropriate data

4.     Whether the EPA acted arbitrarily and/or capriciously, abused its discretion, or otherwise acted contrary to law by erroneously imposing additional control requirements on certain EGUs, including disregard for the finding of the DC Circuit in the *Wisconsin* case, which determined that the CSAPR Update had already properly addressed controls on certain EGU sources.

5.     Whether the EPA acted arbitrarily and/or capriciously, abused its discretion, or otherwise acted contrary to law insofar as the challenged Rule reflects improperly stringent statewide emission budgets promulgated as part of the Revised Cross-State Air Pollution Rule Update.

## STATUTES AND REGULATIONS

The Statutory Addendum includes relevant CAA provisions.

## STATEMENT OF THE CASE

The Clean Air Act provides for the implementation, maintenance, and enforcement of national ambient air quality standards ("NAAQS") for areas designated as nonattainment for the relevant NAAQS and in §§110(a)(1) and 110(a)(2) for all states to develop and implement infrastructure state implementation plans ("SIP") to be

submitted to and approved by EPA, regardless of whether the State includes areas designated nonattainment for the relevant NAAQS.  42 U.S.C. §7410(a)(1), (a)(2).

CAA §110 requires states, after a NAAQS revision, to submit recommendations regarding each area's attainment status (either attainment, nonattainment, or unclassifiable) for EPA approval.  Upon a final determination of attainment status by EPA, each State is responsible for developing plans to demonstrate as "expeditiously as practicable"[1] how standards will be achieved, maintained, and enforced. The plans must take into consideration unique air pollution problems in the State and significantly contribute to other "downwind" states.

CAA §110(a)(2)(D)(i)(I) establishes a so-called "good neighbor provision" that requires each State to include in its SIP provisions that prohibit emissions in amounts that will contribute significantly to nonattainment in or interfere with maintenance by another State concerning any NAAQS.  *Id.* (a)(2)(D)(i)(I).

CAA §110(c)(1) requires EPA to promulgate within two years a Federal Implementation Plan ("FIP") to address specific requirements needed if the Administrator: (1) finds that a State has failed to make a required SIP submission; (2) finds a SIP submission to be incomplete; or (3) disapproves a SIP submission to address the specific requirements.  *Id.* (c)(1).  In this matter, the Rule is an action by EPA to

---

[1] 42 U.S.C. §7502(c)(1).

3

establish a FIP to address state good neighbor obligations concerning the 2008 ozone NAAQS.

The Rule's federal implementation plans establish statewide emission "budgets" limiting ozone-season (May-through-September) nitrogen oxide ("NOx") emissions from electricity-generating units ("EGUs") in twelve states that EPA found requires further ozone season NOx emission reductions to address significant contribution to nonattainment or interfere with maintenance of the 2008 ozone NAAQS in other states. Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23,054 (Apr. 30, 2021); JA__. EPA invoked CAA §110(a)(2)(D)(i)(I), which requires each State to prohibit emissions "in amounts which will ... contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any [NAAQS]."

In 2011, EPA promulgated the Cross-State Air Pollution Rule ("CSAPR") under CAA §110(a)(2)(D)(i)(I) to address, among other things, the 1997 ozone NAAQS. Federal Implementation Plans: Interstate Transport of Fine Particulate Matter and Ozone and Correction of SIP Approvals, 76 Fed. Reg. 48,208, 48,213 (Aug. 8, 2011); JA ___. Following litigation in this Court and the Supreme Court, *EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012), *rev'd & remanded*, 134 S. Ct. 1584 (2014), *on remand*, 795 F.3d 118 (D.C. Cir. 2015), CSAPR finalized a FIP for twenty states and established emission limitations which took effect in 2015.

4

In 2016, EPA promulgated the CSAPR Update to address interstate transport for the 75 ppb ozone NAAQS promulgated in 2008. CSAPR Update finalized FIPs for twenty-two states, and emission budgets became effective in 2017. EPA believed at the time that the FIPs promulgated for twenty-one of the twenty-two states only partially addressed good neighbor obligations under the 2008 ozone NAAQS. Cross-State Air Pollution Rule for the 2008 Ozone NAAQS, 81 Fed. Reg. 74,504 (Oct. 26, 2016); JA__.

The CSAPR Update was challenged in this Court in *Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019), which resulted in a remand of the Rule to provide, in part, a complete rather than a partial remedy.

Of additional relevance to this matter is the July 28, 2020, order of the U.S. District Court for the Southern District of New York ("New York District Court Order")[2] which established a deadline of March 15, 2021, for EPA to issue a final rule fully resolving the good neighbor obligations under the 2008 ozone NAAQS for seven upwind states. EPA references this deadline as a key date relevant to its deliberations in this final agency action. 86 Fed. Reg. 23,054, 23,081 (Apr. 30, 2021); JA__.

The Rule subject to this Petition offered the following statement concerning the remand of the CSAPR Update rule,

> In response to the D.C. Circuit's remand of the CSAPR Update in Wisconsin and the court's vacatur of the CSAPR Close-out in New York[3], this rule finds that 12 of the 22

---

[2] *New Jersey v. Wheeler*, 475 F.Supp.3d 308 (S.D.N.Y. 2020).

[3] *New York v. EPA*, 781 Fed. App'x 4 (D.C. Cir. 2019) ("*New York*").

> states listed in Table I.A-1 require further ozone season NOx
> emission reductions to address the good neighbor provision
> as to the 2008 ozone NAAQS.

*Id.* 23,056; JA__.

EPA promulgated new or revised FIPs for those states with new EGU NOx ozone season statewide emission budgets to be implemented with the 2021 ozone season. *Id.* EPA determined that only EGUs need to be subject to the Rule in order to resolve good neighbor obligations. *Id.* 23,057; JA__. The estimated cost of this Rule is $260 - $370 million for an average air quality improvement relative to a base of 0.17 ppb. *Id.* 23,060, 23,108; JA ___, ____.

EPA has been using a four-step process to determine the appropriateness of imposing ozone-season NOx emission budgets on upwind states to satisfy CAA §110(a)(2)(D)(i)(I). *Id.* 23,057; JA ___. These four steps are as follows:

**Step 1**:   Identify downwind [air-quality] receptors expected to have problems attaining or maintaining [NAAQS];

**Step 2**:   Determine which upwind states contribute to these identified problems in amounts sufficient to "link" them to the downwind air quality problems;

**Step 3**:   For states linked to downwind air quality problems, identify upwind emissions that significantly contribute to downwind nonattainment or interfere with downwind maintenance of a [NAAQS]; and

6

**Step 4**:     For states that are found to have emissions that significantly contribute to nonattainment or interfere with maintenance of the NAAQS downwind, implement the necessary emission reductions through enforceable measures.

*Id.*

To apply the first step of the four-step framework to the 2008 ozone NAAQS for the Rule, EPA deviated from its past practice of performing state-of-the-science photochemical air quality modeling for the analytical year of 2021, the attainment year in question, in favor of using a linear interpolation technique to predict air quality concentrations at monitors in 2021. Rather than performing photochemical modeling as it had done in prior regulations, EPA drew a straight line between the results of its photochemical air quality modeling for the 2023 analytical year to ozone air quality monitoring concentrations in 2016 to interpolate 2021 ozone concentrations. *Id.* EPA offered the following explanation of its linear interpolation methodology:

> ("Interpolation" is a numerical method for constructing new data points within the range of a discreet set of known data points, in this case the known data are the 2016 measured-based and the 2023 modeling-based ozone concentrations.) EPA evaluated 2021 projected ozone concentrations at individual monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2008 ozone NAAQS. Such monitoring sites are referred to as nonattainment and/or maintenance receptors. Based on EPA's analysis, the Agency identified four nonattainment

7

> and/or maintenance receptors in 2021 (i.e., three receptors
> in Connecticut and one in Texas).

*Id.* 23,058; JA___.

EPA acknowledged that downwind states had certain emissions reductions programs on-the-books and represents that its assessment of future air quality generally accounts for those by taking a 2014 emission inventory, updating it to reflect 2016, and projecting to create 2023 and 2028 base case inventories.  *Id.* 23,075; JA___.

EPA applied the remaining three steps: (1) quantifying ozone contributions from upwind states at individual monitors and assessing which of those ozone contributions are "significant," (2) determining the NOx emission reduction controls based in part on the cost per ton of NOx reduced to be implemented, and (3) implementing emissions budgets.

Ultimately, EPA determined that optimization of existing selective catalytic reduction (SCR) controls and selective non-catalytic reduction (SNCR) controls should be included in EPA's identified EGU control strategy.  *Id.* 23,058; JA___.  Additionally, EPA determined that new combustion controls should be included in EPA's control strategy; however, those controls cannot be achieved until the start of the 2022 ozone season.  *Id.* EPA found that non-EGU source NOx emissions controls were not required to meet the 2008 ozone NAAQS.  *Id.* 23,059; JA___. EPA represented these steps would ensure a full remedy as required under the *Wisconsin* decision.  *Id.* 23,071; JA___.

8

EPA's approach for aligning implementation of emission budgets with relevant attainment dates for the 2008 ozone NAAQS was to require emission reductions in upwind states to take effect in 2021.  86 Fed. Reg. 23,054 23,075 (Apr. 30, 2021).  However, even though the Agency recognized that downwind state controls were not being implemented by the 2021 attainment date, it failed to account for that fact in the promulgation of this Rule.  EPA-HQ-OAR-2020-0272-0223, 23; JA___.

In addition to addressing the remand of CSAPR Update and related FIPs, the Rule included a final action "error correction" under CAA §110(k)(6) to convert an approval to disapproval.  The Rule stated that the July 17, 2018, approval by EPA of the 2008 ozone NAAQS Good Neighbor plan from Kentucky resolving the Commonwealth's Good Neighbor obligation erroneously relied upon the same analysis which the D.C. Circuit determined to be unlawful in the CSAPR Close-Out.  86 Fed. Reg. 23,054 23,063 & n.49 (Apr. 30, 2021); JA___.  Following *Wisconsin* and *New York* remands, EPA's reassessment of Good Neighbor obligations using the linear interpolation method led EPA to conclude that the Kentucky SIP was deemed insufficient.  The Rule promulgated a FIP for Kentucky consistent with the obligations for the remaining CSAPR Update region states.  *Id.* 23,066; JA___.  EPA concluded that Kentucky has additional emission reduction obligations under the 2008 ozone NAAQS.  *Id.* 23,068; JA___.

## STANDARD OF REVIEW

Because the Rule imposed federal implementation plans under CAA §110(c)(1), *Id.* 23,061; JA__, CAA §307(d)(9) applies,[4] subjecting the Rule to reversal if "arbitrary, capricious, an abuse of discretion, or otherwise" unlawful.  42 U.S.C. §7607(d)(9).

## SUMMARY OF ARGUMENT

The underlying theme of this Rule is one of abbreviated and manipulated Agency decisions designed to accelerate the promulgation of a rule by a March 15, 2021, deadline.  While the New York District Court Order initially created that deadline, that order invited EPA to seek relief if needed.  EPA chose not to seek relief of that deadline, thereby electing to act upon it. The numerous flawed decisions outlined below demonstrate that EPA needed more time to avoid the promulgation of this arbitrary and capricious rule.

Had EPA not taken a mathematical and analytical shortcut to avoid photochemical air modeling, it would have determined EGU ozone NOx emissions in 2021 to be 32% lower than the estimate it made using the "linear interpolation" methodology.  EPA's action to meet a court-crafted deadline instead of following its own technically supported protocols to achieve the CAA's standards resulted in its election to use linear interpolated data rather than a "state-of-the-science" photochemical modeling that used actual emissions data to derive 2021 ozone.  Such

---

[4] CAA §307(d)(1)(B). 42 U.S.C. §7607(d)(1)(B).

modeling would have required additional time, but it would have provided a more accurate picture of ambient air quality for 2021. Instead, EPA drew a straight line between its 2016 monitoring data and 2023 modeling data to "interpolate" 2021 ambient ozone concentrations. EPA used this short-hand data to determine mandatory state obligations to manage contribution from upwind states to downwind monitors. EPA must not be afforded deference on its modeling choices in this Rule because "the assumptions and the methodology used" are inconsistent with prior modeling upheld by this Court, are not justified, and are therefore arbitrary and capricious.

Lending to a list of anomalies in this Rule, EPA also ignored its established flexible approach in identifying maintenance monitors. Had EPA implemented its flexibility policy, all maintenance monitors would have been eliminated, relieving upwind states from unnecessary control obligations.

Adding to a series of awkward administrative steps, EPA rejected requests to reconsider the method used to determine the significance threshold for good neighbor impact. When MOG asked for an extended comment period to review the data files provided late in the comment period and to attain additional files, EPA again pointed to the New York District Court's March 15, 2021, deadline as justification for rejecting the request. After denying a comment period extension to allow technical analysis, EPA then rejected the Petitioner's comments asserting they did not provide sufficient detail regarding the air quality impacts of implementing state emissions programs. Without

hiding behind the artifice of a court-derived deadline, additional analyses of those programs along with supplementation of publicly available information would have assisted the public in access to notice and a meaningful opportunity to comment. Following the CAA as prescribed by the D. C. Circuit rather than the deadline of the New York District Court Order would have avoided this arbitrary and capricious rulemaking.

It is essential that EPA manage NAAQS nonattainment responsibilities created under the CAA.  In doing so, this Court has required EPA to harmonize the upwind states' Good Neighbor responsibilities[5]  with the downwind states' nonattainment obligations[6]  by incorporating realistic facts that inform the order of actions to achieve attainment.  Illustrative of EPA's arbitrary and capricious actions relative to the balance of laws for upwind and downwind emissions sources is the fact that the Agency's modeling did not include legal emission reduction requirements in effect for downwind sources and failed to consider the impact of exceptional events on the impacted monitors.

In the *Wisconsin* and *New York* decisions, this Court directed EPA on remand to align the obligations of upwind states pursuant to the Good Neighbor Provisions to the obligations of downwind states to achieve the statutory attainment date of 2021 for

---

[5] CAA §110(a)(2)(D)(i).

[6] CAA §107(d)(1)(A)(i).

