**ORAL ARGUMENT NOT YET SCHEDULED**
**Case No. 21-1146**

# United States Court of Appeals
# for the District of Columbia Circuit

MIDWEST OZONE GROUP,

*Petitioner*,

V.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

ON PETITION FOR REVIEW OF FINAL ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
86 Fed. Reg. 23,054 (Apr. 30, 2021)

**CORRECTED BRIEF OF THE STATES OF NEW YORK,
DELAWARE, AND NEW JERSEY, THE COMMONWEALTH OF
MASSACHUSETTS, AND THE CITY OF NEW YORK AS *AMICI
CURIAE* IN SUPPORT OF RESPONDENTS**

STEVEN C. WU
 *Deputy Solicitor General*
JUDITH VALE
 *Assistant Deputy Solicitor General*
MORGAN A. COSTELLO
CLAIBORNE E. WALTHALL
 *Assistant Attorneys General*
  *Of Counsel*

LETITIA JAMES
 *Attorney General of New York*
BARBARA D. UNDERWOOD
 *Solicitor General*
State Capitol
Albany, NY 12224
(518) 776-2392
morgan.costello@ag.ny.gov

Dated: February 28, 2022

*Counsel for Amicus Curiae State of New York*
*Counsel for Additional Amici Curiae Listed Below on Signature Page*

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

The undersigned counsel of record certifies as follows:

## A. Parties and Amici

<u>Petitioners</u>

Midwest Ozone Group appears in this case as petitioner.

<u>Respondents</u>

The following parties appear in this case as respondents: United States Environmental Protection Agency (EPA) and Michael Regan, in his official capacity as Administrator of the EPA.

<u>Intervenors</u>

The following parties have intervened in support of respondents: Downwinders at Risk, Texas Environmental Justice Advocacy Services, Appalachian Mountain Club, Sierra Club, Environmental Defense Fund, and Clean Wisconsin (*see* Doc. No. 1910137).

<u>Amici</u>

The State of New York stated its intention to appear in this action as *amicus curiae* in support of respondents (*see* Doc. No. 1911572). The following additional parties join this brief as *amicus curiae* in support of respondents: the State of Delaware, the State of New Jersey, the

i

Commonwealth of Massachusetts, and the City of New York. Pursuant to Circuit Rule 29(b), the parties have consented to the City of New York's participation as *amicus curiae* in this proceeding.

## B. Ruling Under Review

Petitioner seeks review of the final agency action by respondents entitled: "Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS," 86 Fed. Reg. 23,054 (Apr. 30, 2021).

## C. Related Cases

The final agency action at issue in this proceeding has not been previously reviewed in this or any other court. There are no other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

DATED: February 28, 2022          Respectfully submitted,

*/s/Morgan A. Costello*
MORGAN A. COSTELLO
*Assistant Attorney General*
Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2392
morgan.costello@ag.ny.gov

*Counsel for Amicus Curiae*
*State of New York*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES .................................................................................i

TABLE OF AUTHORITIES ........................................................ v

GLOSSARY ....................................................................viii

INTEREST OF AMICI ............................................................ 1

STATUTES AND REGULATIONS ............................................ 2

BACKGROUND ..................................................................... 3

    A. Interstate Ozone Transport and the Good Neighbor Provision ................................................................... 3

    B. Amici's Efforts to Attain the 2008 Ozone Standard and Their Current Nonattainment Problems ......................... 7

    C. Amici's Deadline Enforcement Litigation ..................... 12

ARGUMENT ....................................................................... 14

POINT I ............................................................................ 15

MIDWEST MISCONSTRUES UPWIND AND DOWNWIND STATE OBLIGATIONS UNDER THE GOOD NEIGHBOR PROVISION ....................... 15

A. This Court Has Already Rejected the Argument that Downwind States Must Meet Attainment Requirements Before Upwind States Eliminate Significant Contributions. ............ 16

B. EPA Was Not Required to Impose Distinct Obligations on New York as an Upwind State That Other Upwind States Would Not Share. ..................................................... 19

C. Midwest's Argument Amounts to an Impermissible Collateral Attack on EPA's Separate Approval of New York's Revision to Its State Plan. ....................................................... 22

iii

POINT II .................................................................................. 24

EPA Acted Reasonably to Issue the Revised Update
    in Response to *Wisconsin* and a Court-Ordered Deadline .......... 24

CONCLUSION ....................................................................... 28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMIT ...................................................................................... 30

CERTIFICATE OF SERVICE ................................................ 31

STATUTORY AND REGULATORY ADDENDUM ............................ 32

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*EPA v. EME Homer City Generation, L.P.*,
  572 U.S. 489 (2014) ...................................................... 1, 18, 19, 20, 21

*Natural Res. Def. Council v. Train*,
  510 F.2d 692 (D.C. Cir. 1974) ............................................................ 27

*New Jersey v. Wheeler*,
  475 F. Supp. 3d 308 (S.D.N.Y. 2020)........................................... 13, 26

*New Jersey v. Wheeler*,
  S.D.N.Y. No. 20-cv-1425, Doc. 1 (S.D.N.Y. filed Feb. 19,
  2020) ................................................................................................ 13

*New York v. EPA*,
  781 F. App'x 1 (D.C. Cir. 2019).............................................................5

*New York v. Pruitt*,
  No. 18-cv-406(JGK), 2018 WL 2976018 (S.D.N.Y. Jun. 12,
  2018) ............................................................................................... 13n8

*North Carolina v. EPA*,
  531 F.3d 896, *amended in part on reh'g*, 550 F.3d 1176
  (D.C. Cir. 2008) ................................................................... 3, 17, 18, 27

*NRDC v. EPA*,
  25 F.3d 1063 (D.C. Cir. 1994) ............................................................ 23

*Sierra Club v. Johnson*,
  444 F. Supp. 2d 46 (D.D.C. 2006) ...................................................... 27

*Sierra Club v. Ruckelshaus*,
  602 F. Supp. 892 (N.D. Cal. 1984)...................................................... 28

*Wisconsin v. EPA*,
    938 F.3d 303 (D.C. Cir. 2019) ................... 1, 5, 6, 13, 17, 18, 21, 24, 27

**FEDERAL STATUTES**

42 U.S.C.
    § 7407(d)(1)(A)(i) ................................................... 10
    §§ 7408-7409 ........................................................ 4
    § 7410(a)(1) ...................................................... 4, 26
    § 7410(a)(2)(D)(i)(I) .............................................. 4
    § 7410(c)(1) ................................................. 5, 13, 26
    § 7511 ............................................................ 18
    § 7511(b)(2)(A) ................................................... 11
    § 7511a ......................................................... 8, 10
    §§ 7511a(a)-(e) ................................................... 8
    § 7511a(b) ........................................................ 8
    § 7511a(c) ........................................................ 8
    § 7511a(c)(2)(B) .................................................. 8
    § 7511c(b) ........................................................ 9
    § 7604(a)(2) ..................................................... 27

**STATE REGULATIONS**

6 N.Y.C.R.R. Subpart 227-3, Ozone Season Oxides of
    Nitrogen (NOx) Emission Limits for Simple Cycle and
    Regenerative Combustion Turbines, Revised Regulatory
    Impact Statement ............................................... 11

**FEDERAL REGULATIONS**

77 Fed. Reg. 30,088 (May 21, 2012) ............................... 10

80 Fed. Reg. 39,961 (Jul. 13, 2015) ............................... 5

81 Fed. Reg. 26,697 (May 4, 2016) ................................ 10

81 Fed. Reg. 74,504 (Oct. 26, 2016) ............................. 3, 5

83 Fed. Reg. 25,776 (June 4, 2018) .............................. 7n3

83 Fed. Reg. 56,781 (Nov. 14, 2018) .............................. 11

83 Fed. Reg. 65,878 (Dec. 21, 2018) ............................................................ 6

84 Fed. Reg. 44,238 (Aug. 23, 2019) ................................................. 7n3, 10

86 Fed. Reg. 11,688 (Feb. 26, 2021) ........................................................... 11

86 Fed. Reg. 23,054 (Apr. 30, 2021) ............................... 1, 8, 10n5, 15, 21

86 Fed. Reg. 43,956 (Aug. 11, 2021) ..................................... 11, 12, 22, 23

86 Fed. Reg. 60,602  (Nov. 3, 2021) ...................................................... 7n2

# GLOSSARY

| | |
|---|---|
| Act | Clean Air Act |
| AG Comments | Comments of the Attorneys General of the States of New York, New Jersey, Connecticut, Delaware and Massachusetts and the Corporation Counsel of the City of New York on Proposed Rule "Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS," 85 Fed. Reg. 68,964 (Oct. 30, 2020), dated December 14, 2020, EPA Docket ID# EPA-HQ-OAR-2020-0272-0114 |
| Close-Out | Determination Regarding Good Neighbor Obligations for the 2008 Ozone National Ambient Air Quality Standard, 83 Fed. Reg. 65,878 (Dec. 21, 2018); also known as "CSAPR Close-Out" |
| Update | Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 81 Fed. Reg. 74,504 (Oct. 26, 2016); also known as "CSAPR Update" |
| Revised Update | The rule under review: "Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS," 86 Fed. Reg. 23,054 (Apr. 30, 2021); also known as "Revised CSAPR Update" |
| EPA | United States Environmental Protection Agency |
| Good Neighbor Provision | 42 U.S.C. § 7410(a)(2)(D)(i)(I) |

| New York Metropolitan Area | New York-Northern New Jersey-Long Island, NY-NJ-CT Nonattainment Area for the 2008 ozone standards |
| --- | --- |
| 2008 ozone standards | The national ambient air quality standards for ozone promulgated by EPA in 2008; also known as 2008 ozone NAAQS |
| 2015 ozone standards | The national ambient air quality standards for ozone promulgated by EPA in 2015; also known as 2015 ozone NAAQS |

## INTEREST OF AMICI

Petitioner Midwest Ozone Group's (Midwest) challenge to the rule under review—the Revised Cross-State Air Pollution Rule Update for the 2008 Ozone NAAQS, 86 Fed. Reg. 23,054 (Apr. 30, 2021) (Revised Update)—misapprehends EPA's long-standing framework for allocating responsibility for upwind ozone pollution under the Clean Air Act's Good Neighbor Provision. Midwest asks this Court to depart from the approach that the Supreme Court endorsed in *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014), and this Court required in *Wisconsin v. EPA*, 938 F.3d 303, 314 (D.C. Cir. 2019), under which upwind States must address their cross-state emissions in the first instance, subject to uniform stringency levels. Instead, Midwest argues that EPA should have required one State, New York, to make greater reductions than other States, before upwind emissions are addressed.

Midwest's arguments rest on numerous mistaken understandings of the Clean Air Act's Good Neighbor Provision. Midwest is fundamentally mistaken in arguing that downwind States must try to reach attainment of the ozone standards before upwind States are required to reduce their emissions. And Midwest mischaracterizes

1

actions that New York has adopted for its own (downwind) attainment obligations as part of its (upwind) responsibilities under the Good Neighbor Provision, conflating New York's distinct roles as both an upwind and downwind State.

Amici Curiae New York, Delaware, Massachusetts, New Jersey, and New York City (amici) have a direct interest in this dispute. Amici are affected by excess ozone pollution transported from upwind States that are now subject to the Revised Update. And more specifically, Midwest has improperly criticized as inadequate New York's upwind obligations under the rule at issue here, on the basis of supposed harms to Connecticut's downwind attainment. Although amici asked EPA to impose more stringent limitations on upwind States during the proposal phase of rulemaking, we support respondents here because we wish to preserve the long overdue, if limited, relief to downwind States that the Revised Update provides.