Serious nonattainment areas for the 2008 ozone NAAQS.  The Agency ignored that responsibility when it allowed New York to phase in its emissions control programs in 2023 and 2025, long after the 2021 attainment date.  The New York controls for certain simple cycle combustion turbines were identified by New York and Connecticut as the sources causing the Connecticut monitors' nonattainment and maintenance status.  These are the same monitors that are the Rule's sole basis for the need to regulate sources in eleven of the upwind states.  By New York's own estimate, the local simple cycle combustion turbine controls would have produced a 4.8 ppb air quality improvement– much more than the 2.9 ppb improvement needed to achieve attainment at the three Connecticut monitors.  Particularly egregious is that EPA accepted New York's representation that its delay in implementation was a decision unrelated to the Serious nonattainment compliance date.  Connecticut objected to the New York decision in comments to New York, noting its significant adverse impact on Connecticut's attainment status.

EPA may not simply choose to assess control strategies for upwind states and ignore downwind state obligations to manage ambient air quality attainment as it did in this Rule.  Inaction by a downwind state is not a basis for EPA's promulgation of a rule directed at upwind states.  Nor may EPA simply ignore the impacts of state emissions control programs that are "on-the-books."  Historically, EPA has modeled the future year air quality by including inputs for state emissions reduction programs.  EPA's

statement that it "generally" assessed on-the-books programs promulgated in 2019 is neither transparent nor complete for a rule finalized in 2021.

EPA's dismissive management of exceptional events is yet another example of the agency's CAA failures. CAA §319 provides for screening and exclusion of monitoring data and analyses for exceptional events that would improperly influence the representative nature of monitored days.  Connecticut identified monitored days influenced by wildfires in 2016 and 2017 for only one monitor, Westport but left open the option of extending their request to other monitors.  EPA concurred with the removal of data as requested.  Petitioner filed comments to this Rule requesting EPA consider the Connecticut demonstration that noted forest fire impact on the projected design values and urged recalculation.  EPA's response agreed that the reductions from eliminating the exceptional event (forest fire) data would have lowered the Connecticut design values for nonattainment by changing one monitor to attainment (New Haven) and another (Stratford) to maintenance.  EPA made no effort to assess exceptional events in this Rule despite knowing that consideration of exceptional events and other errors in the Rule would have lawfully changed the required emissions reduction strategy and avoided unnecessary costs to the upwind states.

In another departure from reason, EPA selected some monitored dates that measured attainment for the 2008 ozone NAAQS to identify significant contribution and linkage among the upwind and downwind states.  Only three of the ten selected

days were predicted to be at or above the 76 ppb nonattainment level. Stated differently, EPA's assessment of upwind state linkage to downwind monitors was based on ten EPA-selected days, seven of which were days in which the monitors actually attained the 2008 ozone NAAQS.

EPA's Rule ignored the Court's *Wisconsin* ruling, which confirmed that the CSAPR Update Rule properly determined the requirements for EGUs equipped with SCR and combustion controls. EPA failed to understand that the remand directed the Agency to impose controls on sources that had not already been properly addressed in the CSAPR Update Rule. EPA instead promulgated the Revised CSAPR Update Rule that imposed an additional set of EGU controls on the very same EGU units (equipped with SCR and combustion controls) the *Wisconsin* ruling determined had been properly regulated. To demonstrate that EGU emissions were significant contributors to nonattainment, EPA used an existing 22-state emissions database for EGUs to calculate allowable emissions for a 12-state region. In taking that action, EPA arbitrarily ignored the Cichanowicz Report[7] filed by the Petitioner, which demonstrated that the EPA methodology failed to recognize the unique qualities of the EGUs within the 12 states targeted by the Rule. Petitioner's comments also demonstrated that the incremental cost of controls estimated by EPA using such a calculation, $1,600 per ton of NOx

---

[7] J. Edward Cichanowicz *et al.*, Technical Comments on the Environmental Protection Agency (EPA) Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS (December 13, 2020); JA__.

15

removed, was inappropriately low and that the correct incremental cost of controls on the units in the 12 targeted states was actually $2,816 as set forth in the Cichanowicz Report. Cichanowicz 1.   This palate of broad calculations, assumptions, and modifications serves as another illustration of EPA's rush to promulgate a rule by a random deadline for which it could have requested a justifiable extension.  The CAA requires EPA to develop adequate justifications for its actions.

In conclusion, the Rule is not correctly developed under the CAA and must be vacated in its entirety.

## STANDING

Petitioner is an association whose members include owners of EGUs that are directly regulated by the Rule and thus has standing because its members suffer concrete, particularized injury-in-fact caused by the Rule and remediable by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (standing in such cases "is self-evident").

## ARGUMENT

I.     **EPA Acted Unlawfully and Arbitrarily Following this Court's Remand of the Cross-State Air Pollution Rule Update by Taking a Series of Shortcuts to Meet a Deadline of March 15, 2021, Imposed by a New York District Court.**

EPA erroneously placed the New York District Court Order deadline ahead of its legal obligation to respond to the *Wisconsin* remand and to develop a rational rule based on the CAA.  The Agency presented a Rule that fails on many objective levels by

16

grasping at dated and incomplete data sets representing emissions, controls, regulatory programs, and modeling outputs. Photochemical computer-based modeling is a relevant rulemaking tool that is complicated, time-consuming and has limitations. EPA's abbreviated analysis of nonattainment and maintenance data, as well as its failure to thoroughly assess the appropriate level for significance, illustrate the erroneous and unlawful result of this Rule.

## A. EPA Failed to Conduct Appropriate Photochemical Computer-based Modeling.

The central issues addressed by EPA in this Rule are those actions taken to respond to this Court's remand in *Wisconsin. Wisconsin,* 938 F.3d at 318-320; 86 Fed. Reg. 23,054, 23,055 (Apr. 30, 2021); JA__. While the *Wisconsin* Court upheld EPA's (photochemical air quality) modeling in support of the CSAPR Update, the Court remanded that Rule directing EPA to analyze the year 2021 rather than 2023. *Id.*; *New York* 781 Fed. App'x at 7.

In the preamble to the final CSAPR Update Rule, EPA described the air quality modeling used to support that rule (and which was ultimately upheld by the *Wisconsin* Court) as follows:

> In order to apply the first and second steps of the CSAPR 4-step framework to interstate transport for the 2008 ozone NAAQS, the EPA used air quality modeling to project ozone concentrations at air quality monitoring sites to 2017. The EPA updated this modeling for the final rule, using the most current complete dataset available, taking into account comments submitted on the August 2015 Air Quality

17

> Modeling NODA and on the CSAPR Update rule proposal. For the final rule, the EPA evaluated modeling projections for air quality monitoring sites and considered current ozone monitoring data at these sites to identify receptors that are anticipated to have problems attaining or maintaining the 2008 ozone NAAQS. The EPA then uses air quality modeling to assess contributions from upwind states to these downwind receptors and evaluates these contributions relative to a screening threshold of 1 percent of the NAAQS. States with contributions that equal or exceed 1 percent of the NAAQS are identified as warranting further analysis for significant contribution to nonattainment or interference with maintenance. States with contributions below 1 percent of the NAAQS are considered to not significantly contribute to nonattainment or interfere with maintenance of the NAAQS in downwind states.

81 Fed. Reg. 74,504, 74,507 (Oct. 26, 2016); JA__.

Even though EPA concedes in connection with the Revised CSAPR Update that the formation of ozone from precursor emissions can be highly <u>nonlinear,</u> 86 Fed. Reg. 23,054, 23,084 (Apr. 30, 2021); JA__, the Agency arbitrarily elected to apply a <u>linear</u> interpolation methodology that drew a straight line between its 2016 monitoring data and its 2023 modeling data to assess 2021 ozone concentrations in an attempt to calculate the contribution of upwind states to downwind monitors. EPA's linear approach was executed even though the Courts have gone to great lengths to uphold EPA non-linear modeling in connection with prior Good Neighbor Provision rules.

The *Wisconsin* Court offered the following explanation of the modeling used by EPA to develop the CSAPR Update that confirmed modeling to be an appropriate

methodology to identify states expected to have problems attaining or maintaining air

quality in compliance with the 2008 ozone NAAQS:

> To identify those State

> s, EPA had to estimate the future air quality in each State. *Id.* at 74,516-17. EPA devised a measure to turn 2011 ozone measurements into 2017 projections.

> EPA started with 2011 modeled data from "receptors," devices in each State that measure air quality. EPA modeled ozone concentrations in a three-by-three grid around each receptor. EPA chose the ten days with the highest projected ozone concentration, noted which of the nine 12-km² grid cells had the highest ozone concentration on that day, and averaged the ten observations. *See id.* at 74,526-27. EPA then ran the model for 2017, inputting 2011 environmental conditions (like rainfall and fire emissions) but projected 2017 NOx emissions rates. The percentage change from 2011 to 2017 was deemed a receptor's "relative response factor," which measures the sensitivity of an area to ozone formation. Multiplying a 2011 observation by the relevant response factor yielded a projection for 2017 for the receptor.

> ….

> At the second step, EPA identified those upwind States whose pollution was linked to nonattainment or nonmaintenance at downwind receptors. EPA quantified the impact of each State's pollution on downwind receptors using a model that apportioned responsibility for ozone formation at a given receptor to various categories of emitters. *See id.* at 74,536. EPA then multiplied a given State's contribution factor by the projected average ozone concentration at each receptor (calculated in Step 1) to yield each State's contribution to ozone formation at each downwind receptor.

*Wisconsin* 938 F.3d at 310, 311.

While the *Wisconsin* Court deferred to EPA's modeling choice as described above (*Wisconsin* 938 F.3d at 324), the Court made it clear that EPA's power to use predictive models is limited by the Agency's ability to explain "the assumptions and methodology used in preparing the model." *Appalachian Power v. EPA*, 249 F.3d 1032, 1054-55 (D.C. Cir. 2001). The Court in *Appalachian Power* stated:

> In this case, the EPA has not fully explained the bases upon which it chose to use one set of growth-rate projections for costs and another for budgets, nor has it addressed what appear to be stark disparities between its projections and real world observations. 'With its delicate balance of thorough record scrutiny and deference to agency expertise, judicial review can occur only when agencies explain their decisions with precision, for `it will not do for a court to be compelled to guess at the theory underlying the agency's action . . .' As a result, we have no choice but to remand the EPA's EGU growth factor determinations so that the agency may fulfill its obligation to engage in *reasoned* decisionmaking on how to set EGU growth factors and explain why results that appear arbitrary on their face are, in fact, reasonable determinations.

*Id* (citations omitted).

The Supreme Court previously recognized the complexity of this analysis when it stated,

> For several reasons, curtailing interstate air pollution poses a complex challenge for environmental regulators. First, identifying the upwind origin of downwind air pollution is no easy endeavor. Most upwind States propel pollutants to more than one downwind State, many downwind States receive pollution from multiple upwind States, and some States qualify as both upwind and downwind. . .. The overlapping and interwoven linkages between upwind and

downwind States with which EPA had to contend number in the thousands.

Further complicating the problem, pollutants do not emerge from the smokestacks of an upwind State and uniformly migrate downwind. Some pollutants stay within upwind States' borders, the wind carries others to downwind States, and some subset of that group drifts to States without air quality problems. "The wind bloweth where it listeth, and thou hearest the sound thereof, but canst not tell whence it cometh, and whither it goeth." The Holy Bible, John 3:8 (King James Version). In crafting a solution to the problem of interstate air pollution, regulators must account for the vagaries of the wind.

Finally, upwind pollutants that find their way downwind are not left unaltered by the journey. Rather, as the gases emitted by upwind polluters are carried downwind, they are transformed, through various chemical processes, into altogether different pollutants. The offending gases at issue in these cases — nitrogen oxide (NOx) and sulfur dioxide ($SO_2$) — often develop into ozone and fine particulate matter ($PM_{2.5}$) by the time they reach the atmospheres of downwind States. . . . Downwind air quality must therefore be measured for ozone and $PM_{2.5}$ concentrations. EPA's chore is to quantify the amount of upwind gases (NOx and $SO_2$) that must be reduced to enable downwind States to keep their levels of ozone and $PM_{2.5}$ in check. (Citations omitted).

*EME Homer City*, 134 S. Ct. at 1594.

In its promulgation of the CSAPR Update that was the subject of the remand, EPA noted that prior court rulings are deferential to modeling choices. 81 Fed. Reg. 74,504, 74,527 (Oct. 26, 2016); JA__. However, EPA has elected to utilize an analytical tool to support the Revised CSAPR Update Rule that is fundamentally different from

the one the Court assessed in connection with the CSAPR Update Rule. EPA

description of the process it has used in previous rules of this type is as follows:

> First, the components of the modeling system used for this
> final rule, (*i.e.,* the photochemical grid model, the
> meteorological model, emissions models, and input data) are
> based on <u>state-of-the-science</u> methods and data that are
> designed to represent the physical and chemical processes
> associated with the formation, transport, and fate of ozone
> and precursor pollutants. Emphasis added.

*Id.* 74,534.

Yet, in the promulgation of the Revised CSAPR Update Rule that is the subject

of this case, EPA abandoned its historical "state-of-the-science" approach of using

photochemical modeling to assess the analytic year of 2021. Instead, EPA conducted

no 2021 photochemical grid modeling whatsoever. As a result, EPA explained in its

proposed Rule that its modeling platform did not include emissions data for 2021.

Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 85 Fed.

Reg. 68,964, 68,985 (Oct. 30, 2020); JA__. In the absence of photochemical modeling

to determine 2021 ozone design values, EPA inappropriately relied upon an

interpolation or split-the-difference technique using modeling it had previously

performed for 2023 and measured ozone data for 2016. *Id.* EPA asserted in response

to comments on the Proposed Rule that it had no legal obligation to model 2021

directly, and it chose to use existing modeling data rather than conduct new modeling

of the applicable analytical year to meet the court-ordered March 15, 2021, deadline. 86

Fed. Reg. 23,054, 23,081 (Apr. 30, 2021); Resp't Resp. to Proposed Rule Comments 90;

JA___.  In other words, EPA has used the New York District Court Order as an excuse

to ignore this aspect of the Court's *Wisconsin* remand.

Even though the New York District Court Order provided EPA with the

opportunity to seek scheduling relief from the March 15, 2021, deadline, EPA chose

not to do so.  Instead, EPA inappropriately elected to abandon its historical science-

based approach of directly assessing the applicable analytical year.  EPA did this without

advising the District Court (or the D.C. Circuit) of the implications of an accelerated

decision and abbreviated rulemaking and chose not to request additional time to

conduct photochemical modeling of 2021.