## STATUTES AND REGULATIONS

Except for the additional statutory and regulatory provisions contained in the Addendum filed with this brief, relevant provisions are

contained in the Addendums filed with petitioner's and respondents' respective briefs.

## BACKGROUND

Amici supplement the facts in the parties' briefs with the following background.

## A. Interstate Ozone Transport and the Good Neighbor Provision

Ozone pollution develops on a regional scale over much of the eastern United States, as ozone and its precursors travel with the wind across state lines, sometimes hundreds of miles from their sources. 81 Fed. Reg. 74,504, 74,514 (Oct. 26, 2016). Many downwind areas have problems attaining or maintaining federal ozone standards because of emissions transported from sources in upwind States. When a State's pollution problems are substantially caused by sources in upwind States, that downwind State must regulate its own sources more stringently to compensate. But many downwind areas are unable to attain healthy air—even after imposing costly in-state controls—without reductions from upwind States. *See North Carolina v. EPA*, 531 F.3d 896, 912, *amended in part on reh'g*, 550 F.3d 1176 (D.C. Cir. 2008).

3

Congress enacted the Good Neighbor Provision in the Clean Air Act as one mechanism to address this long-recognized problem of transported interstate pollution. The Good Neighbor Provision imposes additional obligations on States when they devise State Plans to comply with the Act. Specifically, under the relevant statutory provisions, EPA first sets national ambient air quality standards to define the maximum allowable concentrations for certain air pollutants, including ground-level ozone.[1] 42 U.S.C. §§ 7408-7409. States then submit a state implementation plan (State Plan) within three years that provides for the "implementation, maintenance, and enforcement" of these national standards by statutorily defined attainment deadlines. *Id.* § 7410(a)(1).

As relevant here, the Good Neighbor Provision requires such State Plans to "prohibit" emissions that will "contribute significantly" to nonattainment, or "interfere with maintenance," of federal air quality standards in a downwind State. 42 U.S.C. § 7410(a)(2)(D)(i)(I). Critically, as this Court has repeatedly held, State Plans must ensure that upwind

---

[1] EPA has set primary and secondary standards for ozone to protect human health and welfare, respectively. The level of both standards set in 2008 is 75 ppb averaged over an eight-hour period.

4

States satisfy their Good Neighbor obligations in time to allow downwind States to attain the relevant national air quality standards by the statutory deadlines. *Wisconsin v. EPA*, 938 F.3d 303, 314 (D.C. Cir. 2019); *New York v. EPA*, 781 F. App'x 1, 6 (D.C. Cir. 2019). If EPA finds that a State has failed to submit a State Plan or disapproves the State's submission, EPA must issue a federal implementation plan (Federal Plan) within two years to accomplish the same objective. 42 U.S.C. § 7410(c)(1).

Here, EPA issued the relevant national standards for ozone in 2008. After numerous upwind States failed to timely submit State Plans that complied with the Good Neighbor Provision, 80 Fed. Reg. 39,961 (Jul. 13, 2015), EPA promulgated Federal Plans for those States. *See* 42 U.S.C. § 7410(c)(1). In particular, in 2016, EPA promulgated the Cross-State Air Pollution Rule Update or "CSAPR Update" (Update) to partially—not fully—address these upwind States' Good Neighbor obligations. 81 Fed Reg. 74,504, 74,506 (Oct. 26, 2016) (Update rule "partially address[es] EPA's . . . outstanding obligations to prohibit interstate transport").

In 2018, during a new presidential administration, EPA changed course and issued a second rule, known as the "CSAPR Close-Out,"

concluding that the Update had *fully* remedied upwind States' Good Neighbor obligations under the 2008 ozone standards. 83 Fed. Reg. 65,878 (Dec. 21, 2018) (Close-Out). EPA's conclusion was based on its predictions that downwind States would be able to satisfy the 2008 standards by 2023—two years *after* the statutory attainment deadline in 2021.

In 2019, this Court issued two decisions that partially invalidated and remanded the Update and vacated the Close-Out. In *Wisconsin*, this Court held that the Update violated the Act because it "allows upwind States to continue their significant contributions to downwind air quality problems beyond the statutory deadlines by which downwind States must demonstrate their attainment of air quality standards." 938 F.3d at 309. The Court remanded the Update to EPA to modify the rule. *Id.* at 336-37. A few weeks later, in *New York*, the Court vacated the Close-Out because that rule had improperly found that the Update was a complete remedy for downwind States.

EPA promulgated the Revised Update at issue here in response to both *Wisconsin* and *New York*.[2]

## B. Amici's Efforts to Attain the 2008 Ozone Standard and Their Current Nonattainment Problems

Largely because of EPA's incomplete and untimely enforcement of the Good Neighbor Provision, many amici have not been able to fully attain or struggle to maintain the 2008 ozone standards nearly fourteen years after they were promulgated. The absence of sufficient controls on upwind emissions has forced the downwind States, including all amici, to adopt ever-more-stringent controls on in-state sources to satisfy the Act's statutory attainment deadlines.[3]

Specifically, States with nonattainment areas, such as amici New York, Delaware, and New Jersey, must submit State Plans imposing

---

[2] In September 2018, New York submitted a State Plan revision to address Good Neighbor Provision obligations for the 2008 ozone standards. EPA initially took the position that New York's revision was unnecessary, *see* 86 Fed. Reg. 60,602, 60,603-04 (Nov. 3, 2021), but after issuing a Federal Plan for New York (among others) in the Revised Update, EPA separately proposed disapproval of New York's 2018 State Plan revision. *See id*. Thus, New York remains subject to the Federal Plan in the Revised Update, along with other upwind States.

[3] Areas in "serious" nonattainment of the 2008 ozone standards had a 2021 attainment deadline; "severe" areas must attain by 2027. *See* 84 Fed. Reg. 44,238 (Aug. 23, 2019); 83 Fed. Reg. 25,776, 25,821 (June 4, 2018).

stringent technological controls and emissions limits on in-state sources. *See* 42 U.S.C. § 7511a. These requirements grow more demanding at more severe levels of nonattainment. *Id.* §§ 7511a(a)-(e). For areas in "moderate" nonattainment status and worse, the Act requires in-state sources to install reasonably available control technology (known as "RACT") to control ozone precursors such as nitrogen oxides (NOx). *See, e.g.*, *id.* §§ 7511a(b)&(c) (requirements for certain ozone nonattainment areas). If States do not attain the ozone standards by the statutory deadlines, they may be "bumped up" to a more severe nonattainment level, which in turn would require yet more emissions limits and reductions. *Id.* § 7511a(c)(2)(B).

To comply with these statutory obligations, amici have for decades imposed stringent and costly ozone controls on in-state sources far beyond controls adopted by upwind States. As a result, downwind States such as amici have some of the most stringent emissions limits and controls in the country and emit much less pollution than other States where sources are less tightly controlled. *See* 86 Fed. Reg. at 23,059 tbl. I.B-1; *see also* AG Comments 5-8, 19-20. Moreover, amici are part of the Ozone Transport Region, an area created by the Act that imposes

stringent rules that other upwind States do not face. *See* 42 U.S.C. § 7511c(b). Those limitations have come with considerable and disproportionate costs to the downwind States. For example, New York has required in-state sources to implement controls costing up to $5,500 per ton of nitrogen oxide removed. AG Comments at 19. By comparison, in the 2016 Update, EPA declined to consider any controls on upwind sources at costs above $1,400 per ton; and even in the Revised Update, EPA established a $1,600 per ton cost threshold for certain controls and a $1,800 per ton cost threshold for others.

Downwind States' disproportionate efforts to control ozone pollution have been effective.[4] But because of continued upwind emissions, downwind States, including amici, still face problems attaining and maintaining the 2008 ozone standard, including in the New York-Northern New Jersey-Long Island, NY-NJ-CT Nonattainment Area

---

[4] Between 2008 and 2019, New York's major power plants reduced ozone-season nitrogen-oxide emissions by 83 percent; New Jersey's power plants reduced their ozone-season nitrogen-oxide emissions by approximately 81 percent; Massachusetts reduced its ozone-season nitrogen-oxide emissions by over 85 percent; and Delaware's power plants reduced ozone-season nitrogen-oxide emissions by 93 percent. *See* AG Comments at 8, 19-20. These States' power plant nitrogen-oxide emission rates are among the lowest in the country. *Id.* at 6.

(New York Metropolitan Area). The New York Metropolitan Area is a multistate nonattainment area covering nine counties in New York (including all of New York City), twelve counties in New Jersey, and three counties in Connecticut. *See* 42 U.S.C. § 7407(d)(1)(A)(i). When EPA determines that an air quality monitoring location in a multistate area is in nonattainment, each State in the multistate area will face direct consequences and responsibilities under the Act to address that nonattainment status.[5] *Id.* §§ 7407(d)(1)(A)(i) & 7511a.

In 2012, EPA designated the New York Metropolitan Area as being in "marginal" nonattainment of the 2008 ozone standards, 77 Fed. Reg. 30,088, 30,135 (May 21, 2012), and despite significant in-state emissions reductions, it has remained in nonattainment with increasingly more serious designations. 81 Fed. Reg. 26,697, 26,699 (May 4, 2016); 84 Fed.

---

[5] New York and New Jersey are both downwind and upwind States in the Revised Update since they are both subject to emissions budgets (as upwind States) and are also part of the tri-state New York Metropolitan Area, where excess ozone levels at Connecticut receptors mean portions of all three States are classified as nonattainment (as downwind States). *Contra* EPA Brief at 36. But their emission budgets are lower than most other upwind States' budgets because New York and New Jersey sources have already largely implemented the controls the Revised Update requires. *See* 86 Fed. Reg. at 23,059 tbl. I.B-1; AG Comments at 5-8, 19-20.

Reg. 44,238 (Aug. 23, 2019); 83 Fed. Reg. 56,781, 56,784 (Nov. 14, 2018); *see* 42 U.S.C. § 7511(b)(2)(A).

On May 18, 2020, New York submitted to EPA a revision to the portions of its State Plan that sought to address New York's obligation as a *downwind* State to meet the Act's attainment standards, particularly for the more stringent 2015 ozone standards, at monitoring locations in New York. *See* 86 Fed. Reg. 43,956, 43,958 (Aug. 11, 2021). The proposed revision incorporated New York regulations that sought to limit emissions of nitrogen oxides from "peakers"—i.e., certain smaller power plants that primarily operate during times of peak electricity demand. *See* 86 Fed. Reg. 11,688, 11,689 (Feb. 26, 2021); *see* NYSDEC, 6 N.Y.C.R.R. Subpart 227-3, Ozone Season Oxides of Nitrogen (NOx) Emission Limits for Simple Cycle and Regenerative Combustion Turbines, Revised Regulatory Impact Statement (Impact Statement), at 1.[6] Such peakers were already required to employ stringent control equipment under existing federal standards, *see* 86 Fed. Reg. at 43,958,

---

[6] Relevant portions of the Impact Statement are in the Addendum filed with this brief.

but the new regulations (known as the Peaker Rule) sought to further control emissions during the ozone season.[7]

The revision did not (and was not intended to) address New York's Good Neighbor obligations as an *upwind* State under the 2008 ozone standards, but New York noted that its revised plan would assist in reducing nitrogen oxide emissions to monitoring locations elsewhere in the New York Metropolitan Area, including those in Connecticut. *See* Impact Statement, at 5-7.