Specifically, the New York District Court Order offered the following statement:

> Finally, it is important to note that the Court's order does
> not preclude the EPA from raising certain arguments in the
> future. In this litigation, the EPA has primarily relied on the
> argument of impossibility, which the Wisconsin court
> expressly permitted the EPA to make subsequently. The
> EPA has not carried its "heavy" burden at this point to
> demonstrate that it would be impossible to promulgate the
> final notice of a complete-remedy rulemaking by March 15,
> 2021. The EPA may attempt to invoke the doctrine of
> impossibility again in the future in this Court as
> circumstances may warrant. Moreover, the EPA still has
> flexibility on the substance of its rulemaking as the D.C.
> Circuit Court of Appeals noted in Wisconsin, for example to
> determine what upwind contributions count as "significant"
> within the meaning of the Good Neighbor Provision of the
> Act.

*Wheeler*, 475 F.Supp.3d at 333.

In comments on the proposed Rule, Petitioner objected to EPA's decision to take this shortcut. Petitioner called EPA's attention to the fact that EPA's IPM emission inventory data showed its linear interpolation methodology significantly overstated the amount of EGU NOx emissions in 2021. Petitioner's comments noted that the rulemaking record already contained 2021 data results from the same IPM model used to determine the emissions it modeled in 2023, and this data established the error of EPA's linear interpolation methodology. Pet'r Comments to Proposed Rule 21-24; JA__-__. The following chart from Petitioner's comments compared EGU ozone season NOx emissions as determined by the EPA's linear interpolated method and EPA's IPM model for the twelve upwind states subject to this Rule. *Id.*

| | Ozone Season EGU NOx Tons (Thousands) | | | |
|---|---|---|---|---|
| State | 2016 | 2021 (Interpolated) | 2021 IPM | 2023 IPM |
| Illinois | 14.57 | 11.69 | 9.47 | 10.54 |
| Indiana | 35.42 | 22.85 | 17.28 | 17.83 |
| Kentucky | 25.26 | 13.17 | 6.09 | 8.34 |
| Louisiana | 23.47 | 13.71 | 8.04 | 9.80 |
| Maryland | 5.36 | 3.55 | 2.38 | 2.83 |
| Michigan | 16.7 | 14.7 | 14.1 | 14.0 |
| New Jersey | 2.77 | 2.60 | 2.14 | 2.54 |
| New York | 7.41 | 7.33 | 7.27 | 7.29 |
| Ohio | 24.86 | 20.17 | 17.45 | 18.30 |
| Pennsylvania | 35.04 | 19.72 | 13.13 | 13.59 |
| Virginia | 12.35 | 6.61 | 3.91 | 4.31 |
| West Virginia | 21.60 | 19.12 | 19.87 | 18.13 |
| | | | | |
| **Total** | **224.8** | **146.2** | **110.7** | **114.8** |

**Table 9**. Comparison of IPM and Linear data.

24

This chart plainly illustrated that the IPM method predicts EGU ozone season NOx emissions in 2021 to be 110.7 tons (thousands) as compared with 146.2 tons (thousand) determined by assuming those emissions were linear between 2016 and 2023. The comparison dramatically illustrated that the linear interpolation methodology used to support this Rule over-predicts EGU ozone season NOx emissions in 2021 by 32% (35.5 tons (thousand)) compared with its traditional method of determining EGU emissions. This by itself establishes that EPA's shortcut methodology is not valid and that EPA should have taken the necessary step of actually completing a valid modeling exercise, confirming inputs and assumptions.

At no point in the Final Rule or the Response to Comments did EPA address the concern raised by Petitioner's that EPA's linear interpolation methodology resulted in a significantly higher estimate of 2021 ozone design values than was appropriate. EPA's use of the linear interpolation methodology is an arbitrary action on its face. The EPA's failure to address the concern raised by such a method makes its action more arbitrary.[8]

---

[8] An action is "arbitrary and capricious" if it has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *North Carolina v. EPA*, 531 F.3d 896, 906 (D.C. Cir. 2008).

## B.    EPA Failed to Address the "Interfere with Maintenance" Clause of the CAA.

The preamble to the Rule stated that EPA did not reopen the definition of nonattainment and maintenance receptors. 86 Fed. Reg. 23,054, 23,069 (Apr. 30, 2021); JA__. EPA offered the following statement explaining its decision not to allow comment on the determination of maintenance monitors:

> In conducting its analysis for this rulemaking on an expedited timeframe <u>in order to meet a court-ordered deadline</u> and to achieve reductions by the 2021 attainment date, and to provide consistency with the CSAPR Update, EPA applied many of the same methods and policy determinations employed in the CSAPR Update without reopening them. This includes EPA's approach to identifying nonattainment and maintenance receptors based on a combination of modeling and monitoring. Emphasis added.

Resp't Resp. to Proposed Rule Comments 289, 290; JA__, ___.

Citing EPA's own October 10, 2018, guidance related to flexibilities available to address maintenance monitors, [9] Petitioner commented that the approach for identifying maintenance monitors as outlined in that guidance should have applied to the development of the Rule. Petitioner's comments demonstrated had EPA implemented its guidance, all maintenance monitors that are part of the basis for this

---

[9] Peter Tsirigotis, Director, OAQPS, USEPA, Considerations for Identifying Maintenance Receptors for Use in CAA §110(a)(2)(D)(i)(I) Interstate Transport Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards, (October 19, 2018) ("Maintenance Guidance"); JA__.

Rule would be projected to be in attainment and would not trigger the need for a good neighbor remedy.

Even though EPA's maintenance monitor guidance provides there must be a showing that ozone design values are "trending downward at the site <u>since 2011</u>" (Maintenance Guidance 4, *emphasis added*), EPA responded by stating that for the maintenance monitors involved with this Rule, "design values have been increasing or staying relatively flat over the last 5 years." Resp't Resp. to Proposed Rule Comments 218-219; JA__-___. EPA's disregard for 2011 as the starting point for this analysis in favor of selecting "the most recent 5 years" is an arbitrary action. EPA's departure from its guidance and that of the CAA raises the *Chevron* question about whether the agency can articulate a rational connection between the facts found and the choice made. *National Resources Defense Council v. U.S. Environmental Protection Agency*, 966 F.2d 1292, 97 (9th Cir. 1992) referencing *Chevron USA, Inc. v. NRDC*, 467 U.S. 837, 104 S. Ct. 2778, 81 L.Ed.2d 649 (1984). Pet'r Comments to Proposed Rule 47; JA__.

## C.    EPA Failed to Properly Consider the Air-quality Contribution "Threshold" for Identifying States Subject to the Rule.

EPA declared it would not consider a higher significance level,[10] although such action would have been consistent with the CAA and case law. The CAA does not offer specifications regarding significance relative to interstate transport. 42 U.S.C

---

[10] 86 Fed. Reg. 23,054, 23,085 (Apr. 30, 2021); JA__.

§7410 (a)(2)(D).  The *Wisconsin* court reminded EPA that "the [A]gency retains some flexibility in administering the Good Neighbor Provision." *Wisconsin* 938 F.3d at 320. The Court offered that it acknowledges the "'realities of interstate air pollution … are not so simple', and EPA faces its share of 'thorny… problems' in regulating it." *Id.* The Court provided that EPA "possesses a measure of latitude in defining which upwind contribution 'amounts' count as 'significant' …." *Id.*

Even though EPA advised the New York District Court that it was evaluating whether an alternative significant contribution level was appropriate for the 2008 ozone NAAQS,[11] it determined in connection with this Rule to stay with the approach taken in the CSAPR Update, ignoring the comments filed by the Petitioner and others.  86 Fed. Reg. 23,054, 23,085 (April 30, 2021).  EPA's action in response to these comments was arbitrary and capricious.

### D.     EPA Denied Stakeholders a Meaningful Comment Period on the Proposed Rule.

Petitioner filed with EPA a request for an extension of the 45-day comment period that EPA established for the Rule. EPA-HQ-OAR-2020-0272-0071; JA ___. The request noted the 45-day comment period EPA established for the proposed Rule was insufficient to allow stakeholders to assess the complex information supporting the

---

[11] In her declaration, Anne Isdal stated that EPA was evaluating whether it was appropriate to use 1 ppb for the 2008 ozone NAAQS as it had already proposed to do for the 2015 ozone NAAQS. Anne Idsal Declaration 53, n15; JA__..

proposal to develop comments.  Petitioner also raised a concern that after repeated requests in June and August 2020, it was not until November 13, 2020, and after fully one-third of the comment period had lapsed that Petitioner's received from EPA the detailed data needed to assess the proposed Rule. *Id.*

On December 4, 2020, Anne L. Austin, Principal Deputy Administrator, USEPA, replied to the request "EPA is subject to a court-ordered deadline of March 15, 2021, to sign a final rulemaking addressing outstanding 2008 ozone NAAQS good neighbor obligations for several upwind states included in the Revised CSAPR Update. Granting your request for an extension of the comment period would make the rulemaking schedule EPA is under impossible for EPA to meet."  EPA-HQ-OAR-2020-0272-0078; JA____.  Austin asserted that "EPA included air quality modeling input and output data files on data drives in the docket, which became publicly available as of the date of the proposed rule published in the Federal Register on October 30, 2020."  Austin offered no acknowledgment of the transmission of previously undisclosed data to Petitioner on November 13, 2020.

In conclusion, EPA's assertion that Petitioner failed to provide an extensive assessment of the emissions reduction programs listed for those states experiencing nonattainment represents the capricious nature of the Agency actions in this Rule.  EPA shortened the notice and comment opportunities and shortened its own technical, analytical processes.  The record reflects that EPA failed to adequately address the court

remand or the CAA. Petitioner has not failed its obligation to provide substantive comment.

## II. EPA's Approach to Identifying Downwind Receptors (Step 1) Was Arbitrary and Inconsistent with the *Wisconsin* Remand.

EPA's analysis of downwind nonattainment and maintenance monitors was flawed: (1) EPA failed to harmonize the upwind Good Neighbor Provisions properly, CAA §110(a)(2)(D)(i), 42 U.S.C. §7410(a)(2)(D)(i), with the downwind nonattainment requirements, CAA §107(d)(1)(A)(i), 42 U.S.C. §7407(d)(1)(A)(i);[12] (2) EPA's modeling did not include legally enforceable emission reduction requirements applicable to sources in downwind states; and (3) EPA failed to account for the impact of exceptional events on the ozone design values of the air quality monitors.

Of the twelve upwind states that are the subject of this Rule, eleven states[13] have been improperly included in the Rule solely based on a flawed conclusion that those eleven states are significant contributors to only three Connecticut downwind air quality

---

[12] EPA failed to address the CAA process of first designating "nonattainment" areas, 42 U.S.C. §7407(d)(1)(A), which triggers downwind states' implementation plan obligations in this rule.

[13] Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, New York, Ohio, Pennsylvania, Virginia and West Virginia. The only upwind state linked to the Texas maintenance monitor cited as part of the basis for the Rule is Louisiana. 86 Fed. Reg. 23,054, 23,086 (Apr. 30, 2021); JA __. U.S. Envtl. Prot. Agency, Off. of Air Quality Plan and Standards, Air Quality Modeling Technical Support Document for the Final Revised Cross-State Air Pollution Rule Update, App. C (2020) ("Air Quality Modeling TSD"); JA__.

monitors.[14]  86 Fed. Reg. 23,054 23,086 (Apr. 30, 2021); JA___.  EPA identified two of those monitors as nonattainment (Stratford and Westport in Fairfield County) and one as maintenance (Madison in New Haven County).  *Id.*; Air Quality Modeling TSD 13; JA___.  Significantly, the highest average or maximum design value predicted by EPA for any of these three monitors in 2021 was 78.8 ppb – only 2.9 ppb over the 2008 ozone NAAQS[15].  *Id.* 13; JA ___.

### A.    EPA Failed to Harmonize Good Neighbor Requirements with Nonattainment and Maintenance Requirements.

EPA's analysis of the three Connecticut monitors upon which this Rule is based with respect to eleven of the subject upwind states failed to recognize that these monitors would have been in attainment with the 2008 ozone NAAQS, had certain emission sources within the New York portion of the Connecticut nonattainment area been required to achieve mandated emission reduction requirements by the 2021 ozone season nonattainment deadline.[16]  This oversight inappropriately triggers enhanced

---

[14] In comparison, the CSAPR Update promulgated in 2016 determined that 22 upwind states were linked to six nonattainment monitors in three states and 13 maintenance monitors in eight states. 81 Fed. Reg.74,504, 74,533 (Oct. 26, 2016); JA__.

[15] Projected design values that are 76 ppb or greater are considered by EPA to be violating the 2008 ozone NAAQS. Air Quality Modeling TSD 12; JA__.

[16] As stated in *New York* 964 F.3d 1214, 1219 (D.C. Cir. 2020), "The New York-Northern New Jersey-Long Island, New York-New Jersey-Connecticut Area ("New York Metropolitan Area" or "Area") is a multistate air quality control region. It is currently in "serious" nonattainment of the 2008 ozone NAAQS, having twice failed to meet previously applicable statutory deadlines for attainment. *See* Determination of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Several Areas Classified as Moderate for the 2008 Ozone National

control strategies for eleven of the twelve states.  At issue is the obligation for EPA to actively manage upwind and downwind states' CAA deadlines and obligations.

EPA failed to align states' deadlines and control strategies.  Although EPA conceded that it is obligated to revise the CSAPR Update on remand, in compliance with *Wisconsin* and *New York*, it failed to do so.  EPA was required to conduct its analysis and implementation of emission reductions for the FIP in alignment with the July 20, 2021, Serious area attainment date for the 2008 ozone NAAQS, 86 Fed. Reg. 23,054, 23,056 (Apr. 30, 2021); JA__[17].  It is apparent EPA was aware of the potential for emissions reductions but failed to act upon that information.  EPA acknowledged the existence of legally mandated local downwind nonattainment area control requirements related to the 2008 ozone NAAQS but took no regulatory action with regard to timely implementation of the New York SCCT control measures that would be "phased-in" during the 2023-2025 period, *Id.* 23,097; JA__, even though the nonattainment deadline is 2021.