EPA approved New York's State Plan revision, including its incorporation of the Peaker Rule, in August 2021. 86 Fed. Reg. at 43,956. Midwest commented on the proposal, but did not seek reconsideration or challenge EPA's final approval.

## C.   Amici's Deadline Enforcement Litigation

After the September 2019 *Wisconsin* decision, EPA had a duty to address interstate ozone transport in a revised rule. Although this Court did not set a date for EPA's revision, the Court stated it did not "intend

---

[7] The Peaker Rule requires retrofit and, in some cases, retirements of peakers unable to meet the new regulations, so New York adopted a phased approach to implementation from 2023-2025 to enable these transitions without threatening electric grid reliability.

to grant an indefinite stay of the effectiveness of this court's decision." *Wisconsin*, 938 F.3d at 337. Similarly, the Court's *New York* decision vacated the Close-Out, thus reviving EPA's duty under 42 U.S.C. § 7410(c)(1) and a 2018 district court order[8] to issue Federal Plans for upwind States that would fully address Good Neighbor obligations for the 2008 ozone standards.

When EPA did not promptly move to comply with this Court's decisions, amici commenced deadline-enforcement litigation in federal district court. *See* Complaint, *New Jersey v. Wheeler*, S.D.N.Y. No. 20-cv-1425, Doc. 1 (S.D.N.Y. filed Feb. 19, 2020). In July 2020, more than ten months after the Update was remanded to EPA, the U.S. District Court for the Southern District of New York issued a thorough decision crediting amici's arguments and setting a March 15, 2021, deadline for EPA to issue a revised rule. *See New Jersey v. Wheeler*, 475 F. Supp. 3d 308, 333 (S.D.N.Y. 2020).

EPA promulgated the Revised Update under review here by the March 15, 2021, deadline. Although the Revised Update did not go as far

---

[8] *See* Opinion & Order, *New York v. Pruitt*, No. 18-cv-406(JGK), 2018 WL 2976018, at *3-4 (S.D.N.Y. Jun. 12, 2018).

13

in curbing ozone emissions as amici had urged, the rule did require power plants in upwind States to take further cost-effective steps to reduce emissions, thus providing amici an important measure of long-delayed relief from poorly controlled sources in many upwind States. By this lawsuit, Midwest would seek to excuse sources in upwind States from even those limited requirements.

## ARGUMENT

Amici address two arguments made by Midwest. First, Midwest erroneously argues (in Point II.A of its brief) that EPA could not require emission reductions from the set of covered upwind States because one State, New York, should have been solely responsible for achieving the necessary reductions by accelerating its implementation of the Peaker Rule. But this argument misstates New York's obligation both as a downwind State and as an upwind State. As a downwind State, New York (like other amici) was under no obligation to impose even more stringent and costly controls on in-state sources before upwind States adopted basic, cheaper controls on their own sources. And as an upwind State, New York was not required to make its in-state controls even more stringent when other upwind States have not begun to implement similar

14

controls at all. The Act does not permit, much less *compel* EPA to excuse sources in some upwind States from their Good Neighbor obligations. This is no less true simply because a downwind State has determined to do more than was strictly required by the Act by addressing pollution from peakers, especially when upwind States with these same types of sources face no comparable requirements. *See* 86 Fed. Reg. at 23,097.

Second, Midwest erroneously argues (in Point I.A of its brief) that EPA took impermissible shortcuts and arbitrarily curtailed its modeling to meet a court-ordered deadline. This argument understates the importance of the statutory deadlines here, which EPA is already years late in enforcing. And it also misstates the significant opportunities that EPA provided Midwest (and other parties) to study and comment on its proposal.

## POINT I

### MIDWEST MISCONSTRUES UPWIND AND DOWNWIND STATE OBLIGATIONS UNDER THE GOOD NEIGHBOR PROVISION

Midwest's arguments in Point II.A conflate the related but distinct obligations of upwind and downwind States—particularly concerning New York, which is both. Central to Midwest's flawed arguments is a mischaracterization of New York's Peaker Rule, which was adopted as

15

part of New York's attainment obligations as a downwind State, primarily for separate, stricter 2015 ozone standards, but which Midwest mischaracterizes as part of New York's obligations as an upwind State for the 2008 ozone standards. For the reasons given below, this Court should reject Midwest's attempt to excuse poorly controlled sources in upwind States from the Revised Update's requirements by pointing to purported flaws in the timing of an ambitious emissions control program in New York that is wholly unrelated to New York's obligations as an upwind State under the challenged rule.

## A. This Court Has Already Rejected the Argument that Downwind States Must Meet Attainment Requirements Before Upwind States Eliminate Significant Contributions.

Part of Midwest's argument in Point II.A is that sources in upwind States should be free of the obligations imposed by the Revised Update because if EPA had required New York to implement its Peaker Rule more expeditiously, upwind States would not have been subject to Good Neighbor obligations at all. Midwest Br. at 31-32. This argument turns the Good Neighbor Provision on its head. This Court has repeatedly rejected the argument that, under the Good Neighbor Provision, downwind States must first try to attain the ozone standards on their

16

own before upwind States would be required to eliminate their significant contributions to downwind nonattainment. In *North Carolina* and *Wisconsin*, this Court struck down portions of EPA's transport rules because they failed to require upwind States to eliminate their significant contributions *before* downwind States had to attain the relevant standards. *See Wisconsin*, 938 F.3d at 315; *North Carolina*, 531 F.3d at 912. Midwest thus argues for the very approach that this Court has repeatedly rejected as inconsistent with the Good Neighbor Provision and the statutory deadlines in the Clean Air Act.

Midwest's approach also undermines the equity concerns underlying the Good Neighbor Provision recognized by the Supreme Court in *EME Homer City* and this Court in *North Carolina* and *Wisconsin*. Many of amici are downwind States with one or more nonattainment areas that are subject to attainment deadlines and have taken numerous actions, like New York's promulgation of its Peaker Rule, to attain the 2008 (and 2015) ozone standards. As this Court has repeatedly stated, requiring downwind areas to attain "without the elimination of upwind states' significant contribution to downwind nonattainment" would improperly "forc[e] downwind areas to make

17

greater reductions than [the Good Neighbor Provision] requires." *North Carolina*, 531 F.3d at 912; *see also Wisconsin*, 938 F.3d at 314. And this inequity is heightened by the fact that the additional reductions made by downwind States typically cost far more than equivalent reductions available to upwind States that have not yet implemented similarly stringent pollution controls. *See EME Homer City*, 572 U.S. at 519. For example, as part of the New York Metropolitan Area, which is in nonattainment, New York is required by 42 U.S.C. § 7511 to have certain sources adopt "reasonably available control technology," which costs approximately $5,500 per ton. AG Comments at 19-20. By contrast, the Revised Update requires upwind sources to adopt measures that cost no more than $1,800 per ton.

Midwest thus gets the structure of the Good Neighbor Provision backward by arguing that a downwind State was required to adopt even more stringent controls—beyond the disproportionate costs already borne—so that upwind sources could be exempt from their Good Neighbor obligations altogether. In fact, the Good Neighbor Provision requires upwind States to address their significant contributions first, precisely to spare downwind States, including all amici, the unfair

burden of even more costly pollution control that they have undertaken for years since the 2008 ozone standards were issued. New York's decision to adopt the Peaker Rule thus has no bearing on the obligation of upwind States to reduce their significant contributions.

## B. EPA Was Not Required to Impose Distinct Obligations on New York as an Upwind State That Other Upwind States Would Not Share.

In other parts of Point II.A, Midwest argues that New York, as an *upwind* State, should be singled out and made to do more than the other upwind States subject to the Revised Update (including speedier implementation of the Peaker Rule), in order to address nonattainment at certain Connecticut monitors. Midwest Br. at 34-35. Midwest's argument is contrary to EPA's longstanding, repeatedly upheld approach for allocating responsibility among upwind States under the four-step transport framework.

As the Supreme Court has recognized, nonattainment in downwind States "results from the collective and interwoven contributions of multiple upwind States." *EME Homer City*, 572 U.S. at 514. This complex situation creates a "thorny causation problem" for EPA, which must "allocate among multiple contributing upwind States responsibility for a

downwind State's excess pollution." *Id.* To address this problem, EPA uses a multi-step framework to determine "significant contributions" under the Good Neighbor Provision and the corresponding amounts of pollution that must be eliminated. Under this framework, rather than focusing on particular States, EPA instead identifies *all* States "linked" to downwind nonattainment and then allocates responsibility for required emissions reductions among them. And in *EME Homer City*, the Supreme Court upheld an approach to allocating responsibility under which EPA imposed a uniform cost level for power-plant controls and then set emissions budgets to ensure that *all* States applied this cost level to reduce their significant contributions. 572 U.S. at 519.

As the Supreme Court explained, this approach permissibly chooses "to reduce the amount easier, i.e., less costly, to eradicate," rather than (for example) requiring each upwind source to reduce emissions by or to the same overall amount. *Id.*; *see also id.* at 524. Focusing on the cost of controls also avoids penalizing States like amici that have already undertaken significant measures to reduce emissions from in-state sources. Because the marginal cost of reducing pollution tends to increase with each successively more stringent control measure a State might

20

employ, a cost-focused approach prioritizes reductions from upwind States that are further behind in adopting pollution controls. Thus, under such an approach, "[u]pwind States that have not yet implemented pollution controls of the same stringency as their neighbors will be stopped from free riding on their neighbors' efforts to reduce pollution." *Id.*

The Revised Update follows this precise model to address nonattainment at New York Metropolitan Area monitors. 86 Fed. Reg. at 23,057-59. And this Court rejected challenges to EPA's use of this approach in the Update. *See Wisconsin*, 938 F.3d at 322-23. But Midwest ignores these precedents in asserting that just one upwind State, New York, should be singled out and required to adopt additional emissions reductions that are both more costly and stricter than controls required for other upwind States that significantly contribute to the same downwind monitors. To the contrary, "the Good Neighbor Provision does not require EPA to disregard costs and consider exclusively each upwind State's physically proportionate responsibility for each downwind air quality problem." *EME Homer City*, 572 U.S. at 524.

Indeed, Midwest's approach would effectively penalize downwind States like New York for being more proactive than other upwind States in addressing the interstate transport problems posed by peakers. As EPA acknowledges in its brief (at 36 n.14), the Revised Update declined to require installation of peaker controls for all upwind States. Yet Midwest would have New York alone adopt peaker controls as an upwind State, simply because New York has chosen to address its downwind attainment obligations by reducing peaker emissions. This argument not only conflates New York's distinct roles as both an upwind and downwind State, but it would also impose unique burdens on New York for no other reason than the State's choice to address peakers in the first instance.

## C. Midwest's Argument Amounts to an Impermissible Collateral Attack on EPA's Separate Approval of New York's Revision to Its State Plan.

Midwest's inordinate focus on New York's Peaker Rule also fails for a separate reason. New York included the Peaker Rule (including its implementation schedule) in a revision to its State Plan that EPA approved in August 2021. 86 Fed. Reg. at 43,956. But Midwest never challenged that approval, and is now out of time to do so. To the extent that Midwest now challenges the Peaker Rule as a component of New

York's compliance as a downwind State with various attainment deadlines, it is bringing an impermissible collateral attack on a separate, unrelated rulemaking. A petitioner cannot raise an untimely collateral challenge to an approval in a subsequent, separate proceeding after "[h]aving failed to raise a timely challenge to that" earlier approval. *NRDC v. EPA*, 25 F.3d 1063, 1073 (D.C. Cir. 1994).