_____

Ambient Air Quality Standards, 84 Fed. Reg. 44,238, 44,244 (Aug. 23, 2019) (reclassifying seven areas, including the New York Metropolitan Area, to serious nonattainment); *see also id.* 44,243 tbl.2. The reclassification to serious nonattainment triggered a July 2021 attainment deadline. *Id.* 44,244." JA ___-___.

[17] See also EPA's characterization of this duty as set forth in the Declaration of Anne Idsal 19, JA__: "The court also held that EPA should have better aligned the implementation of CAIR with the attainment dates in the Act and could not rely on claims of "infeasibility," since good neighbor obligations must be implemented 'consistent with' the other provisions of title I of the Act."

As the Petitioner noted in its comments on the proposed Rule, Pet'r Comments to Proposed Rule 83-84; JA__-__, the Regulatory Impact Statement in support of the New York SCCT rule not only links the ozone benefit of these emission reductions to the Westport and Stratford Connecticut air quality monitors that are specifically the basis of this Rule, it also makes clear that reducing these SCCT emissions is the critical measure needed to achieve attainment with the 2008 NAAQS.  *Id.*   It was also critical that EPA evaluate the impact of these required New York measures and conduct appropriate modeling to determine whether the Rule is even necessary for the eleven other states.  The New York Regulatory Impact Statement establishes the basis for this conclusion:

> *New York significantly contributes* to nonattainment monitors in the Connecticut portion of this nonattainment area. Currently, *attainment must be reached by June 20, 2021,* for the 2008 ozone NAAQS and August 3, 2024, for the 2015 ozone NAAQS….
>
> This rulemaking proposes to lower allowable emission rates for SCCTs during the ozone season with the intention to lower NOx emissions from these sources, especially on high ozone days. To better understand the impact of SCCTs on the ambient air quality, DEC used the Community Multiscale Air Quality Modeling (CMAQ) system to model one high ozone day. The high ozone day modeled was July 23, 2011, and the results demonstrated that old SCCTs located in New York State *contributed 0.0048 ppm to downwind monitors that currently show nonattainment.*[18] (Footnotes omitted; emphasis added.)

---

[18] This air quality improvement not only affected the two Connecticut nonattainment monitors named by New York (Westport and Stratford), but also the New Haven maintenance monitor in the same area of Connecticut. Pet'r Comments to

*Id.*

In its May 17, 2019, comments[19] on the New York SCCT rule, Connecticut reinforced New York's admission of responsibility for Connecticut's ozone nonattainment and maintenance concerns as follows:

> Excessive and unnecessary levels of air pollution from these units contribute to unhealthy ozone levels in Connecticut, particularly on days most conducive to high ozone levels in the region …

> Connecticut cannot attain the ozone standards without further emission reductions occurring in the New York metropolitan area. Connecticut currently exceeds the 70 parts per billion (ppb) ozone standard with design values of 82 ppb at the Stratford and Westport monitors.

Pet'r Comments to Proposed Rule 85; JA ____ (As stated above, Stratford and Westport are the only nonattainment monitors involved in this Rule).

Significantly, beyond Connecticut's recognition that New York SCCTs are causing nonattainment at Stratford and Westport, the following Connecticut comments are critical of New York's delay in imposing these emission reductions:

> The proposed rule will not begin its first phase until May 2023 and allows for compliance extensions up to four years.  Delaying requirements for emission reductions from some of the *most inefficient* and *dirtiest* units in the region only

---

Proposed Rule 77, 84; JA__, __. A 0.0048-ppm (parts per million) value is equivalent to 4.8 ppb (parts per billion).  Projected design values that are 76 ppb or greater are considered by EPA to be violating the 2008 ozone NAAQS. Air Quality Modeling TSD 12; JA__.

[19] Tracy Babbidge, Chief, Bureau of Air Management, CTDEEP letter to Ona Papageorgiou, NYDEC, May 17, 2019.   Pet'r Comments to Proposed Rule 83-85; JA__-__.

> helps to assure extended nonattainment of the standards. The timeframe for the implementation of the rule should be condensed to be more consistent with attainment dates for the nonattainment area. (Emphasis added).

*Id.*

Even though New York acknowledged that its SCCT units are causing Connecticut nonattainment, it elected to defer implementation of controls and defer the resulting 4.8 ppb improvement of air quality at the critical Connecticut nonattainment monitors. These are the very monitors upon which this Rule is based for eleven of the upwind states. The phased-in controls extend between 2023 and 2025, well beyond the applicable 2021 attainment date. EPA was well informed that the New York controls call for subject units to meet a NOx emission rate of 100 ppmvd by May 1, 2023, with a more stringent limit by May 1, 2025.[20] New York was challenged by Connecticut to align those SCCT emission reductions with the 2021 attainment date and responded that it deferred the compliance dates for reasons not related to the applicable attainment date.[21] EPA took no action, although the CAA required alignment of these controls with attainment deadlines.

The United States Supreme Court clarified that upwind states are required "to eliminate" those "amounts" of pollution that "contribute significantly to *nonattainment*

---

[20] U.S. Envtl. Prot. Agency, EGU NOx Mitigation Strategies Final Rule TSD, 23 (2021) ("Mitigation TSD"); JA _____.

[21] 6 NYCRR Subpart 227-3, Ozone Season Oxides of Nitrogen (NOx) Emission Limits for Simple Cycle and Regenerative Combustion Turbines, Assessment of Public Comment. Pet'r Comments to Proposed Rule 85; JA__.

in downwind states.  *EME Homer II*, 134 S. Ct. at 1584.  This Court has made clear that EPA must harmonize the deadline for upwind state contributors to eliminate their significant contribution with the attainment deadlines for downwind areas.  *North Carolina* 531 F.3d at 912.  This Court also repeated the mandate in the *Wisconsin* remand in which it stated, "the Good Neighbor Provision calls for the elimination of upwind States' significant contribution *on par* with the relevant downwind attainment deadline." *Wisconsin* 938 F.3d at 315 (emphasis added).  In addition, the *Wisconsin* opinion went on to address the need for fairness and equity of states failing to meet their statutory obligations and forcing additional responsibility on their neighbors. As was articulated in the opinion, "… it is the statutorily designed relationship between the Good Neighbor Provision's obligations for upwind States and the statutory attainment deadlines for downwind areas that generally calls for parallel timeframes." *Id.* 316. The Court explained as follows:

> The Good Neighbor Provision was enacted "to enable downwind States to keep their levels of [air pollution] in check." A "reasonable statutory interpretation" of the Provision "must account for . . . the broader context of the statute as a whole." And the attainment deadlines, the Supreme Court has said, are "the heart" of the Act. …. The Act's central object is the "attain[ment] [of] air quality of specified standards [within] a specified period of time."
> ….
>
> Consider, in this regard, the Rule's 2017 projections for one nonattainment area: Fairfield County, Connecticut. EPA projects that, after the good neighbor reductions called for by the Rule, a monitor in that area would observe an

average ozone concentration of 76.5 ppb, or 1.5 ppb more than the NAAQS. According to EPA, 53.82 ppb of that 76.5 ppb would be caused by pollution from U.S. States (including Connecticut itself). Yet Connecticut's own emissions, according to EPA's projections, would account for only 3.89 ppb of that 53.82. The rest would come from upwind contributions, with a significant share from one State alone (New York, which is projected to contribute 17.22 ppb).

*Id.* 316-317 (citations omitted).

When in connection with its delay of the imposition of new emission reductions on simple cycle combustion turbines until as late as 2025 New York was challenged by Connecticut to align those emission reductions with the 2021 attainment date; New York responded that it deferred the compliances dates for reasons not related to the applicable attainment date.[22]

As a result, New York's failure resulted in the Connecticut monitors, which underlie this Rule, ongoing exceedance of the 2008 ozone NAAQS. *Id.* EPA's failure to acknowledge and act upon that unmet responsibility in the promulgation of this Rule is an arbitrary action and contrary to the mandates of this Court.[23]  86 Fed. Reg. 23,054, 23,097 (Apr. 30, 2021); JA__.

---

[22]Pet'r Comments to Proposed Rule 85; 6 NYCRR Subpart 227-3, Ozone Season Oxides of Nitrogen (NOx) Emission Limits for Simple Cycle and Regenerative Combustion Turbines, Assessment of Public Comment, 46; JA__; __.

[23] EPA's recent actions in August and November 2021 relative to New York's ozone attainment SIP obligations, pursuant to 42 U.S.C. §§7511 and 7410(a)(2)(D)(i), illustrate the Agency's failure at the consistent exercise of alignment of attainment deadlines and control strategies.  In August 2021, EPA responded to  comments filed

It is not enough for EPA to only assess upwind control strategies to achieve attainment.  Attention is required by the CAA to be given to downwind state nonattainment and maintenance requirements.  The action by New York and EPA in delaying implementation of nonattainment controls beyond the statutory attainment date cannot, and should not, be used as the basis for shifting the responsibility of imposing needed controls to upwind states under the Good Neighbor provisions.

In this case, that exact result has occurred.  Even though the applicable attainment date for the three subject Connecticut monitors is 2021, New York and EPA

---

by the Petitioner with respect to approval of the  New York SCCT regulatory program as a revision to the New York ozone SIP. EPA acknowledged that several parties (including EPA) had asked New York to impose the SCCT controls sooner than 2025, but that New York had not done so. EPA stated that it concurred with New York on the 2025 SCCT deadline as allowing owners and operators of those units time to comply. In making this determination, EPA not only arbitrarily failed to acknowledge that the three Connecticut monitors that are the basis for the Revised CSAPR Update would continue to be nonattainment or maintenance monitors.  EPA also arbitrarily failed to acknowledge or address the implications of its action on the Good Neighbor Provisions of the CAA. Approval and Promulgation of Implementation Plans; New York; Ozone Season NOx Controls for Simple Cycle and Regenerative Combustion Turbines, 86 Fed. Reg. 43,956, 43,958 (Aug. 11, 2021), JA__. See also Table 3-30, "Documentation for EPA's Power Sector Modeling Platform v6 Using the Integrated Planning Model, U.S. Environmental Protection Agency, September 2021, JA__.  In November, 2021, EPA took an about face relative to time flexibility in imposing emissions controls and proposed New York's Good Neighbor (40 U.S.C. §7410(a)(2)(D)(i)) SIP had failed to acknowledge the State must implement current and effective controls to eliminate significant contribution to other States by the attainment compliance deadline of 2021 for the 2008 ozone NAAQS.  Disapproval of Interstate Transport Requirements for the 2008 Ozone National Ambient Air Quality Standards; New York and New Jersey, 86 Fed. Reg. 60602 (Nov. 3, 2021), JA___.  EPA's variable management of the CAA attainment deadlines is misleading, arbitrary and capricious.
.

have concluded that, for reasons unrelated to the attainment obligation of New York, SCCT units would be allowed until 2025 to achieve compliance. That decision under the downwind nonattainment provisions of the CAA results, however, in allowing the three subject Connecticut monitors to remain in nonattainment/maintenance status which, unless addressed, shifts the regulatory burden to upstate states under the good neighbor provision of the CAA. 42 U.S.C. §7511; 42 U.S.C. §7410(a)(2)(D)(i).

Given the absence of any reasoned justification and given the direction of this Court that EPA must avoid shifting responsibility between upwind and downwind states, EPA's promulgation of the Rule for eleven states in sole reliance on the subject Connecticut monitors was arbitrary and without legal authority.

### B. EPA Disregarded Existing Emission Reduction Requirements.

An integral part of assessing the responsibility of upwind states under the Good Neighbor Provisions of the CAA is understanding the status of the emissions reductions controls that will be in effect in the future analytic year. After assessing future year air quality impacted by existing emission reductions requirements, the next step is to assess whether there would remain nonattainment or maintenance monitors triggering a Good Neighbor Provisions rule.

In 2016, EPA acknowledged the need to assess ambient air quality in the applicable future analytic year by first determining the extent to which existing "on-the-books" regulatory programs could be expected to improve ambient air quality. EPA

noted in the original CSAPR Update modeling assessment general accounting for on-the-books emissions reductions and assessment of the most up-to-date forecast of future emissions in the absence of the transport policy being evaluated (i.e., base case conditions). 81 Fed. Reg. 74,504, 74,517 (Oct. 26, 2016); JA__. EPA explained that the future base case scenario modeled for 2017 included a representation of changes in activity data and predicted emission reductions from on-the-books action. *Id.* 74,527; JA ___.

Four years later, in the proposed Revised CSAPR Update, EPA offered the following statement:

> The assessment of future air quality conditions generally accounts for on-the-books emission reductions and the most up-to-date forecast of future emissions in the absence of the transport policy being evaluated (i.e., base case conditions).

85 Fed. Reg. 68,964, 68,979 (Oct. 30, 2020); JA__.

Petitioner commented on the proposal that EPA had failed to account for significant on-the-books emissions reductions.  Petitioner's comments provided EPA with a list of regulatory programs applicable to emission sources in Connecticut, New York, and New Jersey that would be effective in the year being modeled by the EPA. Pet'r Comments to Proposed Rule 36-46; JA__-__.

Rather than address the merits of the list of controls, EPA replied MOG "has failed to identify with reasonable specificity which of the listed programs or regulations were not included in EPA's emission inventories." Resp't Resp. to Proposed Rule

40

Comments 65; JA___.  This dismissal by EPA was offered despite the MOG request for the relevant inputs for the modeling and an extension of the comment period to "identify with reasonable specificity which of the listed programs or regulations were not included in EPA's emission inventories." Resp't Resp. to Proposed Rule Comments 65; JA___.  EPA's denial of that request improperly and arbitrarily shifted the burden onto MOG to assess the effectiveness of these control programs as the basis for this Rule.  The EPA's denial also arbitrarily disregarded Petitioner's comments regarding the failure to consider the New York SCCT control requirements that would have resulted in attainment of the 2008 ozone NAAQS for all the problem monitors in Connecticut. See Argument II.A.

In the preamble to the Final Rule, EPA offered a more transparent statement of its handling of existing control programs, as follows:

> The IPM version 6—January 2020 reference base case accounts for updated federal and state environmental regulations, committed EGU retirements and new builds, and technology cost and performance assumptions <u>as of late 2019</u>. Emphasis added.