Midwest's characterizations of New York's Peaker Rule are misplaced in any event, including for reasons already discussed. For example, Midwest argues that EPA improperly allowed New York (as a downwind State) to phase in the Peaker Rule after the 2021 attainment deadline for the New York Metropolitan Area. Midwest Br. at 12-13. But, as discussed, the Good Neighbor Provision does not require that downwind States attain by relying on in-state reductions alone when, as here, upwind States can still make meaningful and cost-effective reductions to their significant contributions. Nor is New York (as an upwind State) allowing its sources to pollute unimpeded. To the contrary, the plants subject to the Peaker Rule are already subject to stringent technology requirements and emission limits. See *supra* at 11-12. The Peaker Rule builds on these existing, continuing requirements. *See* 86

23

Fed. Reg. at 43,958 (detailing history of peaker regulation in New York and existing stringent requirements that remain in place).

Midwest missteps when it asserts that one State, by adopting certain pollution controls ahead of other States, is required to bear sole responsibility for all downwind nonattainment—including its own. Neither the Good Neighbor Provision nor any applicable precedent supports this result. Amici have done their part to reach attainment and to prohibit excess emissions. The Revised Update reasonably requires that all upwind States and sources comply with their Good Neighbor obligations as well.

## POINT II

### EPA ACTED REASONABLY TO ISSUE THE REVISED UPDATE IN RESPONSE TO *WISCONSIN* AND A COURT-ORDERED DEADLINE

When this Court decided *Wisconsin* and *New York* and remanded the Update to the agency, EPA had a duty to promulgate Federal Plans that fully eliminated upwind States' significant contributions to downwind nonattainment by the next relevant attainment deadlines for the 2008 ozone standards. *Wisconsin*, 938 F.3d at 313, 336-37. Several downwind States, including amici New York, New Jersey, and Connecticut, faced a July 2021 attainment deadline. Thus, EPA was

24

required to act expeditiously. Midwest nonetheless argues that EPA took impermissible shortcuts in response to a "random" deadline set by the district court in the *New Jersey* litigation. Midwest Br. at 15. Midwest is mistaken.

Far from flouting *Wisconsin* or the statutory deadlines underlying that decision, the district court purposefully set a March 15, 2021, deadline for the agency to comply with *Wisconsin* and the plaintiff States' approaching 2021 attainment deadlines. The decision to give EPA some lead time before the States' July 2021 deadlines reasonably drew on proof accompanying the parties' cross-motions for summary judgment as to the likely rulemaking timeline, which specifically accounted for the necessary public comment period.

Midwest is wrong to argue that EPA had insufficient time to complete the necessary analysis and should have sought even more time to complete additional modeling for the Revised Update. Midwest Br. at 23. In *New Jersey*, EPA conceded that a March 15, 2021, deadline afforded the agency sufficient time to promulgate a rule to address power plant controls that could be implemented by the 2021 attainment

deadlines. 475 F. Supp.3d at 328.[9] That concession was a reasonable one. EPA was already well past its time to issue a rule to implement the 2008 ozone standards. Moreover, the plaintiff States (including amici) sought summary judgment in their district court deadline-enforcement litigation nearly seven months after the *Wisconsin* remand, when EPA was already presumably working to address this Court's mandate. There is thus no basis for Midwest's speculation that EPA took impermissible shortcuts in its consideration of a revised rule. Midwest Br. at 10.

Finally, to the extent that Midwest suggests that the district court exceeded its authority or competence, neither the law nor the facts support such an assertion (or even Midwest's ability to raise it collaterally at this late stage). The Act imposes clear deadlines for States to submit State Plans (including provisions addressing their Good Neighbor obligations) and for EPA to impose Federal Plans when State Plans are either absent or insufficient. *See* 42 U.S.C. § 7410(a)(1), (c)(1). The Act also requires downwind States to meet their attainment

---

[9] EPA had sought a more extended deadline for sources that were not power plants, but Midwest limits its arguments here to the rules applicable to power plants.

obligations by certain statutory deadlines, and this Court has held that those deadlines also apply to upwind States' Good Neighbor obligations. *North Carolina*, 531 F.3d at 912; *see also Wisconsin*, 938 F.3d at 314. There is no serious question that courts have the power to require agencies to comply with statutory deadlines under the Act. 42 U.S.C. § 7604(a)(2). And when, as here, a nondiscretionary deadline has passed, an agency may avoid an "immediate deadline" only where it has used the "utmost diligence in discharging [its] statutory responsibilities" or where to do so would "call [the Administrator] 'to do an impossibility.'" *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 52-53 (D.D.C. 2006) (citing *Natural Res. Def. Council v. Train*, 510 F.2d 692, 705 (D.C. Cir. 1974)). Neither situation was present here.

Contrary to Midwest's arguments, parties' disagreements over the reasonableness of a regulatory schedule do not necessarily create an issue of disputed fact precluding summary judgment. Indeed, courts regularly resolve such competing claims on summary judgment and incorporate the parties' concerns into any timetable imposed by an order for compliance. *See Sierra Club*, 444 F. Supp. 2d at 55-59 (resolving disagreement between parties' declarations in setting schedule for EPA's

compliance with nondiscretionary duty under the Act); *see also Sierra Club v. Ruckelshaus*, 602 F. Supp. 892, 898 n. 9 (N.D. Cal. 1984). The district court thus acted properly in considering the parties' submissions and setting an appropriate deadline for EPA to act.

## CONCLUSION

The Court should deny the petition for review.

Dated: February 28, 2022

Respectfully submitted,

FOR THE STATE OF
NEW YORK

LETITIA JAMES
*Attorney General*
BARBARA D. UNDERWOOD
*Solicitor General*

*/s/Morgan A. Costello*[10]
STEVEN C. WU
*Deputy Solicitor General*
JUDITH VALE
*Assistant Deputy Solicitor General*
MORGAN A. COSTELLO
CLAIBORNE E. WALTHALL
*Assistant Attorneys General*
Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2392
morgan.costello@ag.ny.gov

---

[10] Counsel for the State of New York certifies that the other parties listed in the signature blocks consent to this filing.

28

FOR THE STATE OF
DELAWARE

KATHLEEN JENNINGS
*Attorney General*

*/s/Christian Douglas Wright*
(w/permission)
CHRISTIAN DOUGLAS WRIGHT
*Director of Impact Litigation*
Valerie Satterfield Edge
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8400
valerie.edge@delaware.gov

FOR THE STATE OF
NEW JERSEY

MATTHEW J. PLATKIN
*Acting Attorney General of
New Jersey*

/s/Daniel P. Resler
(w/permission)
DANIEL P. RESLER
*Deputy Attorney General*
Environmental  Enforcement  &
Environmental Justice Section
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 093
Trenton, New Jersey 08625
(609) 376-2735
Daniel.Resler@law.njoag.gov

FOR THE COMMONWEALTH
OF MASSACHUSETTS

MAURA HEALY
*Attorney General*

*/s/David S. Frankel*
(w/permission)
DAVID S. FRANKEL
*Special Assistant Attorney
General*
Environmental Protection
Division
One Ashburton Place, 18th Floor
Boston, MA 02108
(617) 963-2294
david.frankel@mass.gov
jillian.riley@mass.gov

FOR THE CITY OF
NEW YORK

GEORGIA M. PESTANA
*Corporation Counsel*

/s/Christopher G. King
(w/permission)
CHRISTOPHER G. KING
*Senior Counsel*
New York City Law Department
100 Church Street
New York, NY 10007
(212) 356-2319
cking@law.nyc.gov

29

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

The undersigned attorney, Morgan A. Costello, hereby certifies:

1.    This document complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Circuit Rule 32(e)(3). According to the word processing system used in this office, this document, exclusive of the sections excluded by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1), contains 5,272 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Century Schoolbook.


Dated: February 28, 2022          */s/ Morgan A. Costello*
                                  MORGAN A. COSTELLO
                                  *Assistant Attorney General*
                                  New York State
                                   Office of the Attorney General
                                  The Capitol
                                  Albany, NY 12224
                                  (518) 776-2392
                                  morgan.costello@ag.ny.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Corrected Brief of the States of New York, Delaware, and New Jersey, the Commonwealth of Massachusetts, and the City of New York as Amici Curiae in Support of Respondents was filed on February 28, 2022 using the Court's CM/ECF system, and that, therefore, service was accomplished upon counsel of record by the Court's system.

Dated: February 28, 2022

/s/ *Morgan A. Costello*
MORGAN A. COSTELLO
*Assistant Attorney General*
New York State
 Office of the Attorney General
The Capitol
Albany, NY 12224
(518) 776-2392
morgan.costello@ag.ny.gov

# STATUTORY AND REGULATORY ADDENDUM

# TABLE OF CONTENTS

**Federal Statutes**

42 USCS § 7408..........................................................ADD-001

42 USCS § 7604..........................................................ADD-006

**State Regulations**

6 NYCRR Subpart 227-3, Ozone Season Oxides
  of Nitrogen (NOx) Emission Limits for Simple
  Cycle and Regenerative Combustion Turbines,
  Revised Regulatory Impact Statement..........................ADD-010

## 42 USCS § 7408

Current through Public Law 117-80, approved December 27, 2021.

*United States Code Service > TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 162) > CHAPTER 85. AIR POLLUTION PREVENTION AND CONTROL (§§ 7401 — 7675) > PROGRAMS AND ACTIVITIES (§§ 7401 — 7515) > AIR QUALITY AND EMISSION LIMITATIONS (§§ 7401 — 7431)*

## § 7408. Air quality criteria and control techniques

(a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants.

(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after the date of enactment of the Clean Air Amendments of 1970 [enacted Dec. 31, 1970] publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

(A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

(C) for which air quality criteria had not been issued before the date of enactment of the Clean Air Amendments of 1970 [enacted Dec. 31, 1970], but for which he plans to issue air quality criteria under this section.

(2) The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on—

(A) those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant:

(B) the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

(C) any known or anticipated adverse effects on welfare.

**ADD-001**

42 USCS § 7408

**(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership.**

(1) Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

(2) In order to assist in the development of information on pollution control techniques, the Administrator may establish a standing consulting committee for each air pollutant included in a list published pursuant to subsection (a)(1), which shall be comprised of technically qualified individuals representative of State and local governments, industry, and the academic community. Each such committee shall submit, as appropriate, to the Administrator information related to that required by paragraph (1).

**(c) Review, modification, and reissuance of criteria or information.** The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this section. Not later than six months after the date of the enactment of the Clean Air Act Amendments of 1977 [enacted Aug. 7, 1977], the Administrator shall revise and reissue criteria relating to concentrations of $NO_2$ over such period (not more than three hours) as he deems appropriate. Such criteria shall include a discussion of nitric and nitrous acids, nitrites, nitrates, nitrosamines, and other carcinogenic and potentially carcinogenic derivatives of oxides of nitrogen.

**(d) Publication in Federal Register; availability of copies for general public.** The issuance of air quality criteria and information on air pollution control techniques shall be announced in the Federal Register and copies shall be made available to the general public.

**(e) Transportation planning and guidelines.** The Administrator shall, after consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, and with State and local officials, within nine months after enactment of the Clean Air Act Amendments of 1989 and periodically thereafter as necessary to maintain a continuous transportation-air quality planning process, update the June 1978 Transportation-Air Quality Planning Guidelines and publish guidance on the development and implementation of transportation and other measures necessary to demonstrate and maintain attainment of national ambient air quality standards. Such guidelines shall include information on—

(1) methods to identify and evaluate alternative planning and control activities;

**ADD-002**

42 USCS § 7408

(2) methods of reviewing plans on a regular basis as conditions change or new information is presented;

(3) identification of funds and other resources necessary to implement the plan, including interagency agreements on providing such funds and resources;

(4) methods to assure participation by the public in all phases of the planning process; and

(5) such other methods as the Administrator determines necessary to carry out a continuous planning process.