86 Fed. Reg. 23,054, 23,075 (Apr. 30, 2021); JA___.

The fact that EPA did not consider emission control programs adopted after 2019 was confirmed by the following EPA response to Petitioner's comments:

> Rules related to emissions for sources other than EGUs promulgated in 2019 or later following the completion of the inventories for those sources are not included in the modeling for this rule.

41

Resp't Resp. to Proposed Rule Comments 65; JA__.

EPA characterized its process to conduct future year air quality modeling as having "generally" accounted for on-the-books emission reduction programs. 86 Fed. Reg. 23,054 23,069 (Apr. 30, 2021); JA__. EPA's statement clarified the limits of its assessment.

By its admission, EPA agreed it is required to confirm that nonattainment or maintenance monitors will exist in the future analytic year even after implementing on-the-books emissions reductions programs. *Id.* The Agency's failure to have considered such programs that may have been adopted after 2019 is an arbitrary action that exceeds its legal authority under the good neighbor provisions of the CAA.

**C.    EPA Failed to Recognize the Impact of Exceptional Events on the Regulatory Status of Downwind Nonattainment and Maintenance Monitors.**

As stated below, CAA §319 (42 U.S.C. §7619) requires that EPA promulgate regulations that remove the impact of air quality data that is affected by what is known as "exceptional events":

> Not later than 1 year after the date on which the Administrator publishes proposed regulations under subparagraph (A)…the Administrator shall promulgate final regulations governing the review and handling o[f] air quality monitoring data influenced by an exceptional event that are consistent with paragraph (3).…
>
> (3)(A) …In promulgating regulations under this section, the Administrator shall follow—
> …

42

> (v) the principle that air quality data should be carefully
> screened to ensure that events not likely to recur are
> represented accurately in all monitoring data and analyses.

42 U.S.C §7619 (b)(2)(B), (3)(A), (3)(A)(v).

Several states, including Connecticut, made requests to have air masses impacted by the numerous wildfires that occurred in 2016 and 2017 declared Exceptional Events – thus allowing monitored data influenced by those events to be excluded from the calculation of the design value for the affected monitor. Pet'r Comments to Proposed Rule 29-34; JA__-__.

The Connecticut demonstration related to the May 2016 event showed that Canadian wildfire caused the event and noted that ". . . the exceedances of May 25-26th cannot be attributed to EGUs operating on high electric demand days as is more typically the case later in the ozone season." *Id.*  EPA concurred in that demonstration on July 31, 2017.  For the three Connecticut monitors upon which this Rule is based (Stratford/Fairfield, 90013007; Westport/Fairfield, 90019003; and Madison/New Haven, 90099002), accounting for the 2016 exception event results in a significant reduction in the ozone DV for each monitor.  *Id.*

The Connecticut demonstration noted that the Stratford monitor would have had a 2016 4th high ozone value reduced by 1 ppb and the Madison monitor would have had a 2016 4th high ozone value drop 2 ppb because of the wildfire's impact. *Id.*  At the time the demonstration was submitted by Connecticut, there was no regulatory need

43

for seeking relief for any monitor other than Westport; however, the Connecticut

Department of Energy and Environmental Protection (DEEP) offered the following

comment that specifically recognized the potential for additional consideration of this

data in the future:

> Based on the severity of the difference in critical value, and the expectation that those sites with the largest differences will be controlling in any assessment of attainment status, DEEP has decided to focus this demonstration on the four sites with the greatest difference in critical value. *If future assessments of attainment status based on inclusion of sites with lower critical differences prove to be controlling, then DEEP will revisit this analysis.* (Emphasis in original).

*Id.*

Petitioner's comments urged EPA to consider these significant regulatory events,

recalculate the projected design value excluding these event day concentrations, and

determine the attainment status and significant contribution metrics resulting from the

new values.  *Id.*

In response to Petitioner's comment, EPA effectively agreed with Petitioner that

the design values for the Connecticut monitors would indeed be lower if exceptional

events were to be considered.

> The results of the sensitivity analysis indicate that if the data measured on May 25 and 26 were removed the Stratford receptor would be maintenance-only in 2021 rather than nonattainment, and the New Haven receptor would be

projected to be in attainment in 2021 rather than maintenance only.[24]

Resp't Resp. to Proposed Rule Comments 50; JA__.

In addition to the 2016 event, there have been multiple fires and other exceptional events episodes in the 2014-2018 period. The EPA is obligated to examine these exceptional events before concluding that any of the monitors relied upon to support this Rule should be considered nonattainment or maintenance. EPA's failure to undertake this additional analysis creates a fatal flaw in this Rule.

## III. EPA Arbitrarily Relied on Inappropriate Air Quality Monitoring Data in Making its Determination of Upwind State Significant Contribution to Downwind State Nonattainment or Maintenance Monitors (Step 2).

EPA inappropriately selected days in which the air quality monitors involved were actually in attainment with the 2008 ozone NAAQS for its significant contribution analysis. EPA explained that it based this portion of the Rule on "the 10 days in the future year [2023] days with the highest model-predicted concentrations." 86 Fed. Reg. 23,054 23,084 (Apr. 30, 2021); JA__.

---

[24] While EPA noted in its Response to Comments 50 that these exceptional events have already been included in the data related to the Westport monitor, consideration of this data with respect the other Connecticut monitors would eliminate the New Haven monitor altogether and reduce the Stratford monitor to maintenance only. JA__. As is pointed out elsewhere in this argument, Petitioner has identified several other factors that impact on the remaining nonattainment and maintenance monitor and noting the error in EPA characterization of the attainment status of those monitors.

45

While EPA's modeling guideline applicable to determining significant contribution and the linkage of upwind states to downwind monitors[25] allows for the exclusion of days when the modeled concentrations are below 60 ppb,[26] the guidelines do not address days when the monitors are predicted to be above 60 ppb but below 76 ppb – the level at which monitors would be considered in nonattainment with the 2008 ozone NAAQS.

EPA acknowledged that at least four of the future year top ten days were projected to be below 60 ppb and therefore were excluded from the calculations. *Id.* However, EPA failed to recognize that only three of the days it selected for this analysis[27] were days when the ozone concentration predicted for that monitor was at or above the 76 ppb level that would cause a monitor to be either a nonattainment or maintenance monitor under the CAA.

It is also significant that EPA's response to this comment relied solely on data outlined in Table V.D-2, *Id.,* that failed to relate to any of the three Connecticut monitors that are the basis for applying the Rule to eleven of the twelve subject states. The data offered by EPA is identified only as data associated with "a particular receptor" without identifying that receptor. *Id.*  Therefore, the agency provided no

---

[25] *See Generally* U.S. Envtl. Prot. Agency, "Modeling Guidance for Demonstrating Attainment of Air Quality Goals for Ozone, PM2.5 and Regional Haze",(2018).

[26] 86 Fed. Reg 23,054, 23,085 (Apr. 30, 2021); JA__.

[27] 86 Fed. Reg. 23,054 23,084, Table V.D-2 (Apr. 30, 2021); JA__.

46

linkage between the data presented and the Connecticut nonattainment and maintenance monitors on which the Rule is based.[28]

EPA's linkage of upwind states to downwind air quality monitors based on air quality modeling related to days on which the air quality monitors would be in attainment with the 2008 ozone NAAQS is arbitrary, capricious, and unlawful under the Good Neighbor Provisions of the CAA. These details are supportive of a remand of the Rule.

## IV. EPA Action Imposing Additional Control Requirements on EGUs (Step 3) was Inconsistent with the *Wisconsin* Remand and Was Based on Erroneous Data.

At Step 3 of its four-step process, EPA erroneously and arbitrarily determined control requirements for the EGUs subject to this Rule in a manner that was both inconsistent with the *Wisconsin* remand and based upon data related to states not affected by the Rule.

### A. EPA's Action was Inconsistent with the *Wisconsin* Remand, Which Determined that the CSAPR Update Rule had Already Properly Addressed Controls on EGU Sources.

Although the *Wisconsin* Court remanded the CSAPR Update Rule with direction to EPA that its analysis must address the 2021 attainment year (*Wisconsin* 938 F.3d at 309), the *Wisconsin* Court determined that the CSAPR Update emission control

---

[28] Petitioner also notes that all the future year days listed in Table V.D-2 are projected to be below 76 ppb, which is in attainment of the NAAQS. *Id.*

requirements for EGUs equipped with catalytic controls and state-of-the-art combustion controls were reasonably based. The Court's assessment of the appropriateness of those controls is as follows:

> First, Environmental Petitioners challenge EPA's assumption that turning on idled "Selective Catalytic Reduction" (SCR) controls would reduce an EGU's emissions to 0.10 lbs/mmBtu. They contend that a lower rate would be more accurate, and they argue that EPA failed to provide a reasoned explanation for its choice. <u>We conclude that EPA adequately explained its choice.</u>

*Wisconsin* 938 F.3d at 320-321.

In reaching its CSAPR Update conclusion that any emission reductions must be based only on EGU's equipped with SCR or combustion controls, EPA evaluated the following NOx control strategies:

1. fully operating existing Selective Catalytic Reduction (SCR), including both optimizing NOx removal by existing operational SCRs and turning on and optimizing existing idled SCRs;

2. turning on existing idled SNCRs; installing state-of-the art NOx combustion controls;

3. shifting generation to existing units with lower-NOx emission rates within the same state; and

4. installing new SCRs and SNCRs.

81 Fed. Reg.74,504, 74540 (Oct. 26, 2016); JA__.

48

In addition, in the CSAPR Update Rule EPA reached the following conclusion that it was not addressing non-EGU reductions as part of that rule. *Id.* 74542; JA__.

The task thus given to EPA by the *Wisconsin* Court was to consider whether additional controls were appropriate on other sources. The specific direction of the *Wisconsin* Court to EPA on this point is as follows:

> . . . the Rule states that it represents only a "first, partial step to addressing a given upwind State's significant contribution to downwind air quality impacts for the 2008 ozone NAAQS." *Id.* at 74,522. That is in large part because the Update Rule confines itself to addressing upwind contributions from EGUs due to an ostensible lack of information about non-EGUs.

*Wisconsin* 938 F.3d at 313.

The *Wisconsin* Court rejected EPA's basis for not considering non-EGU sources and offered the following comment:

> The agency also concluded that "developing a rule that would have covered additional sectors and emissions reductions on longer compliance schedules would have required more of the EPA's resources over a longer rulemaking schedule." 81 Fed. Reg. at 74,522. But administrative infeasibility, like scientific uncertainty, cannot justify the Update Rule's noncompliance with the statute.
>
> …
>
> EPA has not attempted to meet that burden here. True, EPA would need to devote "more of the EPA's resources" in order to quantify good neighbor obligations from non-EGU sources. 81 Fed. Reg. at 74,522. And "greater uncertainty" about reductions from non-EGUs might render EPA's

49

> calculations more inaccurate than it would prefer. *Id.* at
> 74,542. But that does not amount to impossibility.

*Id.* 319.

In the CSAPR Update Rule preamble, EPA offered a statement that the full resolution of upwind transport obligations would require emission reductions from non-EGUs along with "further" EGU reductions. 81 Fed. Reg. 74,504, 74,522 (Oct. 26, 2016); JA__. The *Wisconsin* remand, however, made it clear that the CSAPR Update Rule emission reductions based on SCR and combustion controls are already appropriate, leaving EPA with the task of addressing non-EGU controls as well as other EGU controls.

Contrary to the *Wisconsin* remand, EPA imposed additional control requirements only on the same two types of EGUs that the *Wisconsin* Court had already determined had been adequately addressed in the CSAPR Update. This Rule exceeds EPA's authority under the *Wisconsin* remand.

### B.    EPA Arbitrarily Determined NOx Reductions Purportedly Available in the Twelve Upwind States Based on Data Related to Twenty-two States with Very Different Characteristics.

Step 3 of EPA's four-step process to address the requirements of the Good Neighbor Provision involved "identifying upwind emissions that significantly contribute to downwind nonattainment or interfere with downwind maintenance of the NAAQS" 86 Fed. Reg. 23,054 23,057 (Apr. 30, 2021); JA___. However, in implementing Step 3 for this Rule, the EPA failed to do so appropriately.

While the Rule established emission budgets for the twelve upwind states subject to the Rule, EPA calculated those budgets based on data related to the types of generating units present in the original twenty-two state CSAPR region - almost twice the scope of the twelve-state region that is subject to the Rule. Cichanowicz 1; JA ___.

As stated in the Cichanowicz Report, submitted as part of Petitioner's comments on the Proposed Rule, EPA's use of data from states not subject to the Rule erroneously resulted in EPA assessing units that exhibit different characteristics involving both boiler and SCR design and operation. *Id.* As stated in those comments:

> The 22-state database contains a much smaller fraction of boilers designed to fire bituminous coal, resulting in post-SCR NOx emission rates that are not representative of the 12-state region….[The] methodology used does not correctly estimate catalyst replacement costs – EPA does not account for the non-linear increase in catalyst volume required for NOx removal beyond 80%, nor the adjustment for PRB coals.

*Id.*

As EPA made clear in the following statements, its objective was not to assess the emission controls in the twelve states, but rather to evaluate control technology having a wider availability:

> EPA believes both its analytic findings and empirical observations (i.e, regarding unit SCR optimization and allowance price) support its finding that $1,600 per ton is a representative cost for when the technology becomes <u>widely</u> available. Emphasis supplied.

Resp't Resp. to Proposed Rule Comments 454; JA__.

In developing the final Revised CSAPR Update, EPA considered all NOx control strategies <u>widely in use</u> by EGUs, listed below. EPA's Mitigation TSD "discusses costs, emission reduction potential, and feasibility . . . [of] EGU NOx emission control strategies. Specifically, the TSD explores three topics: (1) the appropriate representative cost resulting from "<u>widespread</u>" implementation of a particular NOx emission control technology; ...." Mitigation TSD 2 (emphasis added); JA__.

By EPA's own admission, the Rule is based on EPA's analysis – not of the twelve states – but instead of a far more expansive universe of emission controls and thus of units of significantly different design and operating conditions.  EPA also fails to adequately explain its basis for concluding that sources with SCR in these 12-states can suddenly expect to achieve an even more stringent level of emissions than EPA had concluded was reasonably achievable for the sources in the 22-state CSAPR Update region (that is, reducing the expected SCR performance from 0.10 lb/MMBtu to 0.08 lb/MMBtu).