(f) Information regarding processes, procedures, and methods to reduce or control pollutants in transportation; reduction of mobile source related pollutants; reduction of impact on public health.

(1) The Administrator shall publish and make available to appropriate Federal, State, and local environmental and transportation agencies not later than one year after enactment of the Clean Air Act Amendments of 1990 [enacted Nov. 15, 1990], and from time to time thereafter—

(A) information prepared, as appropriate, in consultation with the Secretary of Transportation, and after providing public notice and opportunity for comment, regarding the formulation and emission reduction potential of transportation control measures related to criteria pollutants and their precursors, including, but not limited to—

(i) programs for improved public transit;

(ii) restriction of certain roads or lanes to, or construction of such roads or lanes for use by, passenger buses or high occupancy vehicles;

(iii) employer-based transportation management plans, including incentives;

(iv) trip-reduction ordinances;

(v) traffic flow improvement programs that achieve emission reductions;

(vi) fringe and transportation corridor parking facilities serving multiple occupancy vehicle programs or transit service;

(vii) programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use;

(viii) programs for the provision of all forms of high-occupancy, shared-ride services;

(ix) programs to limit portions of road surfaces or certain sections of the metropolitan area to the use of non-motorized vehicles or pedestrian use, both as to time and place;

(x) programs for secure bicycle storage facilities and other facilities, including bicycle lanes, for the convenience and protection of bicyclists, in both public and private areas;

(xi) programs to control extended idling of vehicles;

**ADD-003**

42 USCS § 7408

(xii)  programs to reduce motor vehicle emissions, consistent with title II [42 USCS §§ 7521 et seq.], which are caused by extreme cold start conditions;

(xiii)  employer-sponsored programs to permit flexible work schedules;

(xiv)  programs and ordinances to facilitate non-automobile travel, provision and utilization of mass transit, and to generally reduce the need for single-occupant vehicle travel, as part of transportation planning and development efforts of a locality, including programs and ordinances applicable to new shopping centers, special events, and other centers of vehicle activity;

(xv)  programs for new construction and major reconstructions of paths, tracks or areas solely for the use by pedestrian or other non-motorized means of transportation when economically feasible and in the public interest. For purposes of this clause, the Administrator shall also consult with the Secretary of the Interior; and

(xvi)  program to encourage the voluntary removal from use and the marketplace of pre-1980 model year light duty vehicles and pre-1980 model light duty trucks.[;]

(B)  information on additional methods or strategies that will contribute to the reduction of mobile source related pollutants during periods in which any primary ambient air quality standard will be exceeded and during episodes for which an air pollution alert, warning, or emergency has been declared;

(C)  information on other measures which may be employed to reduce the impact on public health or protect the health of sensitive or susceptible individuals or groups; and

(D)  information on the extent to which any process, procedure, or method to reduce or control such air pollutant may cause an increase in the emissions or formation of any other pollutant.

(2)  In publishing such information the Administrator shall also include an assessment of—

(A)  the relative effectiveness of such processes, procedures, and methods;

(B)  the potential effect of such processes, procedures, and methods on transportation systems and the provision of transportation services; and

(C)  the environmental, energy, and economic impact of such processes, procedures, and methods.

(g) Assessment of risks to ecosystems.  The Administrator may assess the risks to ecosystems from exposure to criteria air pollutants (as identified by the Administrator in the Administrator's sole discretion).

(h) RACT/BACT/LAER clearinghouse.  The Administrator shall make information regarding emission control technology available to the States and to the general public through a central database. Such information shall include all control technology information received pursuant to State plan provisions requiring permits for sources, including operating permits for existing sources.

**ADD-004**

42 USCS § 7408

## History

HISTORY:

July 14, 1955, ch 360, Title I, Part A, § 108, as added Dec. 31, 1970, P. L. 91-604, § 4(a), 84 Stat. 1678; Aug. 7, 1977, P. L. 95-95, Title I, §§ 104, 105, Title IV, § 401(a), 91 Stat. 689, 790; Nov. 15, 1990, P. L. 101-549, Title I, § 108(a)-(c), (o), 111, 104 Stat. 2465, 2469, 2470; Nov. 10, 1998, P. L. 105-362, Title XV, § 1501(b), 112 Stat. 3294.

United States Code Service

Copyright © 2022 Matthew Bender & Company, Inc.

a member of the LexisNexis Group (TM) All rights reserved.

End of Document

**ADD-005**

## 42 USCS § 7604

Current through Public Law 117-80, approved December 27, 2021.

*United States Code Service > TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 162) > CHAPTER 85. AIR POLLUTION PREVENTION AND CONTROL (§§ 7401 — 7675) > GENERAL PROVISIONS (§§ 7601 — 7628)*

## § 7604. Citizen suits

(a) Authority to bring civil action; jurisdiction.   Except as provided in subsection (b), any person may commence a civil action on his own behalf—

(1)  against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(2)  against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator, or

(3)  against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of title I [42 USCS §§ 7470 et seq.] (relating to significant deterioration of air quality) or part D of title I [42 USCS §§ 7501 et seq.] (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 307(b) [42 USCS § 7607(b)] which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 307(b) [42 USCS § 7607(b)]. In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) shall be provided 180 days before commencing such action.

(b) Notice.   No action may be commenced—

**ADD-006**

42 USCS § 7604

(1) under subsection (a)(1)—

  (A)  prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

  (B)  if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.[, or]

(2)  under subsection (a)(2) prior to 60 days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 112(i)(3)(A) or (f)(4) [42 USCS § 7412(i)(3)(A) or (f)(4)] or an order issued by the Administrator pursuant to section 113(a) [42 USCS § 7413(a)]. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

(c) Venue; intervention by Administrator; service of complaint; consent judgment.

  (1)  Any action respecting a violation by a stationary source of an emission standard or limitation or an order respecting such standard or limitation may be brought only in the judicial district in which such source is located.

  (2)  In any action under this section, the Administrator, if not a party, may intervene as a matter of right at any time in the proceeding. A judgment in an action under this section to which the United States is not a party shall not, however, have any binding effect upon the United States.

  (3)  Whenever any action is brought under this section the plaintiff shall serve a copy of the complaint on the Attorney General of the United States and on the Administrator. No consent judgment shall be entered in an action brought under this section in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator during which time the Government may submit its comments on the proposed consent judgment to the court and parties or may intervene as a matter of right.

(d) Award of costs; security.  The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, wherever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

(e) Nonrestriction of other rights.  Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency). Nothing in

**ADD-007**

42 USCS § 7604

this section or in any other law of the United States shall be construed to prohibit, exclude, or restrict any State, local, or interstate authority from—

(1) bringing any enforcement action or obtaining any judicial remedy or sanction in any State or local court, or

(2) bringing any administrative enforcement action or obtaining any administrative remedy or sanction in any State or local administrative agency, department or instrumentality,

against the United States, any department, agency, or instrumentality thereof, or any officer, agent, or employee thereof under State or local law respecting control and abatement of air pollution. For provisions requiring compliance by the United States, departments, agencies, instrumentalities, officers, agents, and employees in the same manner as nongovernmental entities, see section 118 [42 USCS § 7418].

(f) "Emission standard or limitation under this Act" defined.   For purposes of this section, the term "emission standard or limitation under this Act" means—

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive, [or]

(3) any condition or requirement of a permit under part C of title I [42 USCS §§ 7470 et seq.] (relating to significant deterioration of air quality) or part D of title I [42 USCS §§ 7501 et seq.] (relating to nonattainment),[,] section 119 [42 USCS § 7419] (relating to primary nonferrous smelter orders), any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 211(e) and (f) [42 USCS § 7545(e), (f)] (relating to fuels and fuel additives), section 169A [42 USCS § 7491] (relating to visibility protection), any condition or requirement under Title VI [42 USCS §§ 7671 et seq.] (relating to ozone protection), or any requirement under section 111 or 112 [42 USCS §§ 7411, 7412] (without regard to whether such requirement is expressed as an emission standard or otherwise);[,] or

(4) any other standard, limitation, or schedule established under any permit issued pursuant to title V [42 USCS §§ 7661 et seq.] or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations.[,]

which is in effect under this Act (including a requirement applicable by reason of section 118 [42 USCS § 7418]) or under an applicable implementation plan.

(g) Penalty fund.

(1) Penalties received under subsection (a) shall be deposited in a special fund in the United States Treasury for licensing and other services. Amounts in such fund are authorized to be appropriated and shall remain available until expended, for use by the Administrator to finance air compliance and

42 USCS § 7604

enforcement activities. The Administrator shall annually report to the Congress about the sums deposited into the fund, the sources thereof, and the actual and proposed uses thereof.

(2) Notwithstanding paragraph (1) the court in any action under this subsection [section] to apply civil penalties shall have discretion to order that such civil penalties, in lieu of being deposited in the fund referred to in paragraph (1), be used in beneficial mitigation projects which are consistent with this Act and enhance the public health or the environment. The court shall obtain the view of the Administrator in exercising such discretion and selecting any such projects. The amount of any such payment in any such action shall not exceed $100,000.

## History

HISTORY:

July 14, 1955, ch 360, Title III, § 304, as added Dec. 31, 1970, P. L. 91-604, § 12(a), 84 Stat. 1706; Aug. 7, 1977, P. L. 95-95, Title III, § 303(a)–(c), 91 Stat. 771; Nov. 16, 1977, P. L. 95-190, § 14(a)(77), (78), 91 Stat. 1404; Nov. 15, 1990, P. L. 101-549, Title III, § 302(f), Title VII, § 707(a)-(g) 104 Stat. 2574, 2682.

United States Code Service
Copyright © 2022 Matthew Bender & Company, Inc.
a member of the LexisNexis Group (TM) All rights reserved.

End of Document

6 NYCRR Subpart 227-3, Ozone Season Oxides of Nitrogen (NOx) Emission Limits for Simple Cycle and

Regenerative Combustion Turbines

Revised Regulatory Impact Statement


INTRODUCTION

The New York State Department of Environmental Conservation (DEC) is proposing 6 NYCRR Subpart

227-3, "Ozone Season Oxides of Nitrogen (NOx) Emission Limits for Simple Cycle and Regenerative

Combustion Turbines." The primary goal of this proposal is to lower allowable $NO_x$ emissions from simple

cycle and regenerative combustion turbines during the ozone season. The lower emissions from these sources

will help to address Clean Air Act (CAA) requirements, including ozone nonattainment, and protect the health

of New York State residents. This proposal is only applicable to simple cycle and regenerative combustion

turbines. This is not a mandate on local governments. It applies to any entity that owns or operates a subject

source.


STATUTORY AUTHORITY

The statutory authority for the promulgation of Subpart 227-3 is found in the New York State

Environmental Conservation Law (ECL), Sections 1-0101, 3-0301, 19-0103, 19-0105, 19-0301, 19-0303, 19-

0305, 19-0311, 71-2103 and 71-2105.

ECL Section 1-0101. This Section declares it to be the policy of the state to conserve, improve

and protect its natural resources and environment and control air pollution in order to enhance the

health, safety and welfare of the people of the State and their overall economic and social well-being.