The significance of EPA's failure to limit its analysis to the twelve upwind states that are the subject of the Rule is illustrated by its assessment of the costs of emissions controls. In the preamble to the Rule, EPA states:

> At Step 3, EPA quantified emissions from upwind states that would significantly contribute to nonattainment or interfere with maintenance by first evaluating various levels of uniform $NO_X$ control stringency, each represented by an

estimated <u>representative</u> marginal cost per ton of NO$_X$ reduced (Emphasis added).

86 Fed Reg 23,054, 23,065 (Apr. 30, 2021); JA__.

The Cichanowicz Report addressed the significant differences in the generating units in the twenty-two state CSAPR Update region compared to the twelve-state region affected by the Rule. Specifically, the units in the twelve states have a higher percentage of boilers burning bituminous coal, resulting in an increased concentration of sulfur trioxide (SO3) in the gas stream, affecting catalyst formulation, minimum achievable generating load, and formation of deposits that accumulate on downstream air heater surfaces. Cichanowicz 5; JA__. Approximately 77% of units in the twelve-state region fire bituminous coal compared to 62% in the twenty-two-state region. *Id.*

An alternative analysis offered by Petitioner addressed the incremental cost of lowering NOx from the third-lowest ozone season rate to EPA's target of 0.08 lbs/MBtu with margin and considers the twelve-state region that is the subject of this action. The result of this analysis demonstrates that the cost for controls in the twelve-state region is $2,816/ton, representing a 75% premium compared to EPA's evaluation of $1,600 per ton of NOx removed. Cichanowicz 1, 12; JA__, __

Accordingly, Petitioner submits that EPA's shortcut calculation of control costs by relying on data in other regions results in an erroneous and arbitrary assessment of emission control costs in the twelve-state region.

## <u>CONCLUSION</u>

Petitioners' Petition should be granted, and the Rule remanded.

Respectfully submitted,
David M. Flannery
Kathy G. Beckett
Edward L. Kropp
Steptoe & Johnson PLLC
707 Virginia Street, East
Post Office Box 1588
Charleston, WV 25326
Tel. (304) 353-8000
Dave.flannery@steptoe-johnson.com
Kathy.beckett@steptoe-johnson.com
Skipp.kropp@steptoe-johnson.com

Counsel for Petitioner
Midwest Ozone Group

Dated: November 3, 2021

54

# CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), (f) and (g) and Circuit Rule 32(e)(1), because it contains 12,946 words, excluding exempted parts, according to the count of Microsoft Word 2010. I further certify that the foregoing brief also complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared using Microsoft Word 2010 in 14-point proportionally spaced Garamond typeface.

**/s/** David M Flannery
David M. Flannery

Dated: November 3, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of November 2021, the foregoing Opening

Brief of Petitioner was served electronically on all registered counsel through the

Court's CM/ECF system.

**/s/** David M Flannery
David M. Flannery

**STATUTORY ADDENDUM**

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

**Page**

Clean Air Act ("CAA") §107, 42 U.S.C. §7407 ……......……………….. ADD-01

CAA §110, 42 U.S.C. §7410 …………………..………………….….. ADD-07

CAA §172, 42 U.S.C. §7502… ………………….…..……………….. ADD-16

CAA §181, 42 U.S.C. §7511… ………………….…..……………….. ADD-20

CAA §307, 42 U.S.C §7607 ………………….…..……………….... ADD-23

CAA §319, 42 U.S.C. §7619… ………………….…..……………….. ADD-29

USCA Case #21-1146     Document #1920797     Filed: 11/03/2021     Page 70 of 99

### § 7407. Air quality control regions

#### (a) Responsibility of each State for air quality; submission of implementation plan

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

USCA Case #21-1146     Document #1920797     Filed: 11/03/2021     Page 71 of 99

**(b) Designated regions**

For purposes of developing and carrying out implementation plans under section 7410 of this title—

(1) an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c), shall be an air quality control region; and

(2) the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

**(c) Authority of Administrator to designate regions; notification of Governors of affected States**

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

**(d) Designations**

**(1) Designations generally**

**(A) Submission by Governors of initial designations following promulgation of new or revised standards**

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—

(i) nonattainment, any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

(i) Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expedi-

tiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

(ii) In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

(iii) If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

(iv) A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

**(C) Designations by operation of law**

(i) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

(ii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

(iii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

(A) The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or an-

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 72 of 99

nouncing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

(B) Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

(A) Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

(B) No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

(C) No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area (or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

(D) The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

(F) The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM–10)**

**(A) Ozone and carbon monoxide**

(i) Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

(ii) No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

(iii) No nonattainment area may be redesignated as an attainment area under this subparagraph.

(iv) Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). When-

ever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

(v) Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM–10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)—

   (i) each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator before November 15, 1990) is designated nonattainment for PM–10;

   (ii) any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM–10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM–10; and

   (iii) each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM–10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines

that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase "2 years from the date of promulgation of the new or revised national ambient air quality standard" shall be replaced by the phrase "1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead".

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 PM$_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 PM$_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as "regional haze requirements").

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and recommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

(1) Except as otherwise provided in paragraph (2), the Governor of each State is authorized,

with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) shall be modified accordingly.

(2) In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

(3) No compliance date extension granted under section 7413(d)(5)[1] of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5)[1] of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

(July 14, 1955, ch. 360, title I, §107, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub. L. 95–95, title I, §103, Aug. 7, 1977, 91 Stat. 687; Pub. L. 101–549, title I, §101(a), Nov. 15, 1990, 104 Stat. 2399; Pub. L. 108–199, div. G, title IV, §425(a), Jan. 23, 2004, 118 Stat. 417.)

#### REFERENCES IN TEXT

Section 7413 of this title, referred to in subsec. (e)(3), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsec. (d) of section 7413 no longer relates to final compliance orders.

#### CODIFICATION

Section was formerly classified to section 1857c–2 of this title.

#### PRIOR PROVISIONS

A prior section 107 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, §2, 81 Stat. 490, related to air quality control regions and was classified to section 1857c–2 of this title, prior to repeal by Pub. L. 91–604.

Another prior section 107 of act July 14, 1955, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 399, was renumbered section 111 by Pub. L. 90–148 and is classified to section 7411 of this title.

#### AMENDMENTS

2004—Subsec. (d)(6), (7). Pub. L. 108–199 added pars. (6) and (7).

1990—Subsec. (d). Pub. L. 101–549 amended subsec. (d) generally, substituting present provisions for provisions which required States to submit lists of regions not in compliance on Aug. 7, 1977, with certain air quality standards to be submitted to the Administrator, and which authorized States to revise and resubmit such lists from time to time.

1977—Subsecs. (d), (e). Pub. L. 95–95 added subsecs. (d) and (e).

#### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

[1] See References in Text note below.

#### OZONE AND PARTICULATE MATTER STANDARDS

Pub. L. 108–199, div. G, title IV, §425(b), Jan. 23, 2004, 118 Stat. 417, provided that: "Except as provided in paragraphs (6) and (7) of section 107(d) of the Clean Air Act [subsec. (d)(6), (7) of this section] (as added by subsection (a)), section 6101, subsections (a) and (b) of section 6102, and section 6103 of the Transportation Equity Act for the 21st Century [Pub. L. 105–178] (42 U.S.C. 7407 note; 112 Stat. 463), as in effect on the day before the date of enactment of this Act [Jan. 23, 2004], shall remain in effect."

Pub. L. 105–178, title VI, June 9, 1998, 112 Stat. 463, as amended by Pub. L. 109–59, title VI, §6012(a), Aug. 10, 2005, 119 Stat. 1882, provided that:

"SEC. 6101. FINDINGS AND PURPOSE.

"(a) The Congress finds that—

"(1) there is a lack of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$, in the United States and the States should receive full funding for the monitoring efforts;

"(2) such data would provide a basis for designating areas as attainment or nonattainment for any $PM_{2.5}$ national ambient air quality standards pursuant to the standards promulgated in July 1997;

"(3) the President of the United States directed the Administrator of the Environmental Protection Agency (referred to in this title as the 'Administrator') in a memorandum dated July 16, 1997, to complete the next periodic review of the particulate matter national ambient air quality standards by July 2002 in order to determine 'whether to revise or maintain the standards';

"(4) the Administrator has stated that 3 years of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$ and performed in accordance with any applicable Federal reference methods, is appropriate for designating areas as attainment or nonattainment pursuant to the July 1997 promulgated standards; and

"(5) the Administrator has acknowledged that in drawing boundaries for attainment and nonattainment areas for the July 1997 ozone national air quality standards, Governors would benefit from considering implementation guidance from EPA on drawing area boundaries.

"(b) The purposes of this title are—

"(1) to ensure that 3 years of air quality monitoring data regarding fine particle levels are gathered for use in the determination of area attainment or nonattainment designations respecting any $PM_{2.5}$ national ambient air quality standards;

"(2) to ensure that the Governors have adequate time to consider implementation guidance from EPA on drawing area boundaries prior to submitting area designations respecting the July 1997 ozone national ambient air quality standards;

"(3) to ensure that the schedule for implementation of the July 1997 revisions of the ambient air quality standards for particulate matter and the schedule for the Environmental Protection Agency's visibility regulations related to regional haze are consistent with the timetable for implementation of such particulate matter standards as set forth in the President's Implementation Memorandum dated July 16, 1997.

"SEC. 6102. PARTICULATE MATTER MONITORING PROGRAM.

"(a) Through grants under section 103 of the Clean Air Act [42 U.S.C. 7403] the Administrator of the Environmental Protection Agency shall use appropriated funds no later than fiscal year 2000 to fund 100 percent of the cost of the establishment, purchase, operation and maintenance of a $PM_{2.5}$ monitoring network necessary to implement the national ambient air quality standards for $PM_{2.5}$ under section 109 of the Clean Air Act [42 U.S.C. 7409]. This implementation shall not result in a diversion or reprogramming of funds from other Federal, State or local Clean Air Act activities.

Filed: 11/03/2021 Page 74 of 99 USCA Case #21-1146 Document #1920797

Any funds previously diverted or reprogrammed from section 105 Clean Air Act [42 U.S.C. 7405] grants for PM$_{2.5}$ monitors must be restored to State or local air programs in fiscal year 1999.

"(b) EPA and the States, consistent with their respective authorities under the Clean Air Act [42 U.S.C. 7401 et seq.], shall ensure that the national network (designated in subsection (a)) which consists of the PM$_{2.5}$ monitors necessary to implement the national ambient air quality standards is established by December 31, 1999.

"(c)(1) The Governors shall be required to submit designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 PM$_{2.5}$ national ambient air quality standard within 1 year after receipt of 3 years of air quality monitoring data performed in accordance with any applicable Federal reference methods for the relevant areas. Only data from the monitoring network designated in subsection (a) and other Federal reference method PM$_{2.5}$ monitors shall be considered for such designations. Nothing in the previous sentence shall be construed as affecting the Governor's authority to designate an area initially as nonattainment, and the Administrator's authority to promulgate the designation of an area as nonattainment, under section 107(d)(1) of the Clean Air Act, based on its contribution to ambient air quality in a nearby nonattainment area.

"(2) For any area designated as nonattainment for the July 1997 PM$_{2.5}$ national ambient air quality standard in accordance with the time limit prescribed in this section, notwithstanding the time limit prescribed in paragraph (2) of section 189(e) of the Clean Air Act [42 U.S.C. 7492(e)(2)], the Administrator shall require State implementation plan revisions referred to in such paragraph (2) to be submitted at the same time as State implementation plan revisions referred to in section 172 of the Clean Air Act [42 U.S.C. 7502] implementing the revised national ambient air quality standard for fine particulate matter are required to be submitted. For any area designated as attainment or unclassifiable for such standard, the Administrator shall require the State implementation plan revisions referred to in such paragraph (2) to be submitted 1 year after the area has been so designated. The preceding provisions of this paragraph shall not preclude the implementation of the agreements and recommendations set forth in the Grand Canyon Visibility Transport Commission Report dated June 1996.

"(d) The Administrator shall promulgate the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 PM$_{2.5}$ national ambient air quality standard by the earlier of 1 year after the initial designations required under subsection (c)(1) are required to be submitted or December 31, 2005.

"(e) FIELD STUDY.—Not later than 2 years after the date of enactment of the SAFETEA–LU [Aug. 10, 2005], the Administrator shall—

"(1) conduct a field study of the ability of the PM$_{2.5}$ Federal Reference Method to differentiate those particles that are larger than 2.5 micrometers in diameter;

"(2) develop a Federal reference method to measure directly particles that are larger than 2.5 micrometers in diameter without reliance on subtracting from coarse particle measurements those particles that are equal to or smaller than 2.5 micrometers in diameter;

"(3) develop a method of measuring the composition of coarse particles; and

"(4) submit a report on the study and responsibilities of the Administrator under paragraphs (1) through (3) to—

"(A) the Committee on Energy and Commerce of the House of Representatives; and

"(B) the Committee on Environment and Public Works of the Senate.

"SEC. 6103. OZONE DESIGNATION REQUIREMENTS.

"(a) The Governors shall be required to submit the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] within 2 years following the promulgation of the July 1997 ozone national ambient air quality standards.

"(b) The Administrator shall promulgate final designations no later than 1 year after the designations are required under subsection (a) are required to be submitted.

"SEC. 6104. ADDITIONAL PROVISIONS.

"Nothing in sections 6101 through 6103 shall be construed by the Administrator of Environmental Protection Agency or any court, State, or person to affect any pending litigation or to be a ratification of the ozone or PM$_{2.5}$ standards."

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 76 of 99

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

**(a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems**

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in. or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require. as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, §101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he

shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emis-

sions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, §101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Adminis-

---

[1] See References in Text note below.

USCA Case #21-1146          Document #1920797          Filed: 11/03/2021          Page 78 of 99

trator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, §101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

(d), (e) Repealed. Pub. L. 101–549, title I, §101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409

(f) National or regional energy emergencies; determination by President

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall re-

main in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3): no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria estab-

USCA Case #21-1146      Document #1920797      Filed: 11/03/2021      Page 80 of 99

lished pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

(C) Effect of finding of incompleteness

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

(2) Deadline for action

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

(3) Full and partial approval and disapproval

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

(4) Conditional approval

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

(5) Calls for plan revisions

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines

(not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

(6) Corrections

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

(l) Plan revisions

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

(m) Sanctions

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

(n) Savings clauses

(1) Existing plan provisions

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as

in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

　(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

　(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe,

such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 246, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof

²So in original. Probably should be followed by a comma.