Section 1-0101 further expresses, among other things, that it is the policy of the State to coordinate the

State's environmental plans, functions, powers and programs with those of the federal government and

other regions and manage air resources so that the State may fulfill its responsibility as trustee of the

environment for present and future generations. This Section also provides that it is the policy of the State to foster, promote, create and maintain conditions by which man and nature can thrive in harmony by providing that care is taken for air resources that are shared with other states.

ECL Section 3-0301. This Section empowers the Department to coordinate and develop programs to carry out the environmental policy of New York State set forth in section 1-0101. Section 3-0301 specifically empowers the Department to: provide for the prevention and abatement of air pollution; cooperate with officials and representatives of the federal government, other states and interstate agencies regarding problems affecting the environment of New York State; encourage and undertake scientific investigation and research on the ecological process, pollution prevention and abatement, and other areas essential to understanding and achievement of the environmental policy set forth in section 1-0101; monitor the environment to afford more effective and efficient control practices; identify changes in ecological systems and to warn of emergency conditions; enter into contracts with any person to do all things necessary or convenient to carry out the functions, powers and duties of the Department; and adopt such regulations as may be necessary, convenient or desirable to effectuate the environmental policy of the State.

ECL Section 19-0103. This Section declares that it is the policy of New York State to maintain a reasonable degree of purity of air resources. In carrying out such policy, the Department is required to balance public health and welfare, the industrial development of the State, propagation and protection of flora and fauna, and the protection of personal property and other resources. To that end, the Department is required to use all available practical and reasonable methods to prevent and control air pollution in the State.

ADD-011

ECL Section 19-0105. This Section declares that it is the purpose of Article 19 of the ECL to safeguard the air resources of the State under a program which is consistent with the policy expressed in Section 19-0103 and in accordance with other provisions of Article 19.

ECL Section 19-0301. This Section declares that the Department has the power to promulgate regulations for preventing, controlling or prohibiting air pollution, and shall include in such regulations provisions prescribing the degree of air pollution that may be permitted and the extent to which air contaminants may be emitted to the air by any source in any area of the State.

ECL Section 19-0303. This Section provides that the terms of any air pollution control regulation promulgated by the Department may differentiate between particular types and conditions of air pollution and air contamination sources. Section 19-0303 also provides that the Department, in adopting any regulation which contains a requirement that is more stringent than the CAA or its implementing regulations, must include in the Regulatory Impact Statement (RIS), an evaluation of the cost-effectiveness of the proposed regulation in comparison to the cost-effectiveness of reasonably available alternatives and a review of the reasonably available alternative measures along with an explanation of the reasons for rejecting such alternatives.

ECL Section 19-0305. This Section authorizes the Department to enforce the codes, rules and regulations established in accordance with Article 19. Section 19-0305 also empowers the Department to conduct or cause to be conducted studies and research with respect to air pollution control, abatement or prevention.

ECL Section 19-0311. This Section directs the Department to establish an operating permit program for sources subject to Title V of the CAA (Title V). Section 19-0311 specifically requires that complete permit applications must include, among other things, compliance plans, schedules of compliance, and a compliance certification. This Section further expresses that any permits issued must

include, among other things, terms setting emissions limitations or standards, terms for detailed

monitoring, record keeping and reporting, and terms allowing Department inspection, entry, and

monitoring to assure compliance with Sections 71-2103 and 71-2105 and the terms and conditions of the

permit.

ECL Sections 71-2103 and 71-2105. These sections set forth the civil and criminal penalty

structures for violations of Article 19.


LEGISLATIVE OBJECTIVES

Article 19 of the ECL was enacted to safeguard the air resources of New York from pollution and ensure

the protection of the public health and welfare, the natural resources of the State, physical property, and

integrating industrial development with sound environmental practices. The policy of the State is to require the

use of all available, practical and reasonable methods to prevent and control air pollution in New York. To

facilitate this policy objective, the Legislature granted specific powers and duties to the Department, including

the power to adopt and promulgate regulations for preventing, controlling and prohibiting air pollution. The

provisions cited above clearly provide the Department with the authority to create this regulation.


NEEDS AND BENEFITS

In March of 2008, the United States Environmental Protection Agency (EPA) lowered the eight-hour

ozone National Ambient Air Quality Standard (NAAQS) from 0.08 parts per million (ppm) to 0.075 ppm.[1]

Subsequently, on October 1, 2015, the EPA signed a rule that lowered this standard to 0.070 ppm.[2]  Ozone

---

[1] 73 FR 16436 (March 27, 2008), codified at 40 CFR section 50.15. Attainment of the 2008 ozone NAAQS is determined when the fourth highest daily maximum 8-hour average ambient air quality ozone concentration, averaged over three year, is less than or equal to 0.075 ppm.
[2] 80 FR 65292 (October 26, 2015).

ADD-013

NAAQS attainment status is demonstrated by measurements recorded from a monitoring network set up across the United States. The ozone design value is calculated as the 4th highest daily maximum eight-hour ozone concentration, averaged over three years.[3]

EPA designated the New York-Northern New Jersey-Long Island, Connecticut metropolitan area (New York metropolitan area, or NYMA) as a "marginal" nonattainment area for the 2008 ozone NAAQS effective July 20, 2012. The NYMA failed to attain the NAAQS by the marginal attainment deadline of July 20, 2015, and was, therefore, reclassified to "moderate" nonattainment effective June 3, 2016. With a moderate classification, New York was required to submit a State Implementation Plan (SIP) revision that demonstrated how the NYMA would attain the 2008 NAAQS by July 20, 2018 (based on monitored air quality data from 2015-2017). DEC submitted a SIP on November 10, 2017 that demonstrated that even with emissions reductions nearly double the mandated three percent per year reduction requirement, based on preliminary 2017 design values and projection modeling, the area would fail to meet its moderate attainment deadline. Certified 2017 monitoring later confirmed this. As part of the SIP submission DEC requested a reclassification to serious nonattainment for the 2008 NAAQS, that carries an attainment deadline of July 20, 2021 (based on monitored air quality data from 2018-2020). On August 23, 2019 EPA reclassified the NYMA to "serious" nonattainment.[4] Additionally, the area was designated "moderate" nonattainment for the 2015 ozone NAAQS effective August 3, 2018.[5]

The current design value for the NYMA ozone nonattainment area is 0.082 ppm based upon monitors in Westport and Stratford, Connecticut which are located in the shared multi-state nonattainment area. In addition, design values within New York State reached 0.075 ppm at multiple monitors. This demonstrates that despite DEC's past emission reduction efforts and calls for EPA to address the interstate transport of ozone, the NYMA

---

[3] Code of Federal Regulations, Part 50 Appendix I.
[4] 84 FR 44238 (August 23, 2019).
[5] 83 FR 25776 (June 4, 2018).

remains in nonattainment of the 2008 and 2015 NAAQS. More in-state reductions – particularly on the high-electric demand days that are conducive to ozone formation – will assist the area with attaining these standards.

Simple cycle and regenerative combustion turbines (SCCTs) sometimes referred to as peaking units, run to meet electric load during periods of peak electricity demand. They typically run on hot summer days when there is a higher demand for air conditioning and when there is a strong likelihood of high ozone readings. Many peaking units in New York have very high $NO_x$ emission rates, are inefficient and are approaching 50 years of age. It is difficult to install after-market controls on most of these units because of their age and site limitations.

Older SCCTs have adverse impacts on NYMA air quality and make it difficult, if not impossible, for New York to meet air quality goals and CAA requirements when coupled with ozone transport. SCCTs are generally located in communities of low to moderate income that are populated predominantly by people of color. The emissions generated by SCCTs can have both regional (ozone) and local nitrogen dioxide impacts. These older sources emit significantly more $NO_x$ than new, efficient modern SCCTs. The emissions from these units typically occur during high ozone days and are concentrated in the NYMA which, as described above, does not attain the 2008 or 2015 ozone NAAQS.

This rulemaking proposes to lower allowable emission rates for SCCTs during the ozone season with the intention to lower $NO_x$ emissions from these sources, especially on high ozone days. To better understand the impact of SCCTs on the ambient air quality, DEC used the Community Multiscale Air Quality Modeling (CMAQ) system to model one high ozone day.[6] The high ozone day modeled was July 23, 2011 and the results demonstrated that old SCCTs located in New York State contributed 0.0048 ppm to downwind monitors that

---

[6] CMAQ is an active open-source development project of the U.S. EPA that consists of a suite of programs for conducting air quality model simulations. CMAQ combines current knowledge in atmospheric science and air quality modeling, multi-processor computing techniques, and an open-source framework to deliver fast, technically sound estimates of ozone, particulates, toxics and acid deposition.

currently show nonattainment. With a protective ozone NAAQS, set at a level of 0.070 ppm, it is clear that these sources alone have the ability and potential to significantly impact attainment of the ozone NAAQS.

Section 110(a)(2) of the CAA states that SIPs must contain adequate provisions to prohibit emissions from sources within a state that will contribute significantly to nonattainment in another state. In the preamble to the Cross-State Air Pollution Rule, even though New York has implemented some of the most restrictive ozone control programs in the nation, EPA estimated that New York's largest contribution to a monitor showing nonattainment was 0.0185 ppm.[7]  In the Technical Support Document for the Transport Rule,[8] EPA defined one percent of the NAAQS as a significant contribution (i.e., 0.0007 ppm for the 2015 ozone NAAQS).  Taking into account that the design value of the NYMA nonattainment monitor is 0.008 ppm above the 2008 ozone NAAQS and 0.013 ppm above the 2015 ozone NAAQS, it is clear that emissions reductions are necessary.  These control programs will assist New York in meeting CAA SIP obligations as well as the 2008 and 2015 ozone NAAQS, for which the New York-Northern New Jersey-Long Island area is in nonattainment.  New York significantly contributes to nonattainment monitors in the Connecticut portion of this nonattainment area.  Currently, attainment must be reached by June 20, 2021 for the 2008 ozone NAAQS and August 3, 2024 for the 2015 ozone NAAQS.  DEC is currently working on a suite of regulations, both new and revised rules, in order to further reduce New York's impact on downwind ozone levels

Because high ozone days significantly impact human health in the NYMA and because older SCCTs significantly contribute on these days, DEC assessed the 99 high ozone days between 2011 and 2017.  An analysis of the $NO_x$ emission rates and total emissions from New York State SCCTs on these days gives a better picture of how these units impact air quality during this sensitive time.

| | $NO_x$ (tons) | Heat Input (MMBtu) | Gross Load (MWh) |
|---|---|---|---|
| Pre-1986 SCCT* | 1,849 | 7,193,633 | 580,109 |

---

[7] FR Vol 81. Number 207, October 26, 2016.  Pages 74504-74649.
[8] EPA-HQ-OAR-2009-0491, 2010, Technical Support Document (TSD) for the Transport Rule.