USCA Case #21-1146　　　Document #1920797　　　Filed: 11/03/2021　　　Page 82 of 99

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 83 of 99

and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(b), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(3)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(3)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (d)(3)(D). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7412(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modifica-

tion, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(3), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(6)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, §107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, §14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, §108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, §108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 §14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, §108(g), as (j) and in subsec. (j) as so redesignated, substituted ''will enable such source'' for ''at such source will enable it''.

1974—Subsec. (a)(3). Pub. L. 93–319, §4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, §4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §15, Dec. 31, 1970, 84 Stat. 1713, provided that:

''(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

''(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

''(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter].''

FEDERAL ENERGY ADMINISTRATOR

''Federal Energy Administrator'', for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

§ 7502. Nonattainment plan provisions in general

(a) Classifications and attainment dates

(1) Classifications

(A) On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

(B) The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of title 5 (con-

Filed: 11/03/2021    Page 86 of 99

Document #1920797

USCA Case #21-1146

cerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

(C) This paragraph shall not apply with respect to nonattainment areas for which classifications are specifically provided under other provisions of this part.

**(2) Attainment dates for nonattainment areas**

(A) The attainment date for an area designated nonattainment with respect to a national primary ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable, but no later than 5 years from the date such area was designated nonattainment under section 7407(d) of this title, except that the Administrator may extend the attainment date to the extent the Administrator determines appropriate, for a period no greater than 10 years from the date of designation as nonattainment, considering the severity of nonattainment and the availability and feasibility of pollution control measures.

(B) The attainment date for an area designated nonattainment with respect to a secondary national ambient air quality standard shall be the date by which attainment can be achieved as expeditiously as practicable after the date such area was designated nonattainment under section 7407(d) of this title.

(C) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the attainment date determined by the Administrator under subparagraph (A) or (B) if—

(i) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(ii) in accordance with guidance published by the Administrator, no more than a minimal number of exceedances of the relevant national ambient air quality standard has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this subparagraph for a single nonattainment area.

(D) This paragraph shall not apply with respect to nonattainment areas for which attainment dates are specifically provided under other provisions of this part.

**(b) Schedule for plan submissions**

At the time the Administrator promulgates the designation of an area as nonattainment with respect to a national ambient air quality standard under section 7407(d) of this title, the Administrator shall establish a schedule according to which the State containing such area shall submit a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title. Such schedule shall at a minimum, in-

clude a date or dates, extending no later than 3 years from the date of the nonattainment designation, for the submission of a plan or plan revision (including the plan items) meeting the applicable requirements of subsection (c) and section 7410(a)(2) of this title.

**(c) Nonattainment plan provisions**

The plan provisions (including plan items) required to be submitted under this part shall comply with each of the following:

**(1) In general**

Such plan provisions shall provide for the implementation of all reasonably available control measures as expeditiously as practicable (including such reductions in emissions from existing sources in the area as may be obtained through the adoption, at a minimum, of reasonably available control technology) and shall provide for attainment of the national primary ambient air quality standards.

**(2) RFP**

Such plan provisions shall require reasonable further progress.

**(3) Inventory**

Such plan provisions shall include a comprehensive, accurate, current inventory of actual emissions from all sources of the relevant pollutant or pollutants in such area, including such periodic revisions as the Administrator may determine necessary to assure that the requirements of this part are met.

**(4) Identification and quantification**

Such plan provisions shall expressly identify and quantify the emissions, if any, of any such pollutant or pollutants which will be allowed, in accordance with section 7503(a)(1)(B) of this title, from the construction and operation of major new or modified stationary sources in each such area. The plan shall demonstrate to the satisfaction of the Administrator that the emissions quantified for this purpose will be consistent with the achievement of reasonable further progress and will not interfere with attainment of the applicable national ambient air quality standard by the applicable attainment date.

**(5) Permits for new and modified major stationary sources**

Such plan provisions shall require permits for the construction and operation of new or modified major stationary sources anywhere in the nonattainment area, in accordance with section 7503 of this title.

**(6) Other measures**

Such plan provisions shall include enforceable emission limitations, and such other control measures, means or techniques (including economic incentives such as fees, marketable permits, and auctions of emission rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to provide for attainment of such standard in such area by the applicable attainment date specified in this part.

**(7) Compliance with section 7410(a)(2)**

Such plan provisions shall also meet the applicable provisions of section 7410(a)(2) of this title.

**(8) Equivalent techniques**

Upon application by any State, the Administrator may allow the use of equivalent modeling, emission inventory, and planning procedures, unless the Administrator determines that the proposed techniques are, in the aggregate, less effective than the methods specified by the Administrator.

**(9) Contingency measures**

Such plan shall provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date applicable under this part. Such measures shall be included in the plan revision as contingency measures to take effect in any such case without further action by the State or the Administrator.

**(d) Plan revisions required in response to finding of plan inadequacy**

Any plan revision for a nonattainment area which is required to be submitted in response to a finding by the Administrator pursuant to section 7410(k)(5) of this title (relating to calls for plan revisions (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part. The Administrator may reasonably adjust the dates otherwise applicable under such requirements to such revision (except for attainment dates that have not yet elapsed), to the extent necessary to achieve a consistent application of such requirements. In order to facilitate submittal by the States of adequate and approvable plans consistent with the applicable requirements of this chapter, the Administrator shall, as appropriate and from time to time, issue written guidelines, interpretations, and information to the States which shall be available to the public, taking into consideration any such guidelines, interpretations, or information provided before November 15, 1990.

**(e) Future modification of standard**

If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation.

(July 14, 1955, ch. 360, title I, §172, as added Pub. L. 95–95, title I, §129(b), Aug. 7, 1977, 91 Stat. 746; amended Pub. L. 95–190, §14(a)(55), (56), Nov. 16, 1977, 91 Stat. 1402; Pub. L. 101–549, title I, §102(b), Nov. 15, 1990, 104 Stat. 2412.)

AMENDMENTS

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), expeditious attainment of national ambient air quality standards; in subsec. (b), requisite provisions of plan; and in subsec. (c), attainment of applicable standard not later than July 1, 1987.

1977—Subsec. (b)(4). Pub. L. 95–190, §14(a)(55), substituted "subsection (a)" for "paragraph (1)".

Subsec. (c). Pub. L. 95–190, §14(a)(56), substituted "December 31" for "July 1".

NONATTAINMENT AREAS

Pub. L. 95–95, title I, §129(a), Aug. 7, 1977, 91 Stat. 745, as amended by Pub. L. 95–190, §14(b)(2), (3), Nov. 16, 1977, 91 Stat. 1404, provided that:

"(1) Before July 1, 1979, the interpretative regulation of the Administrator of the Environmental Protection Agency published in 41 Federal Register 55524–30, December 21, 1976, as may be modified by rule of the Administrator, shall apply except that the baseline to be used for determination of appropriate emission offsets under such regulation shall be the applicable implementation plan of the State in effect at the time of application for a permit by a proposed major stationary source (within the meaning of section 302 of the Clean Air Act) [section 7602 of this title].

"(2) Before July 1, 1979, the requirements of the regulation referred to in paragraph (1) shall be waived by the Administrator with respect to any pollutant if he determines that the State has—

"(A) an inventory of emissions of the applicable pollutant for each nonattainment area (as defined in section 171 of the Clean Air Act [section 7501 of this title]) that identifies the type, quantity, and source of such pollutant so as to provide information sufficient to demonstrate that the requirements of subparagraph (C) are being met;

"(B) an enforceable permit program which—

"(i) requires new or modified major stationary sources to meet emission limitations at least as stringent as required under the permit requirements referred to in paragraphs (2) and (3) of section 173 of the Clean Air Act [section 7503 of this title] (relating to lowest achievable emission rate and compliance by other sources) and which assures compliance with the annual reduction requirements of subparagraph (C); and

"(ii) requires existing sources to achieve such reduction in emissions in the area as may be obtained through the adoption, as a minimum of reasonably available control technology, and

"(C) a program which requires reductions in total allowable emissions in the area prior to July 1, 1979, so as to provide for the same level of emission reduction as would result from the application of the regulation referred to in paragraph (1).

The Administrator shall terminate such waiver if in his judgment the reduction in emissions actually being attained is less than the reduction on which the waiver was conditioned pursuant to subparagraph (C), or if the Administrator determines that the State is no longer in compliance with any requirement of this paragraph. Upon application by the State, the Administrator may reinstate a waiver terminated under the preceding sentence if he is satisfied that such State is in compliance with all requirements of this subsection.

"(3) Operating permits may be issued to those applicants who were properly granted construction permits, in accordance with the law and applicable regulations in effect at the time granted, for construction of a new or modified source in areas exceeding national primary air quality standards on or before the date of the enactment of this Act [Aug. 7, 1977] if such construction permits were granted prior to the date of the enactment of this Act and the person issued any such permit is able to demonstrate that the emissions from the source will be within the limitations set forth in such construction permit."

STATE IMPLEMENTATION PLAN REVISION

Pub. L. 95–95, title I, §129(c), Aug. 7, 1977, 91 Stat. 750, as amended by Pub. L. 95–190, §14(b)(4), Nov. 16, 1977, 91 Stat. 1405, provided that: "Notwithstanding the requirements of section 406(d)(2) [set out as an Effective Date of 1977 Amendment note under section 7401 of this title] (relating to date required for submission of certain implementation plan revisions), for purposes of

section 110(a)(2) of the Clean Air Act [section 7410(a)(2) of this title] each State in which there is any non-attainment area (as defined in part D of title I of the Clean Air Act) [this part] shall adopt and submit an implementation plan revision which meets the requirements of section 110(a)(2)(I) [section 7410(a)(2)(I) of this title] and part D of title I of the Clean Air Act [this part] not later than January 1, 1979. In the case of any State for which a plan revision adopted and submitted before such date has made the demonstration required under section 172(a)(2) of the Clean Air Act [subsec. (a)(2) of this section) (respecting impossibility of attainment before 1983), such State shall adopt and submit to the Administrator a plan revision before July 1, 1982, which meets the requirements of section 172(b) and (c) of such Act [subsecs. (b) and (c) of this section)."

USCA Case #21-1146      Document #1920797      Filed: 11/03/2021      Page 88 of 99

Filed: 11/03/2021    Page 89 of 99

Document #1920797

USCA Case #21-1146

## § 7511. Classifications and attainment dates

### (a) Classification and attainment dates for 1989 nonattainment areas

(1) Each area designated nonattainment for ozone pursuant to section 7407(d) of this title shall be classified at the time of such designation, under table 1, by operation of law, as a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area based on the design value for the area. The design value shall be calculated according to the interpretation methodology issued by the Administrator most recently before November 15, 1990. For each area classified under this subsection, the primary standard attainment date for ozone shall be as expeditiously as practicable but not later than the date provided in table 1.

TABLE 1

| Area class | Design value* | Primary standard attainment date** |
|---|---|---|
| Marginal .. | 0.121 up to 0.138 ... | 3 years after November 15, 1990 |
| Moderate .. | 0.138 up to 0.160 ... | 6 years after November 15, 1990 |
| Serious ..... | 0.160 up to 0.180 ... | 9 years after November 15, 1990 |
| Severe ...... | 0.180 up to 0.280 ... | 15 years after November 15, 1990 |
| Extreme ... | 0.280 and above ... | 20 years after November 15, 1990 |

*The design value is measured in parts per million (ppm).
**The primary standard attainment date is measured from November 15, 1990.

(2) Notwithstanding table 1, in the case of a severe area with a 1988 ozone design value between 0.190 and 0.280 ppm, the attainment date shall be 17 years (in lieu of 15 years) after November 15, 1990.

(3) At the time of publication of the notice under section 7407(d)(4) of this title (relating to area designations) for each ozone nonattainment area, the Administrator shall publish a notice announcing the classification of such ozone non-

attainment area. The provisions of section 7502(a)(1)(B) of this title (relating to lack of notice and comment and judicial review) shall apply to such classification.

(4) If an area classified under paragraph (1) (Table 1) would have been classified in another category if the design value in the area were 5 percent greater or 5 percent less than the level on which such classification was based, the Administrator may, in the Administrator's discretion, within 90 days after the initial classification, by the procedure required under paragraph (3), adjust the classification to place the area in such other category. In making such adjustment, the Administrator may consider the number of exceedances of the national primary ambient air quality standard for ozone in the area, the level of pollution transport between the area and other affected areas, including both intrastate and interstate transport, and the mix of sources and air pollutants in the area.

(5) Upon application by any State, the Administrator may extend for 1 additional year (hereinafter referred to as the "Extension Year") the date specified in table 1 of paragraph (1) of this subsection if—

(A) the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan, and

(B) no more than 1 exceedance of the national ambient air quality standard level for ozone has occurred in the area in the year preceding the Extension Year.

No more than 2 one-year extensions may be issued under this paragraph for a single nonattainment area.

(b) New designations and reclassifications

(1) New designations to nonattainment

Any area that is designated attainment or unclassifiable for ozone under section 7407(d)(4) of this title, and that is subsequently redesignated to nonattainment under section 7407(d)(3) of this title, shall, at the time of the redesignation, be classified by operation of law in accordance with table 1 under subsection (a). Upon its classification, the area shall be subject to the same requirements under section 7410 of this title, subpart 1 of this part, and this subpart that would have applied had the area been so classified at the time of the notice under subsection (a)(3), except that any absolute, fixed date applicable in connection with any such requirement is extended by operation of law by a period equal to the length of time between November 15, 1990, and the date the area is classified under this paragraph.

(2) Reclassification upon failure to attain

(A) Within 6 months following the applicable attainment date (including any extension thereof) for an ozone nonattainment area, the Administrator shall determine, based on the area's design value (as of the attainment date), whether the area attained the standard by that date. Except for any Severe or Extreme area, any area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law

in accordance with table 1 of subsection (a) to the higher of—

(i) the next higher classification for the area, or

(ii) the classification applicable to the area's design value as determined at the time of the notice required under subparagraph (B).