Page 7 of 22

**ADD-016**

| Post-1986 SCCT* | 73 | 6,908,887 | 1,040,831 |
|---|---|---|---|
| *Values are the sum of high ozone days 2011 - 2017 | | | |

Table 1:  NOx emissions from older and newer New York SCCTs.[9]

As demonstrated in Table 1, on high ozone days newer SCCTs produced 64 percent of the electricity generated from SCCTs while emitting only 4 percent of NOx emissions from these sources.[10]  It is also well demonstrated that new SCCTs, installed since the late 1980's can meet NOx emission rates lower than those proposed here (less than 25 ppmvd).[11]

A similarly sized and newer SCCT will emit significantly lower amounts of $NO_x$ because the amount of $NO_x$ emitted per heat input (lb NOx/MMBtu) or generation output (lb NOx/MWh) is lower.  The emission rate data assessment for New York State SCCTs from 2011 through 2017 on high ozone days is presented in Table 2.

| | Pre-1986 (lb/MMBtu) | Post-1986 (lb/MMBtu) | Pre-1986 (lb/MWHr) | Post-1986 (lb/MWHr) |
|---|---|---|---|---|
| **2011 NOx Rate*** | 0.457 | 0.026 | 6.406 | 0.231 |
| **2012 NOx Rate*** | 0.458 | 0.020 | 6.590 | 0.174 |
| **2013 NOx Rate*** | 0.460 | 0.011 | 6.012 | 0.102 |
| **2014 NOx Rate*** | 0.421 | 0.010 | 6.195 | 0.089 |
| **2015 NOx Rate*** | 0.431 | 0.011 | 6.890 | 0.110 |
| **2016 NOx Rate*** | 0.401 | 0.009 | 5.982 | 0.096 |
| **2017 NOx Rate*** | 0.438 | 0.013 | 6.579 | 0.127 |
| **\*Rates are for high ozone days** | | | | |

Table 2: NOx emission rates from older and newer SCCT on high ozone days.[12]

If the older (pre-1986) sources were replaced and operated similarly to New York's newer (post-1986) sources, the total emissions from those older sources on the 99 high ozone days assessed would drop from the reported 1,849 tons of NOx to between 40 and 60 tons depending on efficiency.  This would result in an approximate 1,800-ton reduction of $NO_x$ emissions on those 99 high ozone days or an average of approximately

---

[9] EPA Air Markets Program Data.  https://ampd.epa.gov/ampd/.
[10] Percentages calculated from EPA Air Markets Program Data for days which exceeded the ozone NAAQS. https://ampd.epa.gov/ampd/.
[11] "Gas Turbines: A Handbook of Land, Sea and Air Applications" by Claire Soares, publisher Butterworth Heinemann, BH.
[12] EPA Air Markets Program Data.  https://ampd.epa.gov/ampd/.

ADD-017

18 tons of NOx per high ozone day based on 2011-2017 actual use and emissions data. A reduction of 18 tons of $NO_x$ emissions on an ozone season day would represent a reduction of over 10 percent of NYMA NOx emissions from the electricity generation sector and an overall reduction of 3.5 percent from all sources.[13] This represents a significant decrease in $NO_x$ emissions that would likely lead to reduced ozone formation and lower monitored ozone values downwind.

$NO_x$ emission limits for SCCTs have not been updated in New York regulations since 1994. In addition, DEC's current regulation that addresses these sources, 6 NYCRR Part 227-2, includes a compliance option that allows impacted facilities to average emission rates from all of their sources, including turbines and boilers. By utilizing this provision, a facility may average its lower emitting, well controlled, sources with higher emitting sources to calculate an average rate that would not be higher than the total allowable NOx limits from those sources combined on a daily basis. While this option has offered compliance flexibility to impacted sources, the result remains that New York sources are significantly impacting local air quality and downwind monitors, so in this proposal this option will be restricted to allowing only averaging with other SCCTs or new renewable generation and storage.

An annual $NO_x$ mass total will not appropriately characterize the impact of SCCTs because they only run when called upon during periods of peak energy demand. This demand often correlates to weather which is, by nature, unpredictable. If totaled on an annual basis, these sources may show lower total emissions than other sources but when DEC evaluated the days when New York residents are impacted by high ozone levels, SCCTs tend to have the greatest emissions contributions of all electric generating units (EGUs) on a mass basis.

Ozone exceedances are a daily health concern. Data from ozone monitoring stations typically show 10-20 ozone exceedance days per year in the NYMA, meaning that the ozone level is above what is considered protective of human health. SCCTs have historically run on these high ozone days. As other types of EGUs

---

[13] "New York State implementation plan for the 2008 ozone national ambient air quality standards." http://www.dec.ny.gov/chemical/110727.html.

ADD-018

have been controlled through regulation, older SCCTs have emitted a much larger portion of $NO_x$ emissions on high ozone days. In fact, on these high ozone days old SCCTs contribute as much as 94 percent of NOx emissions while providing as little as 36 percent of the gross load.[14]

Electric Grid Reliability:

New York City contains the oldest electrical grid in the United States.[15] The age and the congestion of the grid combined with the population density in the largest city in the United States creates a system where electricity reliability is a serious concern.

The New York State Reliability Council, L.L.C. (NYSRC) is a not-for-profit entity whose mission is to promote and preserve the reliability of electric service on the New York State Power System by developing, maintaining, and, updating the Reliability Rules which shall be complied with by the New York Independent System Operator (NYISO) and all entities engaging in electric transmission, ancillary services, energy and power transactions on the New York State Power System. The NYSRC has set a reliability requirement for minimum capacity meeting a one day in ten years (0.1 day per year) Loss of Load Expectation (LOLE).[16]

LOLE estimates are included in the NYISO's Reliability Needs Assessment (RNA) that is conducted every two years. The 2018 RNA assessed the resource adequacy and transmission security of the New York area from year 2019 through 2028, the study period of that RNA. The final 2018 RNA concludes that there are no transmission security violations and no resource adequacy violations for the 2019-2028 period.[17] This assessment includes the shut-down of the Indian Point Energy Center and all other changes submitted to the NYISO. This demonstrates that under current conditions, there do not appear to be any reliability issues even

---

[14] Percentages calculated from EPA Air Markets Program Data for days that exceeded the ozone NAAQS. https://ampd.epa.gov/ampd/.
[15] http://www.edisontechcenter.org/.
[16] New York State Reliability Council Reliability Rule A-R1, available at
http://www.nysrc.org/pdf/Reliability%20Rules%20Manuals/RRC%20Manual%20V43%20Final[4070].pdf.
[17] The draft 2018 RNA was posted for NYISO Operating Committee approval on September 12, 2018 which voted unanimously to concur in the draft RNA and to recommend that the Board of Directors approve the RNA.

with a large power producer (Indian Point) shutting down. This proposed rule was not considered during the 2018 RNA.

DEC worked with the NYISO, New York State Department of Public Service (DPS) and New York State Energy Research and Development Authority (NYSERDA) to develop a proposal that considers reliability of the electric grid. In addition, DEC reached out to impacted stakeholders with pre-proposal regulatory options and solicited feedback. The pre-proposal stakeholder effort resulted in a phased-in approach to allow impacted sources time to comply.

When an electricity generating unit plans to shut down, a notice is submitted to the NYISO which then conducts an analysis of the reliability impacts (if any) that could result. If such an analysis identifies a reliability need due to the shutdown of an SCCT, provisions in the proposed rule (Section 227-3.6 of Subpart 227-3) could be triggered to allow an SCCT to operate up to four additional years while a permanent solution to the reliability need is implemented.

To adequately assess future reliability needs associated with this rule making, DEC is proposing that affected facilities submit compliance plans by March 2, 2020 so that the NYISO may include the compliance solutions selected by facilities in its 2020 RNA. The results of the 2020 RNA will identify if there are reliability concerns and where new market-based solutions may be required.


Proposal:

To address $NO_x$ emissions on high ozone days from SCCTs, DEC is proposing to develop a new regulation, Subpart 227-3, that will apply to SCCTs with a nameplate capacity of 15 megawatts or greater that inject power into the transmission or distribution systems. This regulation will phase in lower emission limits for NOx and will limit the current averaging provision found in Subpart 227-2 during the ozone season. The sources subject to this proposal will continue to be subject to the requirements of Subpart 227-2 year-round. This rulemaking proposes additional requirements for SCCTs during the ozone season while allowing more flexibility outside of

Page 11 of 22

the ozone season. Black start resources, defined in paragraph 227-3.2(b)(1) of Subpart 227-3 as electric generating units used to bring a facility from shutdown to operational without reliance on external supplies or the electrical system, will not be subject to Subpart 227-3. The requirements of the proposed rule are presented in the following paragraphs.

Control Requirements:

The NOx emission limits for SCCTs will be phased in as shown in Tables 3 and 4. These limits may be met by averaging only SCCTs on a facility-wide basis over a 24-hour period.

| By May 1, 2023 | |
| --- | --- |
| | NO$_x$ Emission Limit (ppmvd[18]) |
| All SCCTs | 100 |

Table 3: NOx emission limits for SCCTs beginning 5/1/2023

| By May 1, 2025 | |
| --- | --- |
| Fuel Type | NO$_x$ Emission Limit (ppmvd) |
| Gaseous fuels | 25 |
| Distillate oil or other liquid fuel | 42 |

Table 4: NOx emission limits for SCCTs beginning 5/1/2025

Also beginning May 1, 2023, SCCTs will only be able to average emissions with other SCCTs at the facility or, if the facility opts to utilize the electric storage and renewable resources compliance option in Section 227-

---

[18] Parts per million on a dry volume basis at fifteen percent oxygen.

ADD-021

3.5, then those SCCTs may average $NO_x$ emissions with approved electricity storage or renewable energy resources during the ozone season. Currently, these sources may average $NO_x$ emissions with other electric generating sources such as boilers. This change to the averaging provision is expected to result in significantly lower emissions for this first phase of the proposal.

Compliance Options:

The proposed rule contains several compliance options that owners and operators may utilize in order to comply with the proposed requirements. The first is to meet the limits as proposed. Owners and operators may also opt to shut down or not run non-compliant SCCTs during the ozone season. If an owner or operator elects to not run an SCCT during the ozone season, this operating restriction must be recorded in the operating permit. Another compliance option offered in this rule allows an owner or operator of an existing source to comply with applicable limits by meeting an average output-based emission limit (that includes renewables and storage) as a daily average emission rate. Currently, SCCTs are regulated on an annual basis, this proposal tightens the requirements to a daily or 24-hour average. The Department researched the 24-hour renewable/storage averaging of this rulemaking to be sure that this was appropriate. One area of research was if storage resources would use older, inefficient and high emitting sources to charge during peak hours. Time of use (TOU) costs of electricity do not support charging storage resources during peak hours during the day and discharging at night. "From June 1 through September 30, electricity during the "off-peak" hours of midnight to 8 AM will cost 1.54 cents per kilowatt/hour (kWh). During the "peak" hours of 8 A.M. to midnight, the rate will soar to 21.80 cents. Rates will be even higher during the "super-peak hours" of 2 to 6 P.M. on summertime weekdays. (During non-summer months, the offpeak rate is unchanged, and the peak rate is 8.07 cents. Customers who are not in the time-of-use program pay roughly 18.00 cents per kWh.)."[19] The Department does not believe that owners of

---

[19] https://www.habitatmag.com/Publication-Content/Legal-Financial/2018/2018-April/Time-of-Use.

affected sources would choose to charge storage resources at 21.80 cents per kWh and then sell that power at 1.54 cents per kWh. This difference in cost does not include any storage loss or invested capital. The Department also researched the possibility of battery storage discharging multiple times per day so that older high emitting sources may run more under the averaging provision. The Department reviewed available data and consulted with the New York State Department of Public Service (DPS) and the New York Energy Research and Development Authority (NYSERDA) with respect to the operation of the SCCTs and what is expected under the averaging option. Based on the information gathered and the newly released Peak Study Analysis[20] developed by NYSERDA and filed by DPS on July 1, 2019, the Department believes that a 24-hour time frame is reasonable. However, this proposal requires data be submitted to the Department annually on the operation of renewable energy and energy storage resources. The Department will monitor how the averaging option is being utilized to ensure that emission reductions are realized. If the Department finds that this option allows for circumvention of the rule, the Department may propose future changes following the requirements of the State Administrative Procedures Act.