No area shall be reclassified as Extreme under clause (ii).

(B) The Administrator shall publish a notice in the Federal Register, no later than 6 months following the attainment date, identifying each area that the Administrator has determined under subparagraph (A) as having failed to attain and identifying the reclassification, if any, described under subparagraph (A).

(3) Voluntary reclassification

The Administrator shall grant the request of any State to reclassify a nonattainment area in that State in accordance with table 1 of subsection (a) to a higher classification. The Administrator shall publish a notice in the Federal Register of any such request and of action by the Administrator granting the request.

(4) Failure of Severe Areas to attain standard

(A) If any Severe Area fails to achieve the national primary ambient air quality standard for ozone by the applicable attainment date (including any extension thereof), the fee provisions under section 7511d of this title shall apply within the area, the percent reduction requirements of section 7511a(c)(2)(B) and (C) of this title (relating to reasonable further progress demonstration and NOₓ control) shall continue to apply to the area, and the State shall demonstrate that such percent reduction has been achieved in each 3-year interval after such failure until the standard is attained. Any failure to make such a demonstration shall be subject to the sanctions provided under this part.

(B) In addition to the requirements of subparagraph (A), if the ozone design value for a Severe Area referred to in subparagraph (A) is above 0.140 ppm for the year of the applicable attainment date, or if the area has failed to achieve its most recent milestone under section 7511a(g) of this title, the new source review requirements applicable under this subpart in Extreme Areas shall apply in the area and the term[1] "major source" and "major stationary source" shall have the same meaning as in Extreme Areas.

(C) In addition to the requirements of subparagraph (A) for those areas referred to in subparagraph (A) and not covered by subparagraph (B), the provisions referred to in subparagraph (B) shall apply after 3 years from the applicable attainment date unless the area has attained the standard by the end of such 3-year period.

(D) If, after November 15, 1990, the Administrator modifies the method of determining compliance with the national primary ambi-

---

[1] So in original. Probably should be "terms".

USCA Case #21-1146      Document #1920797      Filed: 11/03/2021      Page 90 of 99

ent air quality standard, a design value or other indicator comparable to 0.140 in terms of its relationship to the standard shall be used in lieu of 0.140 for purposes of applying the provisions of subparagraphs (B) and (C).

**(c) References to terms**

(1) Any reference in this subpart to a "Marginal Area", a "Moderate Area", a "Serious Area", a "Severe Area", or an "Extreme Area" shall be considered a reference to a Marginal Area, a Moderate Area, a Serious Area, a Severe Area, or an Extreme Area respectively classified under this section.

(2) Any reference in this subpart to "next higher classification" or comparable terms shall be considered a reference to the classification related to the next higher set of design values in table 1.

(July 14, 1955, ch. 360, title I, § 181, as added Pub. L. 101–549, title I, § 103, Nov. 15, 1990, 104 Stat. 2423.)

EXEMPTIONS FOR STRIPPER WELLS

Pub. L. 101–549, title VIII, § 819, Nov. 15, 1990, 104 Stat. 2698, provided that: "Notwithstanding any other provision of law, the amendments to the Clean Air Act made by section 103 of the Clean Air Act Amendments of 1990 [enacting this section and sections 7511a to 7511f of this title] (relating to additional provisions for ozone nonattainment areas), by section 104 of such amendments [enacting sections 7512 and 7512a of this title] (relating to additional provisions for carbon monoxide nonattainment areas), by section 105 of such amendments [enacting sections 7513 to 7513b of this title and amending section 7476 of this title] (relating to additional provisions for PM–10 nonattainment areas), and by section 106 of such amendments [enacting sections 7514 and 7514a of this title] (relating to additional provisions for areas designated as nonattainment for sulfur oxides, nitrogen dioxide, and lead) shall not apply with respect to the production of and equipment used in the exploration, production, development, storage or processing of—

"(1) oil from a stripper well property, within the meaning of the June 1979 energy regulations (within the meaning of section 4996(b)(7) of the Internal Revenue Code of 1986 [26 U.S.C. 4996(b)(7)], as in effect before the repeal of such section); and

"(2) stripper well natural gas, as defined in section 108(b) of the Natural Gas Policy Act of 1978 (15 U.S.C. 3318(b)).[.]

except to the extent that provisions of such amendments cover areas designated as Serious pursuant to part D of title I of the Clean Air Act [this part] and having a population of 350,000 or more, or areas designated as Severe or Extreme pursuant to such part D."

**§ 7511a. Plan submissions and requirements**

**(a) Marginal Areas**

Each State in which all or part of a Marginal Area is located shall, with respect to the Marginal Area (or portion thereof, to the extent specified in this subsection), submit to the Administrator the State implementation plan revisions (including the plan items) described under this subsection except to the extent the State has made such submissions as of November 15, 1990.

**(1) Inventory**

Within 2 years after November 15, 1990, the State shall submit a comprehensive, accurate, current inventory of actual emissions from all sources, as described in section 7502(c)(3) of this title, in accordance with guidance provided by the Administrator.

**(2) Corrections to the State implementation plan**

Within the periods prescribed in this paragraph, the State shall submit a revision to the State implementation plan that meets the following requirements—

**(A) Reasonably available control technology corrections**

For any Marginal Area (or, within the Administrator's discretion, portion thereof) the State shall submit, within 6 months of the date of classification under section 7511(a) of this title, a revision that includes such provisions to correct requirements in (or add requirements to) the plan concerning reasonably available control technology as were required under section 7502(b) of this title (as in effect immediately before November 15, 1990), as interpreted in guidance issued by the Administrator under section 7408 of this title before November 15, 1990.

**(B) Savings clause for vehicle inspection and maintenance**

(i) For any Marginal Area (or, within the Administrator's discretion, portion thereof), the plan for which already includes, or was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included, a specific schedule for implementation of a vehicle emission control inspection and maintenance program, the State shall submit, immediately after November 15, 1990, a revision that includes any provisions necessary to provide for a vehicle inspection and maintenance program of no less stringency than that of either the program defined in House Report Numbered 95–294, 95th Congress, 1st Session, 281–291 (1977) as interpreted in guidance of the Administrator issued pursuant to section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) or the program already included in the plan, whichever is more stringent.

(ii) Within 12 months after November 15, 1990, the Administrator shall review, revise, update, and republish in the Federal Register the guidance for the States for motor vehicle inspection and maintenance programs required by this chapter, taking into consideration the Administrator's investigations and audits of such program. The guidance shall, at a minimum, cover the frequency of inspections, the types of vehicles to be inspected (which shall include leased vehicles that are registered in the nonattainment area), vehicle maintenance by owners and operators, audits by the State, the test method and measures, including whether centralized or decentralized, inspection methods and procedures, quality of inspection, components covered, assurance that a vehicle subject to a recall notice from a manufacturer has complied with that notice, and effective implementation and enforcement, including ensuring that any re-

Filed: 11/03/2021    Page 91 of 99

USCA Case #21-1146    Document #1920797

§ 7607. Administrative proceedings and judicial review

(a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, any order under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect

[4] So in original. Probably should be "subsection,".

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 92 of 99

the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and

---

[5] So in original. The word "to" probably should not appear.

purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

    (A) the factual data on which the proposed rule is based;

    (B) the methodology used in obtaining the data and in analyzing the data; and

    (C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

    (4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

    (B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

    (ii) The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

    (5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

    (6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

    (B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

    (C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

    (7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

    (B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b)). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

    (8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b)) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 94 of 99

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

   (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   (B) contrary to constitutional right, power, privilege, or immunity;

   (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

   (D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section⁶ 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, §307, as added Pub. L. 91–604, §12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, §302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, §6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§303(d),

305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, §14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§108(p), 110(5), title III, §302(g), (h), title VII, §§702(c), 703, 706, 707(h), 710(5), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

### REFERENCES IN TEXT

Section 7321(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, §230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, §230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

### CODIFICATION

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

### PRIOR PROVISIONS

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly §14, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

### AMENDMENTS

1990—Subsec. (a). Pub. L. 101–549, §703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, §706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under sec-

⁶ So in original. Probably should be "sections".

tion 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101-549, §705(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101-549, §702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101-549, §302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101-549, §707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101-549, §110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101-549, §302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101-549, §302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101-549, §110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101-549, §302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101-549, §710(b), which directed that subpar. (H) be amended by substituting "subchapter VI" for "part B of subchapter I", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101-549, §302(h), see below.

Pub. L. 101-549, §302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101-549, §302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101-549, §302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101-549, §110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101-549, §302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101-549, §110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101-549, §302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101-549, §110(5)(C), redesignated former subpar. (U) as (V).

Subsec. (d)(1)(V). Pub. L. 101-549, §302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101-549, §108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95-190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review under section 1857c-10(c)(2)(A), (B), or (C) to

the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95-95, §305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95-95, §305(a), added subsec. (d).

Subsec. (e). Pub. L. 95-95, §303(d), added subsec. (e).

Subsec. (f). Pub. L. 95-95, §305(f), added subsec. (f).

Subsec. (g). Pub. L. 95-95, §305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93-319 inserted reference to the Administrator's action under section 1857c-10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1973—Subsec. (a)(1). Pub. L. 92-157 substituted reference to section "7545(c)(3)" for "7545(c)(4)" of this title.

### EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95-95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95-95, set out as a note under section 7401 of this title.

### TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92-463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

### PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95-95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95-95, see section 406(a) of Pub. L. 95-95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or

USCA Case #21-1146    Document #1920797    Filed: 11/03/2021    Page 96 of 99

other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

USCA Case #21-1146      Document #1920797      Filed: 11/03/2021      Page 97 of 99

Filed: 11/03/2021          Page 98 of 99

Document #1920797

USCA Case #21-1146

### § 7619. Air quality monitoring

#### (a) In general

After notice and opportunity for public hearing, the Administrator shall promulgate regulations establishing an air quality monitoring system throughout the United States which—

(1) utilizes uniform air quality monitoring criteria and methodology and measures such air quality according to a uniform air quality index,

(2) provides for air quality monitoring stations in major urban areas and other appropriate areas throughout the United States to provide monitoring such as will supplement (but not duplicate) air quality monitoring carried out by the States required under any applicable implementation plan,

(3) provides for daily analysis and reporting of air quality based upon such uniform air quality index, and

(4) provides for recordkeeping with respect to such monitoring data and for periodic analysis and reporting to the general public by the Administrator with respect to air quality based upon such data.

The operation of such air quality monitoring system may be carried out by the Administrator or by such other departments, agencies, or entities of the Federal Government (including the National Weather Service) as the President may deem appropriate. Any air quality monitoring system required under any applicable implementation plan under section 7410 of this title shall, as soon as practicable following promulgation of regulations under this section, utilize the standard criteria and methodology, and measure air quality according to the standard index, established under such regulations.

#### (b) Air quality monitoring data influenced by exceptional events

##### (1) Definition of exceptional event

In this section:

###### (A) In general

The term "exceptional event" means an event that—

(i) affects air quality;

(ii) is not reasonably controllable or preventable;

(iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and

(iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event.

###### (B) Exclusions

In this subsection, the term "exceptional event" does not include—

(i) stagnation of air masses or meteorological inversions;

ADD-29

Filed: 11/03/2021          Page 99 of 99

USCA Case #21-1146          Document #1920797

(ii) a meteorological event involving high temperatures or lack of precipitation; or

(iii) air pollution relating to source non-compliance.

**(2) Regulations**

**(A) Proposed regulations**

Not later than March 1, 2006, after consultation with Federal land managers and State air pollution control agencies, the Administrator shall publish in the Federal Register proposed regulations governing the review and handling of air quality monitoring data influenced by exceptional events.

**(B) Final regulations**

Not later than 1 year after the date on which the Administrator publishes proposed regulations under subparagraph (A), and after providing an opportunity for interested persons to make oral presentations of views, data, and arguments regarding the proposed regulations, the Administrator shall promulgate final regulations governing the review and handling or [1] air quality monitoring data influenced by an exceptional event that are consistent with paragraph (3).

**(3) Principles and requirements**

**(A) Principles**

In promulgating regulations under this section, the Administrator shall follow—

(i) the principle that protection of public health is the highest priority;

(ii) the principle that timely information should be provided to the public in any case in which the air quality is unhealthy;

(iii) the principle that all ambient air quality data should be included in a timely manner,[2] an appropriate Federal air quality database that is accessible to the public;

(iv) the principle that each State must take necessary measures to safeguard public health regardless of the source of the air pollution; and

(v) the principle that air quality data should be carefully screened to ensure that events not likely to recur are represented accurately in all monitoring data and analyses.

**(B) Requirements**

Regulations promulgated under this section shall, at a minimum, provide that—

(i) the occurrence of an exceptional event must be demonstrated by reliable, accurate data that is promptly produced and provided by Federal, State, or local government agencies;

(ii) a clear causal relationship must exist between the measured exceedances of a national ambient air quality standard and the exceptional event to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitoring location;

(iii) there is a public process for determining whether an event is exceptional; and

(iv) there are criteria and procedures for the Governor of a State to petition the Administrator to exclude air quality monitoring data that is directly due to exceptional events from use in determinations by the Administrator with respect to exceedances or violations of the national ambient air quality standards.

**(4) Interim provision**

Until the effective date of a regulation promulgated under paragraph (2), the following guidance issued by the Administrator shall continue to apply:

(A) Guidance on the identification and use of air quality data affected by exceptional events (July 1986).

(B) Areas affected by PM-10 natural events, May 30, 1996.

(C) Appendices I, K, and N to part 50 of title 40, Code of Federal Regulations.

(July 14, 1955, ch. 360, title III, § 319, as added Pub. L. 95–95, title III, § 309, Aug. 7, 1977, 91 Stat. 781; amended Pub. L. 109–59, title VI, § 6013(a), Aug. 10, 2005, 119 Stat. 1882.)

AMENDMENTS

2005—Pub. L. 109–59 designated existing provisions as subsec. (a), inserted heading, substituted "After notice and opportunity for public hearing" for "Not later than one year after August 7, 1977, and after notice and opportunity for public hearing", and added subsec. (b).

EFFECTIVE DATE

Section effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

[1] So in original. Probably should be "of".
[2] So in original. Probably should be followed by "in".