Under this option, the storage or renewable energy resource must be under common control with the SCCTs to be included in the averaging calculation. Furthermore, the electric storage or renewable energy resource must service the same community as the SCCTs with which it is averaging. To ensure that the community with higher emitting sources experience the benefits of lower or non-emitting sources, the Department has included requirements under Subpart 227-3.5(b)(2) allowing averaging with lower or non-emitting sources which connect to the same substation or are located within one-half mile of the SCCT.

As noted above, information gathered during the stakeholder process led to the inclusion of an electric system reliability provision in this rulemaking. To address reliability issues identified, the proposal requires a compliance plan to be submitted to DEC by March 2, 2020. In addition, if an SCCT is identified as a reliability

---

[20] NYSDPS website: http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7BFDE2C318-277F-4701-B7D6-C70FCE0C6266%7D.

resource by the NYISO or transmission owner, that SCCT may be given a two-year extension to run while a permanent solution is developed and implemented. This extension may be renewed once for an additional two-year period if the permanent solution is in the process of being permitted or constructed and the SCCT is still considered a reliability needed resource.

COSTS

DEC is proposing to require that each source owner develop a compliance plan to demonstrate how it intends to comply with the proposed standards. The SCCTs installed prior to 1986 are typically not conducive to the addition of retrofit control technology. As a result, DEC expects that most impacted facilities will choose to replace or shutdown the older, non-compliant SCCTs. To estimate replacement costs DEC looked to information provided by the NYISO and Department of Energy's, Energy Information Administration (EIA).

The EIA describes overnight costs for electricity generating facilities as including[21]:

- Civil and structural costs: allowance for site preparation, drainage, installation of underground utilities, structural steel supply, and construction of buildings on the site;

- Mechanical equipment supply and installation: major equipment, including but not limited to, boilers, flue gas desulfurization scrubbers, cooling towers, steam turbine generators, condensers, photovoltaic modules, combustion turbines, and other auxiliary equipment;

- Electrical and instrumentation and control: electrical transformers, switchgear, motor control centers, switchyards, distributed control systems, and other electrical commodities;

- Project indirect costs: engineering, distributable labor and materials, craft labor overtime and incentives, scaffolding costs, construction management start up and commissioning, and contingency fees; and

---

[21] Overnight costs include the costs for the physical power plant assuming it can be built overnight. As a result, interest on loans are not factored into the cost estimates.

**ADD-024**

- Owners costs: development costs, preliminary feasibility and engineering studies, environmental studies and permitting, legal fees, insurance costs, property taxes during construction, and the electrical interconnection costs, including a tie-in to a nearby electrical transmission system.[22]

Table 5 presents the full overnight costs developed by EIA and NYISO for full replacement of an SCCT.

| Source | Overnight Cost ($/kW) | Notes |
|---|---|---|
| EIA | $1,054 - $1,558[23] | Range is specific for the Long Island and New York City area and includes conventional and advanced combustion turbines. |
| NYISO | $1,314 - $1,357[24] | Range is specific for the Long Island and New York City area and represents replacement with a dual fuel peaking turbine. |

Table 5: Estimated range of overnight costs for full replacement of an SCCT

DEC believes that the entire capacity of generation affected by the proposed rule will not need to be replaced. Most SCCTs have a capacity factor of less than 5 percent, meaning that they generate less than 5 percent of the electricity output that they are capable of generating. In addition, with the implementation of several New York State initiatives, including the State's recently announced energy efficiency and energy storage targets, Reforming the Energy Vision and the Clean Energy Standard, demand for these units should continue to decline. There are over 3,400 MW of SCCT capacity listed in the NYISO Gold Book[25] that are older, pre-1986 SCCTs.

---

[22] EIA, Capital Cost Estimates for Utility Scale Electricity Generating Plants, November 2016.
[23] EIA, Capital Cost Estimates for Utility Scale Electricity Generating Plants, November 2016.
[24] NYISO, Demand Curve Model – 2019-2020.xlsm. Retrieved (1/3/2019) from: https://www.nyiso.com/search?time=last-year&sortField=_score&resultsLayout=list&q=Demand%20Curve%20Model%202016.
[25] NYISO, 2017 Load and Capacity Data.

Owners and operators may opt to install after-market emission control devices on sources that are unable to comply. Water injection technology is the after-market technology that a facility owner would likely consider for these older sources. The costs of adding after-market emission control devices varies widely depending on location, operation and land space availability. It has been reported to DEC, anecdotally, that the cost of adding after-market water injection to one of these older sources is approximately two million dollars. Other sources discuss a cost of $10,000 - $15,000 per megawatt,[26] and many of the sources that would be impacted are fifteen to twenty megawatts each. However, this data does not include installation and other associated costs.

Cost of Nonattainment:

This proposal is part of a suite of New York State efforts to bring the NYMA into attainment for ozone, in order to adequately protect human health. In the Regulatory Impact Analysis (RIA) for the 2015 ozone NAAQS, EPA projected a wide array of benefits that would be realized on a national level, excluding California, if ozone attainment is achieved. This includes co-benefits from reduced PM2.5 which both EPA and DEC include because PM2.5 is reduced automatically with NOx controls and there is no additional cost for these reductions. According to the U.S. Census Bureau, New York's nonattainment county population accounts for 14 percent of total United States population[27] excluding California. On a population basis, the benefits to New York State are the prevention of the following annually:

---

[26] The data provided only includes capital cost. "Gas Turbine Combustion." Lefebvre & Ballal. CRC Press, April 26, 2010.
[27] U.S. Census Bureau, "State Population Totals and Components of Change: 2010-2017."
https://www.census.gov/data/tables/2017/demo/popest/state-total.html.

| Attainment Provides Prevention of: | |
|---|---|
| Deaths from effects of ozone | 13 - 22 |
| Deaths from effects of PM2.5 | 31 - 70 |
| Nonfatal heart attacks | 4 - 36 |
| Hospital admissions & emergency room visits | 134 |
| Acute bronchitis events | 48 |
| Upper & lower respiratory symptom events | 1,540 |
| Exacerbated asthma events | 32,200 |
| Missed work & school days | 26,320 |
| Restricted activity days | 86,800 |

Table 6: Summary of Total Number of Annual Ozone and PM-Related Premature Mortalities and Premature Morbidity: 2025 National Benefits (adapted from EPA, 2015 RIA, p. ES-16)

Table 6, which represents a simple population based conservative estimate, demonstrates that there is a serious cost of nonattainment to New York State residents. The NYMA experiences some of the highest ozone levels in the nation outside of California and will greatly benefit from lowered ozone levels.

Cost to the Department:

The authority and responsibility for implementing Subpart 227-3 lies solely with the Department. Each subject facility is required to have a Title V facility permit under 6 NYCRR Subpart 201-6. Permit revisions will be necessary to account for the requirements of Subpart 227-3 and the revised permit conditions will be incorporated into each relevant permit by DEC staff.

Each subject facility will need to submit emissions and possibly generation data. The Department must review and determine the sufficiency of all emissions testing protocols and results that will be submitted by the source owner. The review of the initial compliance testing protocols and compliance test results will require DEC staff time. It is estimated that this rulemaking and ongoing support will require 1.0 full time equivalent (FTE) or $158,333[28] during the first year and 0.5 FTE annually thereafter.

---

[28] Assumptions: Grade 24 pay rate of $97,448 per year and an overhead rate of 62.48 percent. Per: https://www.osc.state.ny.us/agencies/guide/MyWebHelp/#VII/9/9.htm.

LOCAL GOVERNMENT MANDATES

The proposed regulation does not contain a mandate on local governments. Local governments have no additional compliance obligations as compared to other subject entities.

There are two SCCTs that are owned by local governments that are listed in Table 7 below. While these sources will be subject to the requirements of this proposal, they already comply with the lower NOx rates and no changes will be required of the facilities.

| Facility | Local Government |
|---|---|
| Freeport | Village of Freeport |
| SA Carlson | Town of Jamestown |

Table 7: List of Local Government Facilities

PAPERWORK

This proposal will require each affected facility to submit a compliance plan to DEC. The compliance plan will state how each facility plans to comply with the new requirements.

Those facilities required to meet new emission limits will be required to submit permit applications to modify their permits to incorporate the newly applicable requirements by the May 1, 2023 compliance date. If the facility operates under a Title V permit, these changes can be incorporated into the renewal application (Title V permits must be renewed at five-year intervals). If there are no changes caused by the proposed Subpart 227-3 no permit action is required.

Subject facilities that do not use a continuous emissions monitoring system (CEMS) will be required to perform an emissions test to assure compliance with the applicable $NO_x$ emission limits. Every subject facility will be required to submit test protocols and test reports to the Department for approval.

Subject facilities must submit daily emissions data annually and those facilities that opt to comply using the renewable and storage resources compliance option will be required to report hourly MWh input to the grid and hourly MWh charge (for storage) information to the Department.

## DUPLICATION

The proposed Subpart 227-3 does not duplicate or conflict with any other state or federal requirements.

## ALTERNATIVES

### Alternative #1: No Action

Under this alternative, DEC may elect to not address emissions from this sector. Under this scenario, the State would fail to meet its obligations under the CAA to address its significant contribution to nonattainment in downwind areas. Furthermore, as demonstrated throughout this document, these sources have been shown to impact downwind monitors outside of New York. As such, other states can file CAA Section 126 petitions which, if acted upon by EPA, could require controls on these sources within three years. EPA imposed controls may not include the reliability considerations or flexibility options encompassed in this rulemaking.

### Alternative #2: Only lower emission rate limits

DEC may elect to only lower the emission rates on SCCTs without providing for alternative compliance mechanisms. Under this option, sources will have to replace or find another solution more quickly than what is being proposed without regard for system reliability. The simple application of lower emission rates, absent the flexibility being proposed, would ignore the extensive feedback that DEC received during the stakeholder process for this rulemaking and may create electric grid reliability concerns.

FEDERAL STANDARDS

The proposed rule does not exceed any minimum federal standards.

COMPLIANCE SCHEDULE

March 2, 2020:  All impacted sources must submit a compliance plan that must, at minimum, contain:

- Nameplate capacity;

- Ownership;

- A list of each emission source that includes identifying numbers such as facility number, source number and name;

- A schedule outlining how the owner or operator will comply with the requirements set forth in the rule;

- Which emission sources will install controls and what those controls will be; and

- Which emission sources will be replaced or repowered.

May 1, 2023: The first phase of $NO_x$ emission limits will be implemented during the ozone season and SCCTs will be limited to averaging with other SCCTs, storage or renewable energy resources.  The first phase of emission limits will be:

| By May 1, 2023 | |
| --- | --- |
| | $NO_x$ **Emission Limit (ppmvd[29])** |
| All SCCTs | 100 |

Table 8: $NO_x$ emission limits for SCCTs beginning 5/1/2023

---

[29] Parts per million on a dry volume basis at fifteen percent oxygen.

Page 21 of 22

**ADD-030**

May 1, 2025: The second and final phase of $NO_x$ emission limits will be implemented during the ozone season as follows:

| Beginning May 1, 2025 | |
| --- | --- |
| **Fuel Type** | **$NO_x$ Emission Limit (ppmvd)** |
| Gaseous fuels | 25 |
| Distillate oil or other liquid fuel | 42 |

Table 9: $NO_x$ emission limits for SCCTs beginning 5/1/2025

ADD-